Katrina DeMarte (*Pro Hac Vice*)
DeMarte Law, PLLC
39555 Orchard Hill Place
Suite 600 / PMB 6338
Novi, MI 48375
Tel: 313-509-7047
katrina@demartelaw.com

Jeffrey Alan Paris
State Bar No. 113527
PARIS and PARIS, LLP
11901 Santa Monica Blvd.
Suite 517
Los Angeles, CA 90025
(310) 392-8722 – Telephone
(310) 392-1768 – Telecopy
PandP424@aol.com

Counsel for Defendant
National Credit Systems, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KREJCI,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL CREDIT SYSTEMS, INC., and TRANS UNION LLC,<br><br>Defendants. | CASE NO.:  2:23-cv-06709-MEMF-RAO<br><br>**NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Honorable  Maame Ewusi-Mensah Frimpong<br>Courtroom No. 8B |

**TO THE HONORABLE COURT, PLAINTIFF AND HER ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 17, 2025 at 10:00 a.m., or as soon thereafter as counsel may be heard before the Honorable Maame Ewusi-Mensah Frimpong in Courtroom 8B of the United States District Court for the Central District of California, located at 350 West First Street, Los Angeles, CA, 90012, Courtroom 8B, 8th Floor, Defendant National Credit Systems, Inc. ("NCS"), pursuant to Fed. R. Civ. P. 56 and L.R. 56, respectfully requests this Court enter Summary Judgment in its favor, award its costs incurred herein, and dismiss all of Plaintiff's claims with prejudice. In support, NCS files this Notice of Motion, the Joint Memorandum, the Joint Statement of Uncontroverted Facts and Legal Conclusions, and the Joint Appendix of Exhibits, including all exhibits therein.

As set forth more fully in NCS's Memorandum in Support, Plaintiff lacks Article III Standing to bring any claim before this Court. In addition, Plaintiff fails to establish any substantive violation of the: (a) Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, and (b) California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1, *et seq.* Indeed, there is no evidence that NCS received notice from the Original Creditor in 2021 that the subject account was paid in full. In addition, when NCS received a dispute from Equifax in 2023, NCS immediately investigated the dispute and deleted the reporting after the Original Creditor confirmed that Plaintiff had paid the account balance. Moreover, Plaintiff fails to establish any actual damages in support of her CCRAA claim. Finally, to the extent Plaintiff seeks relief for NCS's alleged conduct that occurred outside the statute of limitations, such relief should be denied.

**The motion is made following a conference of counsel pursuant to L.R. 7-3 which took place on May 29, 2025, and was held between undersigned counsel and Craig Marchiando, Counsel for Plaintiff.**

Dated: June 5, 2025

Respectfully submitted,

*/s/ Katrina DeMarte*

Katrina DeMarte (CO Bar: 43135, MI Bar: P81476; GA Bar: 821011)
DeMarte Law, PLLC
39555 Orchard Hill Place
Suite 600 / PMB 6338
Novi, MI 48375
Tel: 313-509-7047
katrina@demartelaw.com

Jeffrey Alan Paris
State Bar No. 113527
PARIS and PARIS, LLP
11901 Santa Monica Blvd.
Suite 517
Los Angeles, CA 90025
(310) 392-8722 – Telephone
(310) 392-1768 – Telecopy
PandP424@aol.com

*Counsel for Defendant National Credit Systems, Inc.*

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

# **TABLE OF CONTENTS**

I.    DEFENDANT'S INTRODUCTION ...................................................1

II.   PLAINTIFF'S INTRODUCTION ...................................................2

III.  STANDARD OF REVIEW .........................................................5

IV.   DEFENDANT'S STATEMENT OF FACTS.....................................5

V.    PLAINTIFF'S STATEMENT OF FACTS ......................................7

VI.   DEFENDANT'S REPLY STATEMENT OF FACTS ..........................12

VII.  DEFENDANT'S REPLY:  PLAINTIFF'S STATEMENT OF MATERIAL FACTS CONTAINS CONCLUSIONS OF LAW, NOT FACT, AND ARE NOT PROPERLY SUPPORTED BY EVIDENCE ..........................14

VIII. ARGUMENT ......................................................................15

   A.  PLAINTIFF'S ARGUMENT: NCS FAILED TO MEANINGFULLY MEET AND CONFER .................................................................15

   B.  DEFENDANT'S REPLY: NCS SATISFIED ALL OBLIGATIONS TO MEET AND CONFER .................................................................15

   C.  DEFENDANT'S ARGUMENT: PLAINTIFF LACKS ARTICLE III STANDING. ...........16

   D.  PLAINTIFF'S ARGUMENT: PLAINTIFF SUFFERED INJURIES SUFFICIENT TO CONFER ARTICLE III STANDING ...........................................18

   E.  DEFENDANT'S REPLY: PLAINTIFF HAS NOT ESTABLISHED ARTICLE III STANDING. .................................................................22

   F.  DEFENDANT'S ARGUMENT:  PLAINTIFF'S FDCPA CLAIM FAILS BECAUSE NCS DID NOT KNOWINGLY REPORT FALSE INFORMATION OR ATTEMPT TO COLLECT AMOUNTS NOT OWED BY CONTRACT OR LAW.......................................23

   G.  PLAINTIFF'S ARGUMENT: NCS ATTEMPTED TO COLLECT A CONSUMER DEBT UNDER THE FDCPA .................................................................27

   H.  DEFENDANT'S REPLY: PLAINTIFF FAILS TO DISTINGUISH NAROG v. CERTEGY 28

   I.  PLAINTIFF'S ARGUMENT: VIEWING THE EVIDENCE IN THE LIGHT MOST-

FAVORABLE TO PLAINTIFF, NCS HAS NOT PROVEN AS A MATTER OF LAW THAT PLAINTIFF'S FDCPA CLAIM FAILS ........................................................................ 29

    1.   *Plaintiff's Argument: NCS Misstates The Elements of 15 U.S.C. § 1692e(8) and 1692f* ...................................................................................................... 29

    2.   *Defendant's Reply: NCS Properly Stated The Elements of 15 U.S.C. § 1692e(8) and 1692f* ............................................................................................ 30

    3.   *Plaintiff's Argument:  The "Knew or Should Have Known" Issue Under 1692e(8) Is Genuinely Disputed.* ........................................................................ 31

    4.   *Plaintiff's Argument:  Plaintiff Doesn't Claim NCS Made A Misrepresentation To Her Under 1692e(8).* .................................................... 34

    5.   *NCS Violated 15 U.S.C. § 1692f* ............................................................ 35

    6.   *Defendant's Reply: Plaintiff Has Identified No Communications That Satisfy The Elements of 15 U.S.C. § 1692e(8) and 1692f* .................................. 35

J.   DEFENDANT'S ARGUMENT: DEFENDANT DID NOT KNOW OR HAVE REASON TO KNOW THE REPORTED INFORMATION WAS INACCURATE UNDER THE CCRAA CLAIM ........................................................................................................ 35

K.   PLAINTIFF'S ARGUMENT: DEFENDANT KNEW OR SHOULD HAVE KNOWN ITS CREDIT REPORTING WAS INACCURATE UNDER THE CCRAA CLAIM .................... 36

L.   DEFENDANT'S REPLY: DEFENDANT DID NOT HAVE ANY REASON TO KNOW THAT THE ACCOUNT BALANCE WAS $0 UNTIL MAY 2023 ...................................... 38

M.  DEFENDANT'S ARGUMENT: PLAINTIFF CANNOT ESTABLISH ACTUAL DAMAGES UNDER THE CCRAA ........................................................................................ 38

N.   PLAINTIFF'S ARGUMENT: PLAINTIFF HAS ACTUAL DAMAGES UNDER THE CCRAA ....................................................................................................... 41

O.   DEFENDANT'S REPLY: PLAINTIFF HAS NO CREDIBLE EVIDENCE OF ACTUAL DAMAGES UNDER THE CCRAA ............................................................................ 42

P.   DEFENDANT'S ARGUMENT: DEFENDANT'S CONDUCT WAS NOT WILLFUL ...... 43

Q.   PLAINTIFF'S ARGUMENT: WHETHER DEFENDANT'S CONDUCT WAS WILLFUL IS

DISPUTED .................................................................................................. 43

R.   DEFENDANT'S REPLY: THERE IS NO EVIDENCE THAT NCS ACTED WILLFULLY ..

....................................................................................................... 46

S.   DEFENDANT'S ARGUMENT: VIOLATIONS OF THE FDCPA AND CCRAA, IF ANY,

RESULTED FROM A BONA FIDE ERROR AND ARE NOT ACTIONABLE. ......................... 47

T.   PLAINTIFF'S ARGUMENT: NCS HAS NOT PROVEN ITS BONA FIDE ERROR

DEFENSE AS A MATTER OF LAW. ......................................................... 50

    1.   NCS Bases Its Arguments On Information Not Disclosed In Response To

    Interrogatories .................................................................................. 50

    2.   There Are Genuine Issues Of Material Fact As To Bona Fide Error ......... 51

U.   DEFENDANT'S REPLY: NCS'S BONA FIDE ERROR DEFENSE IS WELL-

SUPPORTED BY ITS PROCEDURES AND COMPLETE LACK OF NOTICE ..................... 53

V.   DEFENDANT'S ARGUMENT: PLAINTIFF'S FDCPA AND CCRAA CLAIMS ARE

TIME-BARRED. ........................................................................................ 54

W.   PLAINTIFF'S ARGUMENT: NCS HAS NOT SHOWN THAT PLAINTIFF'S CLAIMS

ARE TIME BARRED ..................................................................................... 55

    1.   NCS Has Waived Any Statute of Limitations Defense ............................. 55

    2.   Plaintiff's Claims Are Not Time-Barred .................................................. 56

X.   DEFENDANT'S REPLY: PLAINTIFF'S CLAIMS ARE TIME BARRED BECAUSE NCS

DID NOT REPORT A NEW TRADELINE 80 SEPARATE TIMES .................................... 59

IX.   **CONCLUSION** ................................................................................**59**

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

## **TABLE OF AUTHORITIES**

**Cases**

*Aargon Agency, Inc. v. O'Laughlin*,

    70 F.4th 1224 (9th Cir. 2023) ........................................................................ 27

*Aetna Life Ins. Co. v. Montgomery*,

    286 F. Supp. 832 (E.D. Mich. 2003) ............................................................. 31

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986) ......................................................................................... 5

*Antich v. Capital Accounts, L.L.C.*,

    No. B313167, 2023 WL 4758493 (Cal. Ct. App. July 26, 2023) ..................... 48

*Anton v. Prospera Hotels, Inc.*,

    No.: CV 19-534-CBM-SHKx, 2019 WL 4266528 (C.D. Cal. July 18, 2019) ... 23

*Arriaga v. Logix Fed. Credit Union*,

    No.: CV 18-9128-CBM-AGR(x), 2021 WL 4459759 (C.D. Cal. May 21, 2021)

    .......................................................................................................................... 42

*Bailey v. Nat'l Credit Sys., Inc.*,

    CIVIL ACTION NO. 1:24-cv-1118-MLB-CMS, 2024 WL 5339308, (N.D. Ga.

    May 16, 2024) .................................................................................................. 24

*Baker v. G.C. Servs. Corp.*,

    677 F.2d 775 (9th Cir. 1982) ........................................................................... 3

*Banga v. First USA, NA*,

    29 F. Supp. 3d 1270 (N.D. Cal. 2014) ............................................................ 38

*Basconcello v. Experian Info. Sols., Inc.*,

    No. 16-cv-06307-PJH, 2017 WL 1046969 (N.D. Cal. Mar. 20, 2017) ............. 40

*Bassett v. ABM Parking Servs.*,

    883 F.3d 776 (9th Cir. 2018) ..................................................................... 16, 21

*Broccuto v. Experian Info. Sols., Inc.*,

    No. 3:07CV782-HEH, 2008 WL 1969222 (E.D. Va. May 6, 2008) ................. 59

*Brown v. Transworld Sys., Inc.*,

    73 F.4th 1030 (9th Cir. 2023) ................................................................. 58

*Burrows v. Experian Info. Sols., Inc.*,

    No. 16-cv-06356-PJH, 2017 WL 1046973 (N.D. Cal. Mar. 20, 2017) .............. 40

*Byrne v. Or. One, Inc.*,

    No. 3:16-cv-01910-SB, 2017 WL 3568412 (D. Or. July 18, 2017) ............ 20, 21

*Cahlin v. Gen. Motors Acceptance Corp.*,

    936 F.2d 1151 (11th Cir. 1991) ............................................................ 44

*Carrera v. Allied Collection Servs., Inc.*, 743 F. Supp. 3d 1210 (D. Nev.

    2024) ........................................................................................... 51

*Carvalho v. Equifax Info. Servs., L.L.C.*,

    629 F.3d 876 (9th Cir. 2010) .............................................................. 36

*Casella v. Equifax Credit Info. Servs.*,

    56 F.3d 469 (2d Cir. 1995) ................................................................. 39

*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986) ........................................................................... 5

*Centuori v. Experian Info. Sols., Inc.*,

    431 F. Supp. 2d 1002 (D. Ariz. 2006) ................................................... 44

*Chambers v. Habitat Co.*,

    68 F. App'x 711 (7th Cir. 2003) .......................................................... 26

Civil Code § 1785.25 ............................................................................ 22

*Clark v. Capital Credit & Collection Servs.*,

    460 F.3d 1162 (9th Cir. 2006) ....................................... 24, 30, 26, 47

*Clark v. Green Tree Servicing L.L.C.*,

    69 F. Supp. 3d 1203 (D. Colo. 2014) ................................................... 59

*Cordoba v. Dillard's, Inc.*,

    419 F.3d 1169 (11th Cir. 2005) ........................................................... 48

*Cruz v. Int'l Collection Corp.*,

673 F.3d 991 (9th Cir. 2012) ................................................................. 29

*Czyzewski v. Jevic Holding Corp.*,

580 U.S. 451 (2017) ............................................................................ 18

*Demarais v. Gurstel Chargo, P.A.*,

869 F.3d 685 (8th Cir. 2017) .......................................................... 20, 19

*Dimovski v. Tolisano & Danforth, L.L.C.*,

2011 WL 1638051 (D. Conn. Apr. 28, 2011) ................................... 47

*Doherty v. Microbilt Corp.*,

No. 2:22-cv-03891-SPG-PVC, 2025 WL 1090401 (C.D. Cal. Mar. 6, 2025) ... 37

*Donohue v. Quick Collect, Inc.*,

592 F.3d 1027 (9th Cir. 2010) ...................................................... 26, 35

*Duarte v. J.P. Morgan Chase Bank*,

2014 WL 12561052 (C.D. Cal. Apr. 7, 2014) ........................... 38-39, 39

*Engelen v. Erin Capital Mgmt., LLC*,

544 F. App'x 707 (9th Cir. 2013) ....................................................... 52

*Fairbank v. Wunderman Cato Johnson*,

212 F.3d 528 (9th Cir. 2000) ................................................................ 5

*Fields v. Trans Union, L.L.C.*,

Civil Action No. 17-2939, 2018 WL 1508746 (E.D. Pa. Mar. 26, 2018) .......... 24

*Gadomski v. Equifax Info. Servs., L.L.C.*,

No. 2:17-cv-00670-TLN-AC, 2018 WL 2096862 (E.D. Cal. May 7, 2018) ...... 40

*Garcia v. Navy Fed. Credit Union*,

No. 23-cv-2017-MMA-BLM, 2025 WL 1100898 (S.D. Cal. Apr. 14, 2025)

.................................................................... 22, 44, 42, 44, 45

*Gorman v. Wolpoff & Abramson, L.L.P.*,

584 F.3d 1147 (9th Cir. 2009) .............................................. 36, 54, 52

*Grden v. Leikin Ingber & Winters PC*,

643 F.3d 169 (6th Cir. 2011) ............................................................ 35

*Guimond v. Trans Union Credit Info. Co.*,
    45 F.3d 1329 (9th Cir. 1995) ................................................................. 3

*Hahn v. Triumph P'ships L.L.C.*,
    557 F.3d 755 (7th Cir. 2009) ............................................................... 26

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    579 U.S. 93 (2016) .............................................................................. 45

*Healy v. Milliman, Inc.*,
    No. C20-1473-JCC, 2022 WL 1061921 (W.D. Wash. Apr. 8, 2022) ................ 44

*Hebert v. Barnes & Noble, Inc.*,
    No. 19-CV-591-BEN (JLB), 2020 WL 3969915 (S.D. Cal. July 14, 2020)   21, 16

*Holmes v. NCO Fin. Servs.*,
    538 F. App'x 765 (9th Cir. 2013) .................................... 37, 36, 37, 38

*Holmes v. TeleCheck Int'l, Inc.*,
    556 F. Supp. 2d 819 (M.D. Tenn. 2008) ............................................. 44

*Huffman v. JP Morgan Chase Bank, NA.*,
    No. CV-22-00903-PHX-JJT, 2024 WL 3818605 (D. Ariz. Aug. 12, 2024) . 29-30

*In re Horizon Healthcare Servs. Data Breach Litig.*,
    846 F.3d 625 (3d Cir. 2017) ................................................................ 18

*Joseph v. J.J. Mac Intyre Cos., L.L.C.*,
    281 F. Supp. 2d 1156 (N.D. Cal. 2003) ............................................... 57

*Kirsten v. Ocwen Loan Servicing, LLC*,
    No. 2:13-cv-01215 JAM-KJ, 2013 WL 5315577 (E.D. Cal. Sept. 20, 2013) .... 57

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ....................................................... 17, 23

*Krause v. Hawaiian Airlines, Inc.*,
    No. 2:18-cv-00928 JAM AC, 2019 WL 13225251 (E.D. Cal. June 7, 2019) .... 51

*Larson v. Ford Credit*,
    No. 06-CV-1811 (JMR/FLN), 2007 WL 1875989 (D. Minn. June 27, 2007) ... 59

1   *Lenox v. Equifax Info. Servs. LLC*,

2       2007 WL 1406914 (D. Or. May 7, 2007) ............................................................ 44

3   *Linehan v. AllianceOne Receivables Mgmt.*,

4       CASE NO. C15-1012-JCC, 2016 WL 4765839 (W.D. Wash. Sept. 13, 2016)  20-

5       21

6   *Llewellyn v. Allstate Home Loans, Inc.*,

7       711 F.3d 1173 (10th Cir. 2013) .......................................................................... 42

8   *Lozada v. Dale Baker Oldsmobile, Inc.*,

9       91 F. Supp. 2d 1087 (W.D. Mich. 2000) ............................................................ 40

10  *Lujan v. Defs. of Wildlife*,

11      504 U.S. 555 (1992) ............................................................................... 16, 18

12  *Mack v. Resurgent Cap. Servs., L.P.*,

13      70 F.4th 395 (7th Cir. 2023) .............................................................................. 19

14  *Manuel v. Pac. Gas & Elec. Co.*,

15      173 Cal. App. 4th 927 (2009) ............................................................................ 43

16  *Marino v. Ocwen Loan Servicing L.L.C.*,

17      978 F.3d 669 (9th Cir. 2020) ............................................................................. 43

18  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

19      475 U.S. 574 (1986) ........................................................................................... 5

20  *Maloy v. Phillips*,

21      64 F.3d 607 (11th Cir. 1995) ............................................................................. 54

22  *McMillan v. Experian*,

23      170 F. Supp. 2d 278 (D. Conn. 2001) ............................................................... 39

24  *Mellinger v. Midwestern Audit Serv.*,

25      No. 11-CV-11326, 2012 WL 405008 (E.D. Mich. Feb. 8, 2012) ...................... 31

26  *Miller v. Westlake Servs. L.L.C.*,

27      637 F. Supp. 3d 836 (C.D. Cal. 2022) .............................................................. 36

28  *Mills v. Equifax Info. Servs., LLC*,

2019 WL 5064699 (W.D. Ky. Oct. 9, 2019) ..................................................... 59

*Moran v. Screening Pros*,

No. 2:12-cv-05808-SVW-AGR, 2020 WL 4724307 (C.D. Cal. July 30, 2020)   40

*Mukhtar v. Cal. State Univ.*,

299 F.3d 1053 (9th Cir. 2002) ............................................................... 40

*Muzi Gao v. Campus 150 Venture II, L.L.C.*,

No. SACV 20-01355 DDP (ADSx), 2022 WL 294749 (C.D. Cal. Jan. 31, 2022)

................................................................................. 51, 34

*Narog v. Certegy Check Servs.*,

759 F. Supp. 2d 1189 (N.D. Cal. 2011) ........................................... 23, 29, 35, 28

*Olson v. Six Rivers Nat'l Bank*,

11 Cal. App. 4th 1, (2003) ................................................................... 36

*Pelt v. LVNV Funding L.L.C.*,

No. CV-24-00222-TUC-JGZ, 2024 U.S. Dist. LEXIS 145406 (D. Ariz. Aug. 14,

2024) ....................................................................................... 35

*Petrillo v. Pinnacle Servs.*

Inc., No. 3:22-cv-00261-MMD-CLB, 2024 WL 95855 (D. Nev. Jan. 9, 2024)   19

*Pharms v. Nat'l Credit Sys.*,

2022 U.S. Dist. LEXIS 115129 (S.D. Ga. June 29, 2022) ................................. 47

*Primiano v. Cook*,

598 F.3d 558 (9th Cir. 2010) ............................................................... 40

*Randolph v. IMBS, Inc.*,

368 F.3d 726 (7th Cir. 2004) ............................................................... 26

*Reed v. Experian Info. Sols., Inc.*,

321 F. Supp. 2d 1109 (D. Minn. 2004) ..................................................... 39

*Reichert v. Nat'l Credit Sys., Inc.*,

531 F.3d 1002 (9th Cir. 2008) ........................................................... 30, 29

*Riley v. Giguiere*,

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

No. S-06-2126 LKK/KJM, 2008 WL 436943 (E.D. Cal. Feb. 14, 2008) .... 52, 53

*Robinson v. Equifax Info. Servs., L.L.C.*,

   560 F.3d 235 (4th Cir. 2009) ................................................................ 42

*Rogers v. Equifax Info. Servs. LLC*,

   No. CV 14-1708-JFW AGRX, 2015 WL 467408 (C.D. Cal. Jan. 13, 2015) ..... 57

*Rotkiske v. Klemm*,

   140 S. Ct. 355 (2019) ......................................................................... 54

*Safeco Ins. Co. of Am. v. Burr*,

   551 U.S. 47 (2007) ............................................................................ 43

*Sanchez v. U.S. Bank N.A.*,

   2019 WL 4540121 (C.D. Cal. June 27, 2019) ..................................... 36

*Sarver v. Experian Info. Sols.*,

   390 F.3d 969 (7th Cir. 2004) ............................................................. 47

*Scharer v. OneWest Bank, F.S.B., No*,

   2014 WL 12558124 (C.D. Cal. Sept. 8, 2014) .................................... 36

*Scott v. Harris*,

   550 U.S. 372 (2007) ........................................................................... 5

*Searcy v. eFunds Corp.*,

   No. 08 C 985, 2010 WL 3894165 (N.D. Ill. Sept. 30, 2010) .............................. 44

*Silver State Broad., L.L.C. v. Bergner*,

   705 F. App'x 640 (9th Cir. 2017) ................................................. 50-51

*Sime v. IQ Int'l, Inc.*,

   No. 15-cv-01841-JCS, 2015 WL 3833452, (N.D. Cal. June 19, 2015) ............. 34

*Sisley v. Sprint Commc'ns Co., L.P.*,

   284 F. App'x 463 (9th Cir. 2008) ...................................................... 23

*Sloane v. Equifax Info. Servs.*,

   510 F.3d 495 (4th Cir. 2007) ............................................................. 40

*Smith v. Transworld Sys., Inc.*,

953 F.2d 1025 (6th Cir. 1992) ............................................................. 31

*Smith v. Nationwide Collection Agencies, Inc.*,

　No. 17-12493, 2019 WL 670092, (E.D. Mich. Feb. 19, 2019) ........................ 24

*Spector v. Equifax Info. Servs.*,

　338 F. Supp. 2d 378 (D. Conn. 2004) ................................................. 44

*Spokeo, Inc. v. Robins*,

　578 U.S. 330 (2016) .......................................................... 17, 18, 16

*Stadtmueller v. Sarkisian*,

　No. 3:22-cv-00994-RBM-DTF, 2025 WL 1370819 (S.D. Cal. May 12, 2025)

　........................................................................... 32, 31

*Stockton E. Water Dist. v. United States*,

　583 F.3d 1344 (Fed. Cir. 2009) ....................................................... 47

*Swoager v. Credit Bureau of Greater St. Petersburg*,

　608 F. Supp. 972 (M.D. Fla. 1985) ................................................ 47-48

*Syed v. M–I, L.L.C.*,

　853 F.3d 492 (9th Cir. 2017) ......................................................... 43

*Taylor v. First Advantage Background Servs. Corp.*,

　207 F. Supp. 3d 1095 (N.D. Cal. 2016) ................................................ 43

*Taylor v. Midland Credit Mgmt.*,

　No. 1:07-CV-582, 2008 WL 544548 (W.D. Mich. Feb. 26, 2008) .................... 26

*Tinsley v. Transunion Corp.*,

　879 F. Supp. 550 (D. Md.) ............................................................ 39

*Tolliver v. Nat'l Credit Sys., Inc.*,

　No. 20-cv-728-jdp, 2021 WL 4306056, (W.D. Wis. Sept. 22, 2021) ............... 31

*Tourgeman v. Collins Fin. Servs., Inc.*,

　No. 08-cv-1392-CAB (NLS), 2015 WL 11613279 (S.D. Cal. May 12, 2015) .. 52

*Tourgeman v. Nelson & Kennard*,

　735 F. App'x 340 (9th Cir. 2018) ................................................ 16, 21

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

*Townsend v. Chase Bank USA N.A.*,

    CASE NO. SACV08-00527 AG (ANx), 2009 WL 426393 (C.D. Cal. Feb. 15,

    2009) ............................................................................................................ 26

*TransUnion L.L.C. v. Ramirez*,

    594 U.S. 413 (2021) ................................................................................ 18, 19

*Trichell v. Midland Credit Mgmt.*,

    964 F.3d 990 (11th Cir. 2020) ............................................................... 16

*Trikas v. Universal Card Servs. Corp.*,

    351 F. Supp. 2d 37 (E.D.N.Y. 2005) .................................................... 39

*Turner v. Cook*,

    362 F.3d 1219 (9th Cir. 2004) ............................................................... 23

*Turner v. N. Las Vegas*,

    2021 WL 3362788 (D. Nev. Aug. 2, 2021) ........................................ 40

U.S. Const. art. III ................................................................................... 16

*Goodson v. Bank of Am., N.A.*,

    600 F. App'x 422 (6th Cir. 2015) ........................................................ 35

*United States ex rel. Schutte v. SuperValu Inc.*,

    598 U.S. 739 (2023) ................................................................................ 45, 46

*United States v. Students Challenging Regul. Agency Procedures*,

    412 U.S. 669 (1973) ................................................................................ 18-19

*Urbina v. Nat'l Bus. Factors Inc.*,

    979 F.3d 758 (9th Cir. 2020) ............................................................... 47

*Wallace v. Wash. Mut. Bank, F.A.*,

    683 F.3d 323 (6th Cir. 2012) ............................................................... 26

*Walters v. Fast AC, L.L.C.*,

    60 F.4th 642 (11th Cir. 2023) ............................................................... 19

*Wantz v. Experian Info. Sols.*,

    386 F.3d 829 (7th Cir. 2004) ............................................................... 40

*Whitesides v. Equifax Credit Info. Servs.*,

　125 F. Supp. 2d 807 (W.D. La. 2000) ................................................. 57

*Young v. LVNV Funding L.L.C.*,

　No. 4:12CV01180 AGF, 2013 WL 4551722 (E.D. Mo. Aug. 28, 2013) ........... 59

*Zinermon v. Burch*,

　494 U.S. 113 (1990) ....................................................... 40


**Rules**

Fed. R. Civ. P. 11 ........................................................ 15

Fed. R. Civ. P. 26 ........................................................ 15

Fed. R. Civ. P. 37 ........................................................ 14

Fed. R. Civ. P. 56 ....................................................... 5, 2

Rule 7-3 ................................................................. 15

Rule 8 .................................................................. 55

Rule 26 ................................................................. 50

Rule 30(b)(6) ............................................................ 25

Rule 37(c)(1) ............................................................ 50


**Statutes**

Cal. Civ. Code § 1785.1 et seq. ........................................... 1, 2

Cal. Civ. Code § 1785.25 .......................................... 36, 47, 48

Cal. Civ. Code § 1785.31 (Deering) .............................. 3, 21, 22, 38, 41

Cal. Civ. Code § 1785.33 ................................................. 54

§ 1692e .................................................... 24, 26, 29, 30, 34

§ 1692f .................................................................. 24

§ 1692k ................................................................. 58

12 C.F.R. § 1006.100 ................................................... 33, 9

12 C.F.R. § 1006.100(a) ............................................ 34, 33, 9

15 U.S.C. § 1681 ........................................................................................ 1

15 U.S.C. § 1692 ........................................................................ 30, 2, 1, 23

15 U.S.C. § 1692a ...................................................................................... 27

15 U.S.C. § 1692e ...................................................... 30, 23, 29, 30, 34, 35, 27

15 U.S.C. § 1692f ...................................................................................... 35

15 U.S.C. § 1692k ............................................................................ 48, 54, 47, 21

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

**JOINT BRIEF**

**I.     Defendant's Introduction**

Plaintiff Lisa Krejci brings two causes of action against Defendant National Credit Systems, Inc. ("NCS") based on its reporting of a $138.07 debt (the "Account") originally owed to Plaintiff's landlord, Parc 410 Apartments (the "Original Creditor"): (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and (2) violation of the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1 *et seq.*[1]

Plaintiff's case spins a tale of inaction, asserting that NCS received an email from the Original Creditor advising that her account was paid - and then simply ignored it. But the story unravels quickly. There is no evidence the email was ever sent, no proof it was received, and nothing to suggest NCS had any knowledge of such a communication or payment. In contrast, the record shows that the Original Creditor formally certified the balance as due and owing, and the established procedures for updating an account's status were never followed.

Even if such an email had been sent - an assertion without any evidentiary support - its mishandling, at most, would constitute a bona fide error. Yet Plaintiff seeks to hold NCS liable for failing to remove a tradeline from a credit report that she never viewed, and which no third party viewed while it remained.

Plaintiff seeks to impose liability for failing to act on a dispute she never made, based on information NCS never had, and despite the fact that no one - including the Plaintiff herself - viewed the tradeline while it appeared on her consumer reports. When Plaintiff finally did submit a dispute, NCS verified, closed, and deleted the tradeline within days. The record shows no wrongdoing, no knowledge of error, and no damages. Summary judgment should be granted in NCS's favor.

---

[1] Plaintiff amended her complaint to remove claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* because they failed as a matter of law.

## II.    Plaintiff's Introduction

Plaintiff brings this action against NCS, a national debt collection agency, for reporting inaccurately to the credit bureaus -- 80 times over a two-year period -- that Plaintiff owed a debt which she had fully paid. NCS' own client, the landlord Reep Management, LLC ("Reep"), sent an email to NCS before any credit reporting began, instructing it to stop collections and not make any credit reporting, because plaintiff had already paid. Reep's corporate witness produced the time-stamped email and testified it was sent. The author of the email testified he sent the email without bounce-backs. Eight minutes afterwards, Reep sent a second email, to Plaintiff, confirming it had just emailed NCS to stop collections. No one disputes the second email was sent. NCS is the only party who mysteriously cannot find the disputed email in its files. This fundamental conflict in the evidence cannot be resolved on summary judgment. The receipt of the email is the central question in the whole case, upon which most others depend, and it is disputed.

The motion suffers from a dizzying level of disorganization. About 80% of the evidentiary citations do not stand for the proposition cited. The cited evidence is either completely off-topic, mere deposition colloquy amongst counsel, discovery responses which consist of 100% objections, or deposition quotes invented out of thin air. Much of the evidence Defendant relies upon is not even in the Separate Statement, requiring the Court to hunt through a jumbled record to make Defendant's case for it. Defendant's main witness is Ron Green, its in-house counsel, who has no personal knowledge of the account, and was not disclosed as a witness. Defendant also relies on a "supplemental" and untimely expert report, served after the expert report disclosure deadline.

Defendant treats this action like an FCRA case where the only question is whether a credit furnisher made a reasonable investigation of a consumer's dispute. But this is a CCRAA/FDCPA case, and these statutes impose liability for negligence, without any dispute required. These statutes by design place the affirmative

obligation *on the credit furnisher* to actively check and review to *prevent* inaccurate credit reporting, even in the absence of a dispute. Thus, Defendant's "let's collect and wait for an objection" procedures are inherently violative. Accepting an already paid collection account, missing that fact, and beginning collections without any substantive review, is violative. Actual damages are not required for an FDCPA claim. *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 78-781 (9th Cir. 1982). The FCRA and CCRAA do not require credit denials. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995). Emotional distress is sufficient damages under the FCRA or CCRAA. *Id.* at 1333; CAL. CIV. CODE § 1785.31(A)(1) (DEERING).

However, Plaintiff suffered concrete damages cognizable under the applicable statutes. Article III is satisfied by physical or even slight monetary harm. This harm included Plaintiff's migraines and sleeplessness, costs of doctor visits and medications, costs and time associated with credit reporting disputes, costs to bring suit to remove the inaccurate credit reporting, inability to use credit to buy a home for two years, and emotional distress (frustration, family conflicts, helplessness, stress, worry). Sep. Stmnt. ¶¶ 38-51. Contrary to Defendant's assertions, Plaintiff was concerned about her credit and regularly pulled her credit reports during the two-year period NCS was reporting inaccurately. Sep. Stmnt. ¶ 17. Several credit grantors pulled and viewed Plaintiff's credit reports during the relevant period. Sep. Stmnt. ¶ 35. NCS' conduct caused Plaintiff to forego filing a mortgage application (credit chilling). Sep. Stmnt. ¶ 38. Plaintiff's credit score was 663 while NCS was harming her credit, and 826 after NCS finally stopped, a huge difference. Sep. Stmnt. ¶ 52. Plaintiff successfully obtained a mortgage after NCS was off her credit reports. Sep. Stmnt. ¶ 53.

Defendant's "bona fide error" defense is disputed and not suitable for summary judgment. The defense cannot be adjudicated without first resolving whether defendant received Reep's email. If it did, as plaintiff and Reep maintain, ignoring such an email is intentional conduct, entirely eliminating the defense, which

requires good faith and unintentional conduct. Receipt of the email would also negate the second touchstone of the BFE defense, reasonable procedures to prevent the error, since defendant had no written procedures for sales staff to notate client emails, nor instructions to the sales department on how to handle account closures or credit reporting issues.  In fact, the sales manager had no access to NCS' main collection system, to even log the email. Sep. Stmnt ¶ 70-72. Finally, the BFE defense is unavailable altogether, because defendant denied making any errors in discovery. Sep. Stmnt ¶ 76-77.

The record shows that defendant's "procedures" are nothing more than accepting an account and waiting for the consumer or original creditor to tell NCS something is wrong. Sep. Stmnt ¶ 58-61. This is not a "procedure" at all. NCS did no substantive review of whether a balance was owing, at account inception. Had it done so, the account would have been closed immediately. NCS claims it sent an "account acknowledgment" email to Reep soon after receiving the file, but cannot produce the email, and Reep denies receiving any. Sep. Stmnt ¶ 3-4. NCS claims Reep was required to communicate account closures through a common portal, but no portal even existed, and Reep testified the true procedure was to send an email to Kristin Muse – exactly what happened. Sep. Stmnt ¶ 10. In the entire two years it was destroying plaintiff's credit score, NCS never contacted Reep or plaintiff once to see if the account was still owing. "See no evil, hear no evil," and turning a blind eye, is not an innocent mistake or a clerical error.  This is the conduct the CCRAA and FDCPA were meant to stop.

Plaintiff's claims are not barred by the statute of limitations. NCS admits inaccurate credit reporting during the one year FDCPA limitations period, and during the two year CCRAA limitations period. The motion presents no issue to adjudicate on the statute of limitations.

In conclusion, the motion asks the Court to resolve the most strongly disputed facts in the case. That is the province of the jury, and the motion must be denied.

### III.    Standard of Review

***Defendant's Position***

Summary judgment is warranted where the record shows no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a)*; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant meets its burden by demonstrating the absence of evidence to support the opposing party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).

Once that showing is made, the burden shifts—and the nonmoving party must present specific, admissible facts establishing a triable issue. *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). But where, as here, no rational trier of fact could find for the plaintiff, summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

***Plaintiff's Position***

Plaintiff trusts the Court is already familiar with *Anderson* and *Celotex*, and has no commentary on the relevant standard, without agreeing with Defendant.

### IV.    Defendant's Statement of Facts

The facts of this case are straightforward. On May 4, 2021, Plaintiff's former landlord, Parc410 - managed by REEP - placed a $138.07 account with NCS, certifying both the balance and the supporting documentation as accurate. UF 1-2, See also, Green Decl. ¶¶ 37-38, 45-46. NCS sent an acknowledgment request explicitly asking REEP to review and confirm that the account information was true, accurate, and complete, and to advise NCS of any necessary corrections. UF 4. REEP submitted no revisions. UF 4.

NCS began reporting the $138.07 balance to credit reporting agencies on July 13, 2021. UF 8. It also sent Plaintiff two validation letters—on May 7 and June 16, 2021—informing her of her rights under the FDCPA. UF 5. Additionally, NCS attempted to reach Plaintiff by phone regarding the account. UF 6. Plaintiff never

responded to these letters or calls. UF 7. Nor did she contact NCS to assert that the account had been paid or to provide any evidence to that effect. UF 7.

For two years, NCS received no communication from Plaintiff regarding the account. UF 7, 11. Her first and only contact came indirectly, through an e-OSCAR dispute submitted via Equifax in late May 2023. UF 11. This is undisputed—Plaintiff testified under oath that she never submitted a dispute or contacted NCS about payment prior to May 2023. UF 11.

Upon receiving the dispute, NCS promptly flagged the account in its internal system and opened an investigation. UF 12. Days later, on June 1, 2023, after confirming with REEP that the account had been paid, NCS updated its records and submitted a deletion request for the tradeline from Plaintiff's consumer report. UF 13, 14. These responsive actions not only complied with, but exceeded, the requirements of the FDCPA and CCRAA. Green Decl. ¶¶ 76-79. As noted in the expert report of James Droske, NCS's handling of the dispute reflected best-in-class practices for data furnishers. Droske Rebuttal Report, pp. 17–18.

Plaintiff contends that NCS knew or should have known its credit reporting was inaccurate prior to her May 2023 dispute, relying on an alleged May 2021 email from REEP indicating the account was paid-in-full. ECF 33, ¶¶ 2–4, p.1. But the record tells a different story. There is no evidence that NCS ever received such an email or any other communication indicating the account had been satisfied. Neither Plaintiff nor anyone on her behalf contacted NCS between the account's placement in May 2021 and her May 2023 dispute. Green Decl. ¶¶ 63–66, 75.

Plaintiff references an email purportedly sent on May 18, 2021, by Miguel Alvarado to Kristin Muse, but when REEP produced the message, it did not identify Alvarado as the sender. Green Decl. ¶¶ 62–64; Exh. 1-F. Importantly, Ms. Muse is not the designated recipient for account status updates or cancellations, and REEP acknowledged that sending such updates to her was not the correct procedure. Green Decl. ¶¶ 65–67; Alvarado Dep. 51:1–4, 20.

NCS implements rigorous procedures to ensure the integrity of its account handling and prevent reporting errors such as the one Plaintiff complains of. For accounts like Plaintiff's, Kristin Muse personally verified that files from REEP's Parc 410 included all required documentation before accepting them for placement. Muse Dep. 17:7–18:10; 35:16–36:22; Green Decl. ¶¶ 39–40. New accounts are manually entered into the WinDebt system, which tracks and preserves account data, and automatically requests confirmation of accuracy from the creditor. Sapp Dep. 38:20–46:7; Green Decl. ¶¶ 21–24, 50.

Clients must certify data accuracy and notify NCS of any changes, while all disputes are immediately flagged, investigated, and updated if necessary. Green Decl. ¶¶ 16–18, 27–32, 45–46, 58–61. The alleged May 2021 email does not appear in NCS's records. Green Decl. ¶¶ 27, 50, 75; Exh. C. Compliance oversight by Ron Sapp and Jonathan Green includes audits, staff training, and intake checks to confirm balances and consumer identity. Sapp Dep. 44:4–14, 60:1–5, 66:6–69:4; Green Decl. ¶¶ 1–2, 10–14, 24, 33–36, 40–43, 57–61, 76–79. The evidence confirms NCS followed its procedures precisely.

NCS had no knowledge of the alleged email, and otherwise adhered to its established procedures, acted diligently upon receiving Plaintiff's dispute, and updated the tradeline promptly. Green Decl. ¶¶ 19–30; Droske Rebuttal Report pp. 17–18. The FDCPA and CCRAA do not impose liability absent actual harm and do not penalize compliant furnishers or collectors for conduct unsupported by fact. On this record, Plaintiff cannot meet her burden of proof, and summary judgment is warranted in NCS's favor.

**V.     Plaintiff's Statement of Facts**

Plaintiff is a 20-year veteran of the Air Force, and works for the Department of Veteran's Affairs. Sep. Stmnt ¶ 19. In late 2020, Plaintiff was living at Parc 410 apartments in San Antonio, Texas. It was the family apartment, with no business use. Sep. Stmnt ¶ 21.  She gave notice and moved to California, fully paying her rent.

Sep. Stmnt ¶ 20-22. After move-out, Parc 410 sent her a bill for $138.07 in water and sewer charges, which Plaintiff promptly paid on January 20, 2021. Sep. Stmnt ¶ 23. Parc 410 marked the account as paid on February 15, 2021. Sep. Stmnt ¶ 27.

Parc 410 prepared a collections file for NCS sometime before February 15, 2021, with an account statement showing the $138.07 as unpaid. Index of Evid. Exh. 1-G. Parc 410's representative from NCS and "go to" person at that time, was Kristen Muse, the regional sales director. Sep. Stmnt ¶ 10. Her practice was to physically pick up Reep collection files, but only every three to five months. Sep. Stmnt ¶ 63. Muse picked up Plaintiff's paper collection file on April 30, 2021, which had sat at Reep's office since before February 15, 2021, since it still showed the account as unpaid. Sep. Stmnt ¶ 64. Due to the delay in pick-up, the file did not reflect Plaintiff's January 20, 2021 payment or the February 15, 2021 logging of the payment. Sep. Stmnt ¶ 27. One client of NCS was complaining at this time that Muse was failing to timely pick up collection files, which sat in their office for a month. Sep. Stmnt ¶ 65.

Muse does not recall ever looking at Plaintiff's file. Sep. Stmnt ¶ 66. Her practice was to only conduct a skip trace, and ensure the file included a final account statement and lease, but she did not check to see if any amounts were correct. Sep. Stmnt ¶ 67. Muse never asks her Reep contact Miguel Alvarado to verify any accounts after receiving them, because "he should have done that before he gave it to me." Sep. Stmnt ¶ 60. Muse would not know about a client's error in sending over an account that is paid, unless the client contacted NCS and told her. Sep. Stmnt ¶ 61.

Muse sent the collections file to NCS's Georgia office for scanning. Sep. Stmnt ¶ 67. NCS does not know which of its Georgia employees entered Plaintiff's collection file into the NCS computer system. Sep. Stmnt ¶ 68. Whoever it was, they did no checking to see if the account was paid, because if they had, the paid status of the account would have been immediately identified. NCS claims it sent an

automated "acknowledgment" email to Reep asking for debt verification within 24 hours of account scanning, but Reep never received one, and NCS cannot produce the email. Sep. Stmnt ¶ 3, 54. Reep intentionally programmed its system not to keep such emails, so we'll never see one. Sep. Stmnt ¶ 57. This violated the FDCPA's document retention regulations. 12 C.F.R. § 1006.100(a).

NCS sent Plaintiff a dunning letter dated May 7, 2021, to the wrong address, which Plaintiff received anyway. Sep. Stmnt ¶ 5. The letter threatened credit reporting, and Plaintiff took action immediately. Her husband got into contact with Parc 410 to complain Plaintiff had paid, and informed Parc 410 that Plaintiff was looking to buy a house. Sep. Stmnt ¶ 24-25. Miguel Alvarado of Parc 410 then sent the May 18, 2021 email to Kristin Muse of NCS, which is at the heart of the case. The email stated: "Hello Kristin, Former residents: Lisa Krejci and Jason Collins moved out of state and mailed payment for balance due. I posted payment bring account current. Please stop any collections and do not report as in collections they are attempting to purchase a home." Sep. Stmnt ¶ 25. NCS denies getting this email, but Alvarado testified with certainty that he sent it, and received no bounce-back. Sep. Stmnt ¶ 25, 28. Alvarado's employer Reep Management, LLC retrieved the email from its archives, produced it, and testified it was sent. Sep. Stmnt ¶ 25. The email contained an account statement showing the account as paid. Sep. Stmnt ¶ 27.

Minutes after sending the first email to Kristin Muse, Alvarado sent a second, confirming email to Plaintiff stating: "Attach[ed] is final account statement showing balance paid in full, I did e-mail collections National Credit advising balance paid and stop collection and do not report as collection as you are purchasing a home. Attach is final account statement for your review." Sep. Stmnt ¶ 29. Plaintiff received the email. *Id.* NCS has no explanation for how the first email was allegedly not sent, but the second was, minutes later. NCS stands alone in denying receipt of the email. NCS's search for the email was not done by a qualified IT professional. Sep. Stmnt ¶ 9.

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

NCS claims that Reep was supposed to send account closures via a mutual "client portal," not to Kristin Muse. But Reep testified no client portal exists, and the standard procedure was to send emails to Kristin Muse to close accounts – exactly what happened here. Sep. Stmnt ¶ 10. NCS's written procedures say nothing about account closures, but they do instruct clients to contact the Regional Sales Director, who was Kristin Muse. Sep. Stmnt ¶ 10. Muse has never seen a written policy or procedure on how to close an account, and does not know who handles credit reporting at the company. Sep. Stmnt ¶ 69, 73. Muse had no access to "Windebt," NCS's collection floor system, and thus no way to close the account on the system upon receiving the email. Sep. Stmnt ¶ 70-71. This technical gap may have contributed to Muse never logging the email. Sep. Stmnt ¶ 72.

NCS began derogatory credit reporting to four different credit reporting agencies on July 13, 2021, reporting inaccurately that plaintiff owed an unpaid debt in collections. From July 13, 2021 through May 28, 2023, NCS reported this inaccurate status 80 times to the credit bureaus, and never reported the account as disputed. Sep. Stmnt ¶ 32-34. During this two-year period, NCS never checked with Reep to see if the account was still owed. Sep. Stmnt ¶ 58-61. Three different potential credit grantors pulled Plaintiff's credit report during this period. Sep. Stmnt ¶ 35.

Plaintiff learned of NCS's credit reporting to Trans Union in August, 2021 when she pulled her credit report on a cell phone app. Sep. Stmnt ¶ 36. Plaintiff kept checking her Trans Union report regularly after that, all the way through May, 2023. Sep. Stmnt ¶ 37. As Alvarado had informed NCS on May 18, 2021, Plaintiff was looking to buy a home in 2021-2023. Sep. Stmnt ¶ 31. Now, with the NCS derogatory on her credit reports, she could not. From August, 2021 through the end of May, 2023, Plaintiff refrained from seeking any new credit, including the mortgage she wanted, because she knew that NCS' derogatory credit reporting was still on her credit reports. Sep. Stmnt ¶ 38. Plaintiff did not contact NCS itself, because she

believed if NCS's own client couldn't stop it from credit reporting, she would not be successful either. Sep. Stmnt ¶ 39.  Plaintiff didn't know at this time about her right to make an indirect dispute under the FCRA to the credit bureaus. Sep. Stmnt ¶ 39.

Plaintiff experienced emotional and physical distress because of NCS's derogatory credit reporting, including feeling trapped, anger, frustration, helplessness, stress, and worry. Sep. Stmnt ¶ 40.  Physically, she suffered increased migraine headaches and sleeplessness, which made her lose concentration at her job and in managing her mother's estate. Sep. Stmnt ¶ 40, 42.  The credit reporting caused conflict and upset in Plaintiff's relationship with her husband. Sep. Stmnt ¶ 41.  Plaintiff visited her general practitioner and a neurologist to deal with the increased migraines, and was prescribed new medication. Sep. Stmnt ¶ 43-44.  Plaintiff incurred costs for copays and prescription medication. Sep. Stmnt ¶ 45.

Plaintiff sought legal counsel in May, 2023. Counsel prepared three dispute letters to the credit bureaus, which Plaintiff signed and mailed, incurring mailing costs. Sep. Stmnt ¶¶ 46-48.  By June 16, 2023, Experian and Equifax had notified plaintiff that the result of her disputes was that the NCS credit reporting derogatory was being deleted. However, Trans Union notified Plaintiff in a May 26, 2023 letter that the NCS account would remain on her Trans Union credit report, as a paid collection. Sep. Stmnt ¶ 49. Plaintiff brought this action on August 16, 2023, in part to remove the notation of an NCS paid collection account from her Trans Union credit report, incurring filing fees. Sep. Stmnt ¶ 50-51. Unbeknownst to Plaintiff, because NCS never told her, the NCS derogatory had come off Trans Union sometime in June, 2023. Index of Evid., Exh. 5, ¶ 18.

Plaintiff's Experian credit score was 663 on May 12, 2023 when NCS's derogatory was still on her credit reports. Plaintiff's Experian credit score was 826 on December 18, 2023, after NCS' derogatory had come off. Sep. Stmnt ¶ 52. Plaintiff was now able to finance a home. She found one in late 2023, and bought the home with a favorable mortgage in February, 2024. Sep. Stmnt ¶ 53.

## VI.    Defendant's Reply Statement of Facts

Plaintiff's narrative is a transparent attempt to generate confusion where the facts are clear and unfavorable to her. Her story, built on speculation and unauthenticated documents, is riddled with contradictions and evidentiary holes, all in a calculated effort to manufacture a dispute of fact where none exists. This agenda is also evidenced by Plaintiff's attempts to cloak herself in sympathy with irrelevant details about her federal employment and military service (Response to Plaintiff's Statement of Material Facts, hereinafter "RPSMF", ¶ 19), but those details, while respectfully acknowledged, are immaterial.

The May 2021 email saga—Plaintiff's linchpin—crumbles under scrutiny. Plaintiff's version of events surrounding the May 2021 email allegedly sent to NCS by Parc 410's assistant manager Miguel Alvarado is especially problematic. Mr. Alvarado admitted he did not conduct the document search, could not confirm who performed it, and had no recollection of the email's contents or whether it was sent at all (RPSMF ¶ 25; Alvarado Dep. 11:16–12:5; 53:7–10). Yvette Davis, REEP's representative, similarly conceded that she did not work with NCS during the time at issue, did not conduct the document search herself, and that her company does not retain email records (RPSMF ¶ 25-26, Davis Dep. 55:4–56:17; 58:2–5). Compounding the issue, the version of the email offered by Plaintiff displays a different sender—Brianna Sierra—who was not even employed by REEP at the relevant time, further undermining authenticity (RPSMF ¶ 26; Davis Dep. 11:18–12:9).

NCS, by contrast, conducted a thorough search and unequivocally testified that it never received the email. Kristin Muse and Ron Sapp, both of NCS, confirmed they found no trace of such correspondence despite extensive efforts (RPSMF ¶ 25, Muse Dep. 30:15–31:5; Sapp Dep. 98:15–103:3), and REEP's former liaison, Chris Singleterry, testified that no such email was sent before May 2023 (RPSMF ¶ 25, Green Decl. ¶¶ 63, 75).

Plaintiff's argument that the email must have been received because Alvarado didn't get a bounce-back (RPSMF ¶ 28) also fails— and proves that receipt is merely speculative as Alvarado assumed he didn't receive one and never even looked for confirmation (Alvarado Dep. 57:23–58:15). Finally, although Plaintiff received a similar email herself with a zero-balance statement (RPSMF ¶ 30), that communication does not confirm NCS ever received such documentation, and Plaintiff has offered no authenticated documents or testimony with adequate foundation or personal knowledge to find otherwise. As such, it is irrelevant to whether NCS should have ceased collection efforts based on unverified, unauthenticated correspondence.

NCS's procedures weren't just adequate—they were extensive and well-documented. Contrary to Plaintiff's strawman portrayal of a perfunctory verification process, NCS required upfront certification of accuracy from its clients and provided for multiple avenues to both send and receive updates based upon changes in circumstances, account recall, and consumer disputes (RPSMF ¶¶ 54-58).

Plaintiff's efforts to blame Kristin Muse for perceived errors are equally off-base. Muse had no role in credit reporting or data input, and her function was limited to picking up files. She reviewed those files—including Plaintiff's—and saw nothing unusual (RPSMF ¶¶ 60–64; Muse Dep. 59:11–64:25). The attempt to use her lack of familiarity with Windebt as some form of institutional failure misses the mark: she isn't supposed to know that system—it's not part of her job (RPSMF ¶¶ 66–70).

Plaintiff's narrative about trying to buy a home in 2021 and being thwarted by NCS is fanciful. Plaintiff testified she didn't apply for credit until 2023 and preferred cash transactions. Her alleged credit injuries are imaginary, not actionable (RPSMF ¶¶ 31, 35, 38, 39; Krejci Dep. 70:7–75:14, 109:2–25). Even her claim that she regularly checked her credit reports is contradicted by her own admission that she only saw a summary page in 2021—a page that wouldn't have even shown the modest $138.07 debt (RPSMF ¶¶ 36–37; Krejci Dep. 83:18–84:17; Droske Report

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

5–7).

As for damages, the claims of distress and medical harm are uncorroborated and stem from preexisting conditions. Plaintiff has a 90% disability rating for emotional issues dating back to 2002. She has significant medical issues – all of which significantly pre-date any involvement with NCS - and she offers no medical expert to link any of her issues to NCS's conduct (RPSMF ¶¶ 40–45; Krejci Dep. 111:8–127:17).

Even her discovery attacks fall flat. Plaintiff criticizes NCS's interrogatory responses (RPSMF ¶ 79), but those responses rightly objected to improper legal conclusions and still explained NCS's position, including denial of receiving any communications from REEP and an outline of its dispute-handling practices.

Plaintiff's case is built on smoke and mirrors. The record is clear: NCS did not receive the disputed email; it had reasonable procedures; and Plaintiff didn't even dispute the account until 2023, at which point NCS immediately closed the account and deleted the tradeline at issue. NCS responded appropriately and legally at every step. Plaintiff's failure to generate any actual evidence of harm or misconduct speaks volumes. This is not a case of consumer abuse—it's an after-the-fact scramble to conjure liability where none exists.

## VII.   Defendant's Reply:  Plaintiff's Statement Of Material Facts Contains Conclusions Of Law, Not Facts, And IS Not Properly Supported By Evidence

NCS objects to the Plaintiff's Statement of Material Facts on the grounds that the proposed "facts" are in fact, conclusions of law, and not fact, nor are they properly supported by documentation or declaration despite Plaintiff's assertions to the contrary. NCS further objects to the Plaintiff's "Statement of Material Facts" on the grounds that the "facts" contained therein squarely contradict with the sworn deposition testimony of the Plaintiff, and they should be barred as a consequence of Fed. R. Civ. P. 37. Objections to specific documents are contained within a separate

1  objection, while objections to the utilization of any such document as paired to any
2  statement are noted in response to Plaintiff's Statement of Material Facts.

3  **VIII.  Argument**

4      A.    <u>Plaintiff's Argument: NCS Failed To Meaningfully Meet and</u>
5            <u>Confer</u>

6      Defendant failed to meet and confer before bringing this motion. Defendant
7  served its moving papers on May 15, 2025, without first attempting to meet and
8  confer. Index of Evid. Exh. 6, ¶ 14. The first time Plaintiff's Counsel learned
9  anything about the factual or legal basis for Defendant's motion, was by reading the
10 motion itself. Then, on May 28, 2025, after Plaintiff's Counsel had spent 13 days and
11 untold hours to draft an opposition, Defense Counsel announced that she wanted to
12 "meet and confer," and that the deadline was the next day May 29, 2025.  Index of
13 Evid. Exh. 6, ¶ 14. This is not the "meaningful" pre-motion meet and confer effort
14 required by Local Rule 7-3. Plaintiff agreed to talk anyway, but the moving papers
15 and opposition were already drafted and the meet and confer could accomplish
16 nothing. Under Local Rule 7-3, Defendant had to complete the meet and confer by
17 May 8, 2025, seven days <u>before</u> starting the motion process, not 13 days <u>after</u> serving
18 papers. Defendant waited too long for there to be any meaningful result from the
19 meet-and-confer process.

20     B.    <u>Defendant's Reply: NCS Satisfied All Obligations to Meet and</u>
21           <u>Confer</u>

22     Plaintiff's claim that NCS failed to meaningfully meet and confer is baseless.
23 From the outset, this case has involved continuous and candid communication
24 regarding NCS's position—beginning as early as December 2023, including in Fed.
25 R. Civ. P. 11 discussions that led to the withdrawal of the FCRA claim. NCS's stance
26 was detailed by both undersigned counsel and general counsel, reiterated in the Fed.
27 R. Civ. P. 26(f) report (ECF 23 at 3–4), and further reflected in extensive discovery
28 correspondence (ECF 58-1). To now suggest NCS withheld its position or failed to

engage is entirely disingenuous.[2]

## C.    Defendant's Argument: Plaintiff Lacks Article III Standing.

Under U.S. Const. art. III, federal courts are limited to resolving only actual "cases" or "controversies." U.S. Const. art. III, § 2. A plaintiff bears the burden of establishing standing, which requires: **(1) a concrete and particularized injury-in-fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.** *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992).

Other circuits have cautioned that courts must not entertain suits that rely solely on the theory that "anything-hurts-so-long-as-Congress-says-it-hurts." *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 997 (11th Cir. 2020).  Indeed, Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016), as revised (May 24, 2016).[3]

Plaintiff's claims do not rise to the level of an actionable controversy under Article III. At bottom, Plaintiff asserts nothing more than a bare statutory violation untethered from any concrete or particularized harm. She has not alleged—let alone

---

[2] And, though a small point, Plaintiff's Response appears to slightly exceed the 25-page limitation.

[3] "Spokeo rejected [the Ninth Circuit's] conclusion that a FCRA plaintiff need only invoke a FCRA violation and seek statutory damages to allege a concrete injury." *Bassett v. ABM Parking Servs.*, 883 F.3d 776, 781 (9th Cir. 2018) (finding no standing to sue under the FCRA where certain protected information was conveyed only to the Plaintiff: "We need not answer whether a tree falling in the forest makes a sound when no one is there to hear it. But when this receipt fell into Bassett's hands in a parking garage and no identity thief was there to snatch it, it did not make an injury."); *see also Tourgeman v. Nelson & Kennard, 735* F. App'x 340, 341 (9th Cir. 2018) ("An alleged harm based on letters that Tourgeman never received, saw, or even knew existed cannot satisfy Article III's concreteness requirement."); *Hebert v. Barnes & Noble, Inc., No.* 19-CV-591-BEN (JLB), 2020 WL 3969915, at *2 (S.D. Cal. July 14, 2020) ("Hebert has failed to satisfy the demands of Article III in precisely the manner Spokeo described: she alleges a bare FCRA procedural violation. But she alleges no actual harm. More importantly, since this is a motion for summary judgment, at this stage of proceedings she must present her evidence of harm to support her claim of Article III standing.").

demonstrated—any injury-in-fact resulting from the account placement, credit reporting, or NCS's conduct in this matter. In her own words, Plaintiff confirmed that she "didn't intend to use credit" during the relevant period and had "no plans" to do so. Krejci Dep. 94:1–8; 96:18–22. She further testified that she had not checked her credit report at any time prior to 2023, admitting she "had no reason to." Krejci Dep. 95:11–18. She declined promotional credit solicitations altogether. Krejci Dep. 94:5–6.

Even after the disputed tradeline was deleted, Plaintiff purchased a home for more than $300,000—paid in full without financing. Krejci Dep. 116:22–117:4. When she finally did apply for credit, her FICO score was 826—"Exceptional"—and she did not recall any derogatory information on her report. Droske Rebuttal Report, p. 17; Krejci Dep. 104–106. She could not identify a single instance of credit denial, increased rate, or adverse action. Krejci Dep. 72:1–10; 95:1–25. Nor did she engage with NCS at any point before May 2023, dispute the tradeline with all three credit bureaus, or attempt to mitigate the issue in any form. RFA Nos. 22, 24–28; Rog Responses Nos. 1, 4–5.

In short, Plaintiff cannot identify an actual injury—not even annoyance—that would create standing under *Spokeo, Inc.*, 578 U.S. 330. Her failure to allege or prove any real-world harm underscores that this action does not vindicate a personal interest, but merely seeks to police technical compliance. However, "[p]rivate litigation, even if authorized by statute to serve a range of public ends, must vindicate the plaintiff's interests, rather than serve solely as a vehicle for ensuring legal compliance." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 473 (1982)). Were federal courts simply venues for ventilating generalized grievances, "the concept of 'standing' would be quite unnecessary." *Id.*

Because Plaintiff has failed to allege or establish a concrete injury as required by Article III, this matter must be dismissed for lack of subject matter jurisdiction.

1    Summary judgment—or, alternatively, dismissal—is appropriate.

2    **D.    Plaintiff's Argument: Plaintiff Suffered Injuries Sufficient To**
3    **Confer Article III Standing**

4    Article III standing, a constitutional prerequisite to suing in federal court,
5    consists of three elements: (1) the plaintiff must have suffered an injury in fact, (2)
6    the injury must be fairly traceable to the challenged conduct of the defendant, and
7    (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc.*,
8    578 U.S. at 338. The injury-in-fact element demands that the harm suffered is a
9    concrete and particularized invasion of a legally protected interest. *Lujan*, 504 U.S.
10   at 560–61. Here NCS challenges just the injury-in-fact aspect of standing, and its
11   arguments all fail.

12   The Third Circuit has famously remarked that Article III's injury requirement
13   "is not Mount Everest." *In re Horizon Healthcare Servs. Data Breach Litig.*, 846
14   F.3d 625, 633 (3d Cir. 2017). In the Supreme Court's most-recent standing decision,
15   involving claims under the Fair Credit Reporting Act, a sister statute to the FDCPA,
16   the Court explained that little is required to show a concrete injury:

17   As *Spokeo* explained, certain harms readily qualify as concrete injuries under
18   Article III. The most obvious are traditional harms, such as physical harms and
19   monetary harms. If a defendant has caused physical or monetary injury to the
20   plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.
21   *TransUnion L.L.C. v. Ramirez*, 594 U.S. 413, 425 (2021). The Court applied such
22   reasoning even before *Ramirez*, holding that small financial losses, even "identifiable
23   trifles," are sufficiently concrete. *See, e.g.,* Czyzewski v. Jevic Holding Corp., 580
24   U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of
25   money is ordinarily an 'injury.'"); *see also United States v. Students Challenging*
26   *Regul. Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) ("We have allowed
27   important interests to be vindicated by plaintiffs with no more at stake in the outcome

28

of an action that a fraction of a vote, see, Baker v. Carr, 369 U.S. 186 [1962]; a $5 fine and costs, see McGowan v. Maryland, 366 U.S. 420 [1961]; and a $1.50 poll tax, Harper v. Virginia Bd. of Elections, 383 U.S. 663 [1966].")In the FDCPA context, courts have held that time, energy, and even legal costs incurred in dealing with unlawful collection attempts work sufficient harm to confer Article III standing. *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 699 (8th Cir. 2017) ("Being subjected to attempts to collect debts one knows he or she does not owe can disrupt marriages, impair performance on the job, and cause public embarrassment—the very harms motivating Congress to pass the FDCPA."); *Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 406–07 (7th Cir. 2023) (concluding postage to send a second letter, re-asserting one's FDCPA rights, along with the time and effort to do so, constitute a tangible injury); *Walters v. Fast AC, L.L.C.*, 60 F.4th 642, 649 (11th Cir. 2023) (finding "evidence of lost time, money and peace" are "garden-variety injuries in fact" sufficient for Article III standing); *see Petrillo v. Pinnacle Servs. Inc.*, No. 3:22-cv-00261-MMD-CLB, 2024 WL 95855, at *2 (D. Nev. Jan. 9, 2024) (finding testimony of consumer's research of credit-reporting rules and attorneys who might help her and stress she experienced was sufficient for standing to pursue FDCPA claims). In *Ramirez*, the Supreme Court found that dissemination of inaccurate credit information about a consumer constituted concrete harm. *TransUnion L.L.C.*, 594 U.S. at 439. Any of these injuries results in Article III harm, and Plaintiff has proof of each.

Plaintiff was actually harmed -- by two years of false and derogatory credit reporting. Three credit grantors viewed plaintiff's inaccurate credit reports during the relevant period, as in *Ramirez*. Sep. Stmnt ¶ 35. Plaintiff suffered a significant drop in credit score and as a result was unable to use credit to buy a home for two years. Sep. Stmnt ¶ 38, 52-53. Plaintiff suffered increased migraines and sleeplessness (Sep. Stmnt ¶ 40, 42), and went to the doctor for the worsening migraines. Sep. Stmnt ¶ 43-44. She paid insurance copays on doctor visits and also for additional

prescriptions (Sep. Stmnt ¶ 45). Plaintiff paid mailing costs associated with her May, 2023 credit reporting disputes (Sep. Stmnt ¶ 48), and the filing fee to bring this suit to remove NCS's inaccurate credit reporting on plaintiff's Trans Union credit report (Sep. Stmnt ¶ 51). Last but not least, Plaintiff suffered significant emotional distress, including anger, frustration, unwanted arguments with her husband, helplessness, stress, and worry. Sep. Stmnt. ¶¶ 40-42. All of this is concrete harm that satisfies Article III's low bar for standing. *Petrillo*, 2024 WL 95855, at *2; *Demarais*, 869 F.3d at 699.

NCS's assertions about Plaintiff's damages ignore factual reality altogether. Defendant argues that plaintiff did not intend to use credit, but this is not true, for she wanted to buy a home on credit, but could not. Sep. Stmnt ¶ 16, 38. She did buy a new home and obtained a favorable mortgage, after NCS was off her reports. Sep. Stmnt ¶ 52-53. The May 18, 2021 email to NCS itself states that plaintiff was concerned about her credit because she was "attempting to purchase a home." Sep. Stmnt ¶ 25. NCS argues plaintiff never checked her credit reports, but she was continuously checking them from August, 2021 through May, 2023. Sep. Stmnt ¶ 36-47. NCS argues that plaintiff opted out of promotional credit offers, but she did not. Sep. Stmnt ¶ 18.

The fundamental facts on damages are disputed, requiring denial of the Motion. But, even if all of NCS' assertions were true, this would only show that Plaintiff has limited *damages*, not that she suffered no *harm*. Damages and harm are different things for Article III purposes, with plaintiffs able to show harm even if they may lack actual damages. *See Byrne v. Or. One, Inc.*, No. 3:16-cv-01910-SB, 2017 WL 3568412, at *8 (D. Or. July 18, 2017), *report & recommendation adopted*, No. 3:16-cv-01910-SB, 2017 WL 3568398 (D. Or. Aug. 16, 2017) (concluding, post *Spokeo*, that violation of FDCPA alone conferred standing "even absent additional allegations of harm"); *Linehan v. AllianceOne Receivables Mgmt.*, CASE NO. C15-1012-JCC, 2016 WL 4765839, at *7 (W.D. Wash. Sept. 13, 2016) ("Since Spokeo,

1  the Eleventh Circuit and multiple district courts have considered whether a violation
2  of the FDCPA itself confers standing on a plaintiff, and they have answered that
3  question in the affirmative."). Such is particularly true in the context of consumer-
4  protection claims under the FDCPA and CCRAA, as those statutes allow for statutory
5  damages. 15 U.S.C. § 1692k(a)(2)(A); Cal. Civ. Code § 1785.31(a)(2)(B) (Deering);
6  *see Byrne*, 2017 WL 3568412, at *3 ("Spokeo does not change that consumers
7  seeking relief for FDCPA violations need not demonstrate that they suffered actual
8  damages.").

9       This is not an FDCPA case involving mere technical violations, like a dunning
10 letter with a comma in the wrong place or missing disclosures. Plaintiff has proven
11 real-world harm directly caused by the communication to third parties of inaccurate
12 information about her, 80 times over two years, that she had a debt in collection when
13 she did not. And she experienced actual harm from NCS's actions, including
14 emotional distress, injury to credit reputation, medical expenses, mailing expenses,
15 and court costs.

16      The case of *Hebert*, 2020 WL 3969915 (JLB) is inapposite, because that case
17 involved a settled instance of harm that does not confer Article III standing, namely
18 an employer's provision of an authorization to obtain a background check on
19 applicants that allegedly violates the Fair Credit Reporting Act. *Bassett*, 883 F.3d at
20 781–83 is no different, as the court there found no standing for a consumer who had
21 the expiration date of his credit card printed on the receipt he received from a parking
22 vendor, another well-recognized instance of non-Article III harm. *Tourgeman v.*
23 *Nelson & Kennard*, 735 F. App'x 340, 341 (9th Cir. 2018), likewise does not help
24 NCS, as there the plaintiff never learned of the alleged harm. None of these cases
25 discusses the type of harm Plaintiff has suffered here, which is established Article III
26 injury under the cases cited above. The Court's analysis should end here, with a
27 finding that Plaintiff has Article III standing.

28      Moreover, the CCRAA defines "actual damages" to *include* "court costs, loss

21

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

of wages, attorney's fees and, when applicable, pain and suffering." CAL. CIV. CODE § 1785.31(A)(1) (DEERING). Plaintiff has incurred court costs and attorneys' fees, and experienced pain and suffering. She has also suffered "credit chilling" through fear of being rejected by creditors because the collection account appeared on her credit. Sep Stmnt ¶ 38. Here again, these damages are enough to confer Article III standing, and NCS offers nothing genuine to the contrary. *See Garcia v. Navy Fed. Credit Union*, No. 23-cv-2017-MMA-BLM, 2025 WL 1100898, at *10 (S.D. Cal. Apr. 14, 2025) ("Reputational damages and emotional distress are considered actual damages under the CCRAA and the FCRA.").   Under the FCRA and CCRAA, emotional distress is sufficient damages, and credit denials are not required. *Guimond*, 45 F.3d 1329; CAL. CIV. CODE § 1785.31(A)(1) (DEERING).

Although NCS does not appear to directly address it, nothing is different as to Plaintiff's CCRAA claim because it hews closely to the harm at the foundation of *Ramirez*—the reporting of inaccurate credit information. *TransUnion L.L.C.*, 594 U.S. at 439 (concluding "the 1,853 class members (including Ramirez) whose credit reports were disseminated to third-party businesses during the class period suffered a concrete harm"). Plaintiff has alleged, and discovery has again confirmed, that NCS "violated Civil Code § 1785.25(a) by furnishing information on a specific transaction or experience to a consumer credit reporting agency when it knew or should know have known the information was incomplete." ECF 33 ¶ 20. NCS has acknowledged such reporting occurred, and there are at least fact issues as to the accuracy of the reporting. Under *Ramirez,* inaccuracy alone is sufficient to establish standing. *TransUnion L.L.C.*, 594 U.S. at 439.

## E.    Defendant's Reply: Plaintiff Has Not Established Article III Standing.

Plaintiff's claimed injury is no more cognizable than the proverbial tree falling in the forest with no one around to hear it. As the Supreme Court emphasized in *TransUnion L.L.C.*, 594 U.S. at 431, "if inaccurate information falls into a

consumer's credit file, does it make a sound?"—not unless it's disseminated or causes a concrete harm. Courts have repeatedly rejected standing based on mere annoyance or procedural violations, such as the irritation of shredding non-compliant receipts (*Anton v. Prospera Hotels, Inc.*, No.: CV 19-534-CBM-SHKx, 2019 WL 4266528, at *3 (C.D. Cal. July 18, 2019)) or time spent disputing bills (*Sisley v. Sprint Commc'ns Co., L.P.*, 284 F. App'x 463, 466 (9th Cir. 2008)). As the Fourth Circuit reiterated in *Krakauer*, 925 F.3d at 653 (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 473 (1982)), private litigation must vindicate personal interests, not simply enforce statutory compliance. Here, Plaintiff's speculative fears and lack of actual harm fall short of Article III's concrete injury requirement.

**F.  Defendant's Argument:  Plaintiff's FDCPA Claim Fails Because NCS Did Not Knowingly Report False Information or Attempt to Collect Amounts Not Owed by Contract or Law.**

Plaintiff claims NCS violated 15 U.S.C. § 1692e(8) and 1692f(1), by reporting a $138.07 debt that she contends was already paid before being placed with NCS. ECF 33 ¶¶ 14–15, p.3. Plaintiff's claim fails at the outset because she has not shown NCS attempted to collect a "debt" as defined by the FDCPA. The Act applies only to obligations "primarily for personal, family, or household purposes." *Id.* § 1692a(5).

Plaintiff disclaims owing any debt, claims the account was paid in full, and offers no evidence demonstrating that the obligation was consumer in nature. As the Ninth Circuit held in *Turner v. Cook*, 362 F.3d 1219, 1227 (9th Cir. 2004), the FDCPA applies only to consumer debts. Similarly, *Narog v. Certegy Check Servs.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011), confirmed that the FDCPA does not apply to post-payment conduct.

Even assuming arguendo that this was a consumer debt, Plaintiff's claim still fails. The FDCPA requires knowledge or reckless disregard of a disputed or invalid

debt. *Clark v. Capital Credit & Collection Servs.,* 460 F.3d 1162, 1177 (9th Cir. 2006). Courts routinely hold that a violation of § 1692e(8) or § 1692f(1) requires evidence that the collector actually knew the information was false or disputed. *See Bailey v. Nat'l Credit Sys., Inc.*, CIVIL ACTION NO. 1:24-cv-1118-MLB-CMS, 2024 WL 5339308, at *3 (N.D. Ga. May 16, 2024), report and recommendation adopted, 2024 WL 5495310 (N.D. Ga. Dec. 31, 2024); *Patterson v. AD Astra Recovery Serv., No.: 2:17-cv-01569-SGC*, 2018 WL 6181175, at *3–4 (N.D. Ala. Nov. 27, 2018); *Smith v. Nationwide Collection Agencies, Inc.*, No. 17-12493, 2019 WL 670092, at *3 (E.D. Mich. Feb. 19, 2019); *Fields v. Trans Union, L.L.C.*, Civil Action No. 17-2939, 2018 WL 1508746, at *5 (E.D. Pa. Mar. 26, 2018).

Plaintiff's claim hinges entirely on a May 18, 2021 email allegedly sent by the original creditor to NCS, asserting that the $138.07 debt had been paid. Yet no witness has authenticated the email, confirmed it was sent, or demonstrated that NCS received it. When REEP produced the document, it failed to identify Miguel Alvarado as the sender, and Alvarado himself admitted he did not and could not verify transmission or receipt. Alvarado Dep. 13:1–6, 19:1–13; Exh. 1-F.

Kristin Muse, the NCS employee allegedly copied on the message, unequivocally testified: "I didn't receive an email." Muse Dep. 68:25–69:1. She conducted a comprehensive search of her Outlook inbox and archive files using relevant search terms and found no such message. Muse Dep. 30:15–31:5, 69:1; Sapp Dep. 98:15–23, 99:8–11. Muse confirmed that, had she received such an email, she would have followed NCS's well-established procedures and forwarded it to the Client Services team. Muse Dep. 75:1–7; Green Decl. ¶ 71. She testified to being "responsible" and "organized" in her email practices and was clear that she had not deleted any messages. Muse Dep. 75:23–76:1; Green Decl. ¶¶ 70–72.

NCS's protocol, which Muse communicates to clients during onboarding, requires that any balance updates or cancellations be transmitted through its secure client portal or directly to the Client Services team—not to individual personnel. Muse

Dep. 71:7–10; Green Decl. ¶¶ 65, 67, 70, Exh. 1-G. NCS's 30(b)(6) witness, Ron Sapp, independently verified that the alleged email was not in Muse's system. He reviewed her IMAP account, opened her PST archives, and confirmed no such message existed. Sapp Dep. 99:8–11; Green Decl. ¶¶ 63, 75.

In sharp contrast, REEP's Rule 30(b)(6) witness, Yvette Davis, openly admitted she had no foundation to testify about the communication. Davis acknowledged she was not employed at Parc410 during the relevant period, did not review its files, and did not speak with any individuals involved in the account or with NCS at the relevant time. Davis Dep. 21:3–14, 25:12–18. Davis could not explain how or from where the email was retrieved, and she admitted she never confirmed receipt or checked for bounce-backs. Davis Dep. 15:1–10, 16:1–4. She also offered no testimony as to whether REEP's email records were preserved during the company's ownership transition—which occurred before she joined REEP and the departure of NCS's primary contact, Chris Singleterry, who confirmed that no such email was sent prior to May 2023. Green Decl. ¶¶ 63, 75.

Alvarado likewise testified that he did not retrieve the email himself—it was located by REEP's corporate office without his participation. Alvarado Dep. 11:20–12:5. He could not confirm he sent it to Muse or that it was received. Alvarado Dep. 13:1–6, 19:1–13. He no longer had access to the email and never checked for delivery confirmation. Alvarado Dep. 19:1–24, 20:1–6.

However, NCS followed its protocols. At the time of placement, REEP certified the balance as accurate. SUF 2–4. Muse personally reviewed each file and confirmed it contained a lease, application, and final account statement. Muse Dep. 17:7–18:10, 35:16–36:22; Exh. 1-H. The account was accepted only after verification. Green Decl. ¶¶ 24, 42–43. NCS then sent an acknowledgment email to REEP requesting confirmation of the data; REEP submitted no corrections. SUF 2–4.

Plaintiff did not contact NCS at any point prior to her formal e-OSCAR dispute in May 2023. Krejci Dep. 17:2–7; Exh. 4 – Plaintiff's Response to RFA Nos. 22, 24–

26. NCS responded promptly, flagging the account, initiating an investigation, confirming the debt had been paid, and deleting the tradeline within days. SUF 11–14.

Plaintiff's theory seeks to impose liability on NCS for failing to act on information it never received. But the FDCPA does not require clairvoyance. Collectors are permitted to rely on information certified by creditors. *See Randolph v. IMBS, Inc.*, 368 F.3d 726, 729–30 (7th Cir. 2004); *Clark*, 460 F.3d at 1174. When a dispute is with the creditor, not the collector's conduct, no FDCPA liability lies. *Chambers v. Habitat Co.*, 68 F. App'x 711, 715 (7th Cir. 2003).

Moreover, to be actionable under § 1692e, a statement must be materially false. *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010). Plaintiff admitted she never intended to pay NCS and ignored its letters and calls. Krejci Dep. 94:1–8, 96:13–22; *Green Decl.* ¶¶ 40–44. These facts negate any claim of material deception. *See Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012); *Hahn v. Triumph P'ships L.L.C.*, 557 F.3d 755, 757–58 (7th Cir. 2009). Courts have consistently rejected FDCPA claims based on speculative harm or unclear misrepresentations. *Townsend v. Chase Bank USA N.A.*, CASE NO. SACV08-00527 AG (ANx), 2009 WL 426393, at *2 (C.D. Cal. Feb. 15, 2009); *Taylor v. Midland Credit Mgmt.*, No. 1:07-CV-582, 2008 WL 544548, at *3 (W.D. Mich. Feb. 26, 2008).

In sum, Muse, Sapp, and NCS followed documented procedures and maintained meticulous records. The individuals Plaintiff relies on—Alvarado, Davis, and third-party vendors—lacked personal knowledge, failed to verify the message, and provided no competent evidence of communication. Where, as here, Plaintiff offers no proof of material misrepresentation and no evidence NCS knew of any inaccuracy, there is no genuine dispute of fact. Plaintiff's case is built on speculation and cannot survive summary judgment.

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

### G.    Plaintiff's Argument: NCS Attempted To Collect A Consumer Debt Under The FDCPA

NCS argues that Plaintiff's debt was not "consumer in nature," taking it outside the ambit of the FDCPA. This claim has no basis whatsoever. The debt was a personal, family debt for a residential apartment, and covered by the FDCPA.

The FDCPA defines "debt" as:

[A]ny obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5). The debt at issue here easily fits within this definition.

This debt was for personal, family or household purposes. Namely, plaintiff and her husband used the apartment as their family living space, and never for any business, or even rental income. Sep. Statement ¶ 21. NCS wrote a dunning letter to Plaintiff in May, 2021 with a footer that states: "[t]his communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose." Sep. Stmnt ¶ 5, Index of Evid. Exh. 1-D. This notice, known as the "mini-Miranda warning," is a notice required by the FDCPA when one is attempting to collect a debt covered by the statute. *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1237 (9th Cir. 2023); *see* 15 U.S.C. § 1692e(11) (requiring that a debt collector disclose to consumers in the initial communication "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose," and to state in subsequent communications that they are from a debt collector). It is difficult to understand how NCS believed these warnings were necessary if it did not also believe the FDCPA covered the debt.

NCS's Corporate Representative erased all doubt on this point with his

deposition testimony. He agreed that the debt at issue originated with REEP Management, a landlord in San Antonio, Texas, someone other than NCS. Sep. Stmnt ¶ 80. NCS had a contractual relationship with Reep to "perform debt collection services" for it. Sep. Stmnt ¶ 81. NCS sent Plaintiff the May 7, 2021 letter because it was attempting to collect the REEP Management debt. Sep. Stmnt ¶ 82. If Plaintiff were to make a payment on the debt, NCS would retain part of that payment for itself, with the rest going to REEP. Sep. Stmnt ¶ 83. The majority of NCS's clients are landlords in "the multi-family housing industry," as is REEP Management. Sep. Stmnt ¶ 84. NCS's Representative also testified that NCS is a licensed debt collector in California. Sep. Stmnt ¶ 85. And Plaintiff confirms that she and her husband rented the Parc 10 apartment strictly for their personal use. Sep. Statement ¶ 21. At a minimum, there is a genuine issue of material fact on the "consumer debt" issue. Summary judgment should therefore be denied.

*Narog*, 759 F. Supp. 2d at 1193 does not save NCS's arguments, as that case involved a circumstance where not only had the plaintiff paid off the debt, but the "the debt collector acknowledged that the debt was paid in full." *Id*. So while that court declined to permit the plaintiff to pursue claims after these events, nothing like that has happened here. NCS did not agree that the debt was already paid, until June, 2023. Sep. Statement ¶ 49.

### H.    Defendant's Reply: Plaintiff Fails to Distinguish *Narog v. Certegy*

Plaintiff's attempt to distinguish *Narog v. Certegy* falls flat. In *Narog*, the FDCPA claim was dismissed because all complained-of conduct occurred after the debt had been paid – where the consumer admits that there was a debt *at one time* – but that there is no longer. Here, as in *Narog*, the creditor—not NCS—was the entity that allegedly issued a paid-in-full confirmation. Absent any showing that NCS had actual knowledge of that status prior to 2023, Plaintiff's claims are legally

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

indistinguishable. *See Narog*, 759 F. Supp. 2d at 1193 ("A plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full" and after it was "acknowledged that the debt was paid in full."). "When a debt is cancelled [which is the case here], there is no debt and there can be no debt collection." *Young v. ProCollect Inc.*, NO. 4:18-CV-475-A, 2019 U.S. Dist. LEXIS 27421, at *7 (N.D. Tex. Feb. 21, 2019) ("The law is clear that once a consumer has paid a debt in full, there is no debt as defined in the FDCPA and the FDCPA does not apply to post-collection activities.").

## I.   Plaintiff's Argument: Viewing The Evidence In The Light Most-Favorable To Plaintiff, NCS Has Not Proven As A Matter Of Law That Plaintiff's FDCPA Claim Fails

### 1.   Plaintiff's Argument: NCS Misstates The Elements of 15 U.S.C. § 1692e(8) and 1692f

NCS misstates the elements of the applicable subsections of the FDCPA by arguing "[t]he FDCPA requires knowledge or reckless disregard of a disputed or invalid debt." Plaintiff has brought claims under § 1692e(8) (negligent or knowing false credit reporting) and 1692f (collecting on a debt not owed). The FDCPA is a strict liability statute, including as to these claims, and no mental state is required. *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1004 (9th Cir. 2008) (holding that the "FDCPA is a strict liability statute in that a plaintiff need not prove an error was intentional"); *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 997 (9th Cir. 2012) (holding that the "FDCPA is a strict liability statute; there is no mental state required to violate it"). If anything, there are knowledge requirements attached to NCS's defense of bona fide error, but Plaintiff does not have to prove anything on that issue—NCS shoulders all responsibilities as to proof. *Huffman v. JP Morgan Chase*

*Bank, NA.*, No. CV-22-00903-PHX-JJT, 2024 WL 3818605, at *4 (D. Ariz. Aug. 12, 2024) ("[T]o prevail on a bona fide error defense, a defendant has the burden to prove that (1) it violated the FDCPA unintentionally, (2) the violation resulted from a bona fide error, and (3) it maintained procedures reasonably adapted to avoid the specific error at issue.") (citing *McCollough v. Johnson, Rodenburg & Lauinger, L.L.C.*, 637 F.3d 939, 948–49 (9th Cir. 2011)).

The FDCPA is a strict-liability statute, so NCS's state-of-mind is immaterial. *Reichert*, 531 F.3d at 1004. Further, the Ninth Circuit long ago held that a violation of Section 1692e need not be knowing or intentional. *Clark*, 460 F.3d at 1176.

Plaintiff's claim under 15 U.S.C. § 1692e(8) prohibits "Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." There is no requirement of *knowing* or *reckless* false credit reporting (though that is a violation too), but only that the debt collector "should have known" the information was false. This is a negligence standard which can be proven on circumstantial facts, and has no mental state element. Plaintiff prevails, for example, if defendant should have known the credit information was inaccurate because of the May 18, 2021 email, or even without the email, if it should have known the account was paid before the assignment even began.

As to 1692f, there is no mental state element for the claim. Defendant would have to prove under its "bona fide error" defense that it maintained reasonable procedures and made a good faith mistake notwithstanding. It has failed in that since it essentially had no procedure other than "see no evil, hear no evil."

### 2.    *Defendant's Reply: NCS Properly Stated The Elements of 15 U.S.C. § 1692e(8) and 1692f*

Here, Plaintiff literally ignores the text of 1692(e)(8), which states that NCS would need to furnish "credit information *which is known or which should be known* to be false." *Id.* (emphasis added). Plaintiff similarly offers no citations to law to

support her claims that this can be proven "circumstantially" or that some lesser quantum of proof is necessary – and these unsupported assertions should be summarily disregarded.

In this case, Plaintiff has produced no admissible evidence showing that NCS ever received the alleged May 2021 email, and without receipt, no duty to investigate or act was triggered. As courts have held, including in *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1031 (6th Cir. 1992) and *Mellinger v. Midwestern Audit Serv.*, No. 11-CV-11326, 2012 WL 405008 (E.D. Mich. Feb. 8, 2012), the FDCPA and FCRA obligations arise only upon actual receipt of a consumer dispute—not mere transmission. Here, NCS conducted a thorough search and found no trace of the email, and Plaintiff failed to use any verifiable means like certified mail to establish delivery, making the mailbox or other such rules inapplicable. *See Aetna Life Ins. Co. v. Montgomery*, 286 F. Supp. 832, 840 (E.D. Mich. 2003); *see also Tolliver v. Nat'l Credit Sys., Inc.*, No. 20-cv-728-jdp, 2021 WL 4306056, at *2 (W.D. Wis. Sept. 22, 2021).

### 3.    Plaintiff's Argument:  The "Knew or Should Have Known" Issue Under 1692e(8) Is Genuinely Disputed.

REEP says it emailed NCS, telling it Plaintiff owed no balance and to stop collection activity, but NCS claims it never received that email. NCS hopes to tip the scale in its favor by summarizing all the evidence it can scrape up, to show the email did not arrive, but Plaintiff has arguably stronger evidence showing the opposite. Sep Statement ¶ 9-11, 25-30. The Court should disregard this discussion entirely, as it merely highlights a key factual dispute that the Court cannot resolve now:  whether an email was sent or received.  That is a jury question. *Stadtmueller v. Sarkisian*, No. 3:22-cv-00994-RBM-DTF, 2025 WL 1370819, at *4 (S.D. Cal. May 12, 2025) ("When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.").

NCS also argues that it was not negligent in reporting a paid debt as unpaid

for two years, because it followed certain alleged "procedures" involving loan-onboarding protocols, and account verification. As with the email, the use and effectiveness of these procedures are simply disputed all across the board. For each protocol that NCS throws out, there are serious disputes regarding whether they even existed, how robust they were, and whether NCS followed them.

NCS claims that its "onboarding" procedure gave it confidence the debt was owed. But there really was no onboarding procedure at NCS except scanning the file onto the collection floor. Kristin Muse in San Antonio picked up Plaintiff's file, and cannot remember if she looked at it. Sep Statement ¶¶ 64, 66. She did not research whether any amounts were correct. Sep. Statement ¶ 67. She merely checked that the final account statement was in there and had a positive balance, and sent it to the collections floor. *Id.* NCS cannot even recall which of its Georgia employees processed plaintiff's file into its system, so any broad-stroke speculation now, of what they supposedly did or saw, is nothing but hearsay. Sep. Statement ¶ 68. The Georgia employee(s) obviously did no substantive review, since even a cursory check with the client would have revealed the account was already paid.

Kristin Muse was negligent in her approach to new files. She only picked up files every few months. Sep. Stmnt ¶¶ 62-63. It was perfectly foreseeable that a consumer might pay the account in the months it was sitting at Reep's office waiting to be picked up. Yet Muse viewed account accuracy as the client's problem, not hers. As she said regarding account verification: "he should have done that before he gave it to me." Sep. Stmnt ¶ 60. Other clients of NCS were even complaining about Muse's delays in picking up files. Sep. Stmnt ¶ 65. This is the probable scenario of what happened with Plaintiff's file: in January, 2021, Alvarado created a physical file for Muse to pick up (when the account was still owing), then received and logged the payment in February, but forgot to withdraw the file from the collections stack. Muse picked up the file months later on April 30, 2021, but she never checked whether Plaintiff had paid in the interim – which Plaintiff had. In fact, NCS cannot produce

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

1  any witness who checked Plaintiff's file, before beginning collections. That is not a

2  reasonable "procedure" if it can even be called that.

3      For its next "procedure," NCS claims it sent an automated "acknowledgment"

4  email to Reep asking for debt verification within 24 hours of account scanning. But

5  Reep never received one, and NCS cannot produce the email. Sep. Stmnt ¶ 3, 54.

6  Reep intentionally programmed its system <u>not</u> to keep such emails, which is

7  suspicious at best. Sep. Stmnt ¶ 57. This violated the FDCPA's document retention

8  regulations, and suggests a desire to prevent an audit trail, not create one. 12 C.F.R.

9  § 1006.100(a).

10      NCS spills much ink on the acknowledgment "procedure" that never

11  happened. The acknowledgment email template says, in essence, "let us know if there

12  is anything wrong with the data you already sent us, or we're going to go ahead with

13  collection." Sep. Statement ¶ 3. Yet, nothing either REEP or NCS produced—or to

14  which a witness testified—shows that this exchange ever took place, and Reep denies

15  it. *Id.* Even if the procedure were in place, it is a weak and ineffective one, as who

16  can guarantee a client is not going to ignore automated emails coming in on a busy

17  work day with full inboxes? NCS's claim that Reep didn't respond proves the point,

18  as REEP would certainly have reiterated what Mr. Alvarado said in his email—

19  Plaintiff paid.

20      Finally, NCS cannot explain why it reported Plaintiff's account to the credit

21  bureaus for two more years <u>after</u> account inception, without ever trying to verify the

22  account, even with its client. Sep. Statement ¶¶ 58-61. This "collect until someone

23  tells us to stop" approach is not a commercially reasonable procedure under industry

24  standards, according to Plaintiff's expert. Sep. Statement ¶ 74-75. As stated above,

25  the FDCPA and CCRAA differ from the FCRA, in that they put the burden on the

26  debt collector to maintain accurate reporting, not on the consumer to dispute.

27      There is evidence that REEP told NCS in its May 18, 2021 email that Plaintiff

28  owed no balance and for NCS to cease collection activity, which viewed in the light

most-favorable to Plaintiff as the Court must at this stage, permits an inference that NCS knew or should have known the reporting was inaccurate, yet kept going.

### 4.    Plaintiff's Argument:  Plaintiff Doesn't Claim NCS Made A Misrepresentation To Her Under 1692e(8).

NCS also argues that its reporting of the account was not "materially false," because "Plaintiff admitted she never intended to pay NCS and ignored its letters and calls." Mot. at 26. NCS says this scenario "negates any claim of material deception." *Id.* These arguments appear to be pasted from another case, but whatever they may mean, they fail.

Plaintiff did intend to pay the debt, and did so promptly before NCS ever had the account. Sep. Stmnt ¶¶ 22-23.  Plaintiff did not ignore any letters or calls, as the single letter NCS sent went to the wrong address, and Plaintiff immediately disputed with Parc 410. Sep. Stmnt ¶ 5.

NCS is at least correct that a false statement supports a violation of Section 1692e. 15 U.S.C. § 1692e. Where it goes astray, however, appears to be the argument that NCS did not deceive Plaintiff. Plaintiff never alleged that NCS deceived her directly. ECF 33 ¶¶ 14–15. She instead alleges that NCS made false representations about the debt *to the credit bureaus*, a violation of Section 1692e(8). *Muzi Gao v. Campus 150 Venture II, L.L.C.*, No. SACV 20-01355 DDP (ADSx), 2022 WL 294749, at *4 (C.D. Cal. Jan. 31, 2022) (discussing plaintiff's claim that reporting false information to credit bureaus violates the FDCPA, and noting "[s]everal courts have indeed suggested that reporting of information to credit reporting agencies is sufficiently 'connected to debt collection,' at least for purposes of 15 U.S.C. § 1692e(2)(A)") (collecting cases); *Sime v. IQ Data Int'l, Inc.*, No. 15-cv-01841-JCS, 2015 WL 3833452, at *4 (N.D. Cal. June 19, 2015) (same). NCS agrees the information it reported to the CRAs was false, because NCS corrected it in June 2023. Mot. at 17. That NCS reported materially false information to the CRAs is therefore cemented.

### 5.    *Plaintiff's Argument: NCS Violated 15 U.S.C. § 1692f*

NCS violated 15 U.S.C. § 1692f by collecting on a debt that was not owed. NCS' credit reporting, which is an effort to force payment, continued until June, 2023.  This is a strict liability claim, and defendant has no defense, for it admits the debt was not owed and that NCS tried to collect the debt through credit reporting which continued in the one year before the claim was filed.

### 6.    *Defendant's Reply: Plaintiff Has Identified No Communications That Satisfy The Elements of 15 U.S.C. § 1692e(8) and 1692f*

Here, Plaintiff unequivocally states she did not owe the debt and never considered paying it, eliminating any claim that NCS's credit reporting was intended to induce payment. Under *Goodson v. Bank of Am., N.A.*, 600 F. App'x 422, 431 (6th Cir. 2015), and *Grden v. Leikin Ingber & Winters PC, 64*3 F.3d 169, 173 (6th Cir. 2011), a communication is not "in connection with the collection of a debt" (and therefore not violative of the FDCPA) unless its animating purpose is to prompt payment. Courts in this Circuit and others—including *Pelt v. LVNV Funding L.L.C.*, No. CV-24-00222-TUC-JGZ, 2024 U.S. Dist. LEXIS 145406, at *4 (D. Ariz. Aug. 14, 2024), and *Narog*, 759 F. Supp. 2d at 1193—have held that simply furnishing information to credit reporting agencies does not satisfy this standard, and Plaintiff has identified no other supposed "communications". See also *Donohue*, 592 F.3d at 1033–34 ("The FDCPA is not concerned with mere technical falsehoods that mislead no one, but instead with genuinely misleading statements."). Similarly, these cases hold that the inclusion of the "Mini-Miranda" likewise does not transform a communication into an actionable communication under the FDCPA.

### J.    <u>Defendant's Argument: Defendant Did Not Know or Have Reason to Know the Reported Information Was Inaccurate Under the CCRAA Claim</u>

The CCRAA prohibits furnishing credit information "if the person knows or

should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a). A plaintiff must establish: (1) defendant is a "person"; (2) defendant reported information to a CRA; (3) the information was inaccurate; (4) the plaintiff was harmed; and (5) the defendant knew or should have known of the inaccuracy. *Miller v. Westlake Servs. L.L.C.*, 637 F. Supp. 3d 836, 855 (C.D. Cal. 2022) (citing *Robbins v. CitiMortgage*, Inc., 2017, at *14 (N.D. Cal. 2017)).

"Because the [CCRAA] is substantially based on the [FCRA], judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions." *Olson v. Six Rivers Nat'l Bank*, 111 Cal. App. 4th 1, 12 (2003); *see also Carvalho v. Equifax Info. Servs., L.L.C.*, 629 F.3d 876 (9th Cir. 2010).

The "should have known" standard is judged by a test of reasonableness. *Holmes v. NCO Fin. Servs.*, 538 F. App'x 765, 766 (9th Cir. 2013). Courts have recognized that the "knew or should have known" standard mirrors the FCRA's reasonable investigation duty. *Miller*, 637 F. Supp. 3d at 855; *Sanchez v. U.S. Bank N.A.*, 2019 WL 4540121, at *5 (C.D. Cal. June 27, 2019); *cf. Scharer v. OneWest Bank, F.S.B.*, No, 2014 WL 12558124, at *7 (C.D. Cal. Sept. 8, 2014).

Plaintiff's claims under the CCRAA fail for the same reasons that her prima facie FDCPA claims fail – there is no evidence that the email was sent or received, or that NCS had any idea there was an inaccuracy, and the Original Creditor certified the balance as due and owing. These facts support only one conclusion regarding reasonableness. *Gorman v. Wolpoff & Abramson, L.L.P., 58*4 F.3d 1147, 1157 (9th Cir. 2009) ("summary judgment on questions of reasonableness is appropriate 'when only one conclusion…is possible'").

### K.    Plaintiff's Argument: Defendant Knew Or Should Have Known Its Credit Reporting Was Inaccurate Under The CCRAA Claim

As noted just above, NCS admits that its reporting of the account before June,

2023 was inaccurate, which is why NCS asked the CRAs to delete it at that time. All that NCS challenges now is whether it knew or should have known this earlier.

The evidence presented above under the FDCPA claim shows that there are multiple disputed fact issues on this point. The parties have presented conflicting evidence on whether NCS received the May 18, 2021 Reep email. The Parties dispute whether NCS had any procedure to verify accounts before accepting them, any post acceptance verification procedures, and any procedures to continue verifying after credit reporting has started. The Parties also dispute whether NCS's overall "let's go until someone tells us to stop" approach is reasonable. There are therefore insurmountable fact questions over what NCS knew or should have known during the time it reported the account as in collections.

To the extent NCS may be correct that reasonableness is part of the analysis, courts have held that reasonableness in this context is a jury question in the overwhelming majority of cases. *Doherty v. Microbilt Corp*., No. 2:22-cv-03891-SPG-PVC, 2025 WL 1090401, at *6 (C.D. Cal. Mar. 6, 2025) (quoting *Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995) and citing *Shaw v. Experian Info. Sols., Inc*., 891 F.3d 749, 755 (9th Cir. 2018)). Even still, NCS's own authority confirms that summary judgment as to Plaintiff's CCRAA claim for reporting inaccurate information is inappropriate.

*Holmes*, 538 F. App'x at 766, involved claims of CCRAA violations for reporting a debt that, like here, the plaintiff alleged the debt collector should have known was disputed. The defendant, the fourth of a series of collectors on the account did not access—but could have accessed—a system used by the other three and that contained the notation that Mr. Holmes was disputing the account. *Id.* The district court granted summary judgment to the collector, finding no "dispute of material fact as to whether NCO should have known that Holmes disputed his debt." *Id.* The Ninth Circuit reversed, finding an issue of fact as to whether the collector should have known about the disputed nature of the account because of its access to the system

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

containing that information. *Id.* In the court's words, "[v]iewing all the evidence in the light most favorable to Holmes, a trier of fact could conclude that a reasonable debt collector in NCO's position should have known that Holmes's account was disputed." *Id.*

Things are similar here. There are fact questions about: (1) what NCS had access to (the May 18, 2021 email from REEP) and how that information would have changed its conduct (if at all), and (2) what NCS did to verify the balance as accurate with REEP, as the record lacks any communication between REEP and NCS on that topic. *Holmes* is therefore more helpful to Plaintiff than it is to NCS, and confirms that NCS has not carried its summary judgment burden on Plaintiff's CCRAA claim.

## L.    Defendant's Reply: Defendant Did Not Have Any Reason to Know that The Account Balance was $0 Until May 2023

NCS promptly deleted the tradeline after Plaintiff first disputed the account, and when REEP, for the first time in May 2023, indicated a $0 balance (RPSMF ¶¶ 74–75; Green Decl. ¶¶ 60–61). Unlike *Holmes*, there is no evidence NCS received or had access to any May 2021 dispute; extensive searches confirmed no such email was received (Muse Dep. 30:15–31:5; Sapp Dep. 98:15–103:3; Green Decl. ¶¶ 63, 75). NCS's procedures required certification of account accuracy and were followed here (RPSMF ¶¶ 54, 58; Green Decl. ¶¶ 17–22, 39–43). And unlike the collector in *Holmes*, NCS did not have access to any shared database or system containing prior collector notes or dispute notations.

## M.    Defendant's Argument: Plaintiff Cannot Establish Actual Damages Under the CCRAA

To recover under the CCRAA, a plaintiff must prove actual damages. Cal. Civ. Code § 1785.31(a); *see Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1280 (N.D. Cal. 2014) (granting summary judgment absent evidence of harm); *Duarte v. J.P. Morgan Chase Bank*, 2014 WL 12561052, at *3 (C.D. Cal. Apr. 7, 2014) ("a plaintiff

cannot recover under the CCRAA without proving actual harm").

Here, Plaintiff offers no competent evidence of damage. She testified she avoided credit altogether, stating, "No, I didn't intend to use credit," and "[using credit] makes me feel embarrassed." Krejci Dep. 96:13–22; SUF 16. She opted out of promotional offers, instructed credit bureaus not to share her information, and had no plans to use credit. SUF 18. She never checked her credit report prior to 2023, stating, "I had no reason to." SUF 17. After the NCS tradeline was removed, she and her husband bought a home for over $300,000 in cash. Krejci Dep. 116:22–117:4. When she finally applied for credit in December 2023, her FICO score was an "Exceptional" 826, and her report showed no derogatory accounts. Droske Rebuttal Report, p. 17.

Krejci failed to identify any instance of credit denial or adverse action tied to NCS. Krejci Dep. 72:1–10; 95:1–25; 96:1–25; 104:6–106:2. She admitted she did not obtain her credit report during the relevant time and did not seek prospective lenders. *Id.* Her speculation about lost opportunities is legally insufficient. *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 475 (2d Cir. 1995) (plaintiff's intent to apply for credit is too speculative); *see also Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 45 (E.D.N.Y. 2005); *Reed v. Experian Info. Sols., Inc.*, 321 F. Supp. 2d 1109, 1115 (D. Minn. 2004); *McMillan v. Experian*, 170 F. Supp. 2d 278, 285 (D. Conn. 2001); *Tinsley v. Transunion Corp.*, 879 F. Supp. 550, 552 (D. Md.), *aff'd*, 64 F.3d 659 (4th Cir. 1995).

Her claims of emotional distress are similarly baseless, particularly because Plaintiff was instructed by counsel not to answer questions about damages on "relevancy" grounds. Krejci Dep. 104:2–5. She produced no expert testimony or medical documentation and admitted that her anxiety and depression were longstanding and unrelated to NCS. Krejci Dep. 107:7–11; 108:21–109:5. Although she claimed to possess supporting materials, none were produced. See Exh. 3 – Rogs 1–2; Exh. 4 – RFAs 1, 3, 9, 10.

Courts uniformly require more than lay assertions to sustain a distress claim.

1   *See Zinerman v. Burch*, 494 U.S. 113, 142 n.1 (1990); *Lozada v. Dale Baker*

2   *Oldsmobile, Inc.*, 91 F. Supp. 2d 1087, 1114 (W.D. Mich. 2000); *Sloane v. Equifax*

3   *Info. Servs.*, 510 F.3d 495, 503 (4th Cir. 2007); *Wantz v. Experian Info. Sols.*, 386

4   F.3d 829, 834 (7th Cir. 2004). The Ninth Circuit demands expert testimony where

5   causation is not obvious. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010);

6   *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), overruled on

7   other grounds; *Turner v. N. Las Vegas*, 2021 WL 3362788, at *9 (D. Nev. Aug. 2,

8   2021).

9       Even more troubling, Plaintiff's conduct during discovery underscores the

10  weakness of her case. She delayed proceedings, issued duplicative discovery, and—

11  most critically—failed to disclose third-party subpoena responses directly bearing on

12  the alleged email at the heart of her claim which would either prove or disprove her

13  case. This subpoena was sought after the time for discovery motions had closed, and

14  these records were withheld despite arriving and despite their potential to confirm or

15  refute the alleged transmission. This selective concealment is deeply prejudicial and

16  warrants preclusion of any materials related to the alleged email.

17      Plaintiff also cannot recover litigation costs or attorney's fees absent liability.

18  *Moran v. Screening Pros*, No. 2:12-cv-05808-SVW-AGR, 2020 WL 4724307, at *9

19  (C.D. Cal. July 30, 2020), *aff'd*, 25 F.4th 722 (9th Cir. 2022); *Basconcello v. Experian*

20  *Info. Sols., Inc.*, No. 16-cv-06307-PJH, 2017 WL 1046969, at *11 (N.D. Cal. Mar.

21  20, 2017); *Gadomski v. Equifax Info. Servs., L.L.C.*, No. 2:17-cv-00670-TLN-AC,

22  2018 WL 2096862, at *5 (E.D. Cal. May 7, 2018); *Burrows v. Experian Info. Sols.,*

23  *Inc.*, No. 16-cv-06356-PJH, 2017 WL 1046973, at *11 (N.D. Cal. Mar. 20, 2017).

24      In sum, Plaintiff has failed to establish actual damages, reputational harm,

25  emotional injury, or any measurable consequence of NCS's reporting. The law

26  demands more than speculation and rhetoric. It demands proof. On this record, her

27  CCRAA claim fails as a matter of law for lack of damages.

28

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

N.    **Plaintiff's Argument: Plaintiff Has Actual Damages Under The CCRAA**

NCS argues that Plaintiff has not provided evidence of actual damages, claiming that her evidence is insufficient because she did not apply for or use credit and her statements about emotional distress are not corroborated by medical records or testimony. Mot. at 39-41.[4] Contrary to these arguments, Plaintiff has sufficient proof of damages to survive NCS's Motion.

The CCRAA defines "actual damages" to include "court costs, loss of wages, attorney's fees and, when applicable, pain and suffering." CAL. CIV. CODE ANN. § 1785.31(a)(1). Though NCS would have the Court discount it, Plaintiff testified as to the money she expended trying to get NCS to acknowledge the error and correct it, to the credit chilling that occurred, to medical and prescription costs, and to the emotional distress she experienced in dealing with NCS's inaccurate reporting. Sep. Stmnt ¶¶ 38-53.  Specifically, Plaintiff testified at deposition:

> I was harmed in the following ways: My credit reputation; wasn't allowed to get credit for two years. Why? Because I knew that the collection being on my credit reports would negatively affect me; also felt trapped.
>
> Medically: Loss of sleep that led to migraines that made it hard for me to focus on a new job. And also, recently, during that time period, my mother's financial power of attorney got transferred to me. So for having migraines, it was hard for me to focus on those responsibilities.
>
> Emotionally: Fights with my husband. During that time when I was trying to figure out how to get this resolved, I continuously was asking my husband, How are we going to get this taken care of? What do we need to do? Who do we need to contact, so on and so forth. He kept saying he would handle it. So those are the ways that I was injured.

Sep. Stmnt ¶¶ 40–44. She also testified about doctors she has seen for treatment relating to problems with NCS, and identified them by name. Sep. Stmnt ¶¶ 43-44.

---

[4] NCS also launches *ad hominem* accusations of discovery misconduct that has no basis in fact, and NCS provides none. Mot. at 40. The Court should ignore them.

All of these are aspects of her harm. Courts have found similar testimony is sufficient to raise a fact issue on damages. *Garcia v. Navy Fed. Credit Union*, No. 23-cv-2017-MMA-BLM, 2025 WL 1100898, at *11 (S.D. Cal. Apr. 14, 2025) (finding plaintiff's testimony of nightmares and panic attacks, plus having to seek therapy due to stress, among evidence of actual damages sufficient to survive summary judgment); *Arriaga v. Logix Fed. Credit Union*, No.: CV 18-9128-CBM-AGR(x), 2021 WL 4459759, at *2 (C.D. Cal. May 21, 2021) (upholding conclusion that "Plaintiff's deposition testimony that he experienced stress, helplessness, tension, worry, panic and experienced chest compressions as a result of the double reporting that there was a genuine issue of material fact" as to his actual damages); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1183 n.3 (10th Cir. 2013) (discussing "drenching night sweats, panic attacks," "great stress and anxiety," and plaintiff's feeling that he "could not recover"); *Robinson v. Equifax Info. Servs., L.L.C.*, 560 F.3d 235, 241 (4th Cir. 2009) (testifying about "headaches, sleeplessness, skin acne, upset stomach, and hair loss"). Separately, Plaintiff may count costs of filing this case and accumulated attorneys' fees from her Counsel's work as actual damages under the CCRAA. Sep. Stmnt ¶ 45.

On the whole, this evidence of damages is enough to permit Plaintiff to present them to a jury, warranting denial of NCS's Motion on this point.

## O.    Defendant's Reply: Plaintiff Has No Credible Evidence of Actual Damages Under The CCRAA

Plaintiff offers no credible evidence of actual damages under the CCRAA. After the NCS tradeline was removed, her credit score remained in the 600s—well below "Excellent"—and she admitted she never applied for credit during the reporting period (RPSMF ¶¶ 31, 39, 52). Her testimony was internally inconsistent: she claimed the NCS account blocked her from credit, yet also testified she avoided credit by choice and never checked her report until 2023 (RPSMF ¶¶ 17–18, 36–37).

These contradictions, along with the absence of any medical or expert evidence, are fatal to her CCRAA claim.

## P.    Defendant's Argument: Defendant's Conduct Was Not Willful

Willful CCRAA violations require "reckless disregard" of statutory obligations. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007); *Marino v. Ocwen Loan Servicing L.L.C.*, 978 F.3d 669, 673 (9th Cir. 2020). Willfulness is shown where the conduct poses an "unjustifiably high risk of harm." *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1101 (N.D. Cal. 2016) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). California law also requires positive intent to harm or conscious disregard of consequences. *Manuel v. Pac. Gas & Elec. Co., 17*3 Cal. App. 4th 927, 947 (2009).

No such conduct occurred here. Critically, Plaintiff concedes that after she submitted written disputes to the credit bureaus in May 2023, NCS promptly reviewed the information and instructed the credit bureaus to delete the account from her credit report. ECF 33 ¶ 6, p.2; Sapp Dep. 53:6–13, 97:1–98:5. This timeline - two years after the original reporting - strongly supports a finding that NCS acted in good faith, and that any initial reporting was based on the information provided by the Original Creditor. This conduct reflects reasonable and prompt remediation—not willful indifference.

## Q.    Plaintiff's Argument: Whether Defendant's Conduct Was Willful Is Disputed

Willfulness under the CCRAA embraces reckless disregard of a statutory duty, as well as knowing violations. *Syed v. M–I, L.L.C.*, 853 F.3d 492, 503 (9th Cir. 2017) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). A defendant acts in reckless disregard if the defendant's action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely

careless." *Safeco Ins. Co. of Am.*, 551 U.S. at 69. That is, the defendant must have taken action involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68. The law does not require an intent to cause harm, just an intent to fail to comply with the statute. *Garcia v. Navy Fed. Credit Union*, No. 23-cv-2017-MMA-BLM, 2025 WL 1100898, at *14 (S.D. Cal. Apr. 14, 2025). Courts analyze a defendant's willfulness in light of its interpretation of the statute, and whether that interpretation was objectively unreasonable. *Id.* at *14. NCS suggests California law adds an additional requirement of "positive intent to harm or conscious disregard of consequences" (Mot. at 43), but Courts have held that standard is the same as FCRA and CCRAA willfulness. *Id.* at *15 (collecting cases). Like reasonableness, willfulness is overwhelmingly a jury question. *Id.* at *14; *Spector v. Equifax Info. Servs.*, 338 F. Supp. 2d 378, 390 (D. Conn. 2004); *see Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 3894165, at *6 (N.D. Ill. Sept. 30, 2010) (denying motion for summary judgment on willfulness, and collecting cases supporting the conclusion that willfulness is a jury question).[5]

NCS gives willfulness slack attention, arguing just that "Plaintiff concedes that after she submitted written disputes to the credit bureaus in May 2023, NCS promptly reviewed the information and instructed the credit bureaus to delete the account from her credit report," which supposedly supports good-faith conduct. Mot. at 43. But the CCRAA is concerned with accurate credit reporting at all times, not just when the consumer disputes. The Court must consider how obvious the risk of harm was in attempting to collect debts without confirming with the original creditors (like REEP) that the balance was indeed owed and correct. Sep. Stmnt ¶¶ 54-68. Likewise,

---

[5] *See Healy v. Milliman, Inc.*, No. C20-1473-JCC, 2022 WL 1061921, at *4 (W.D. Wash. Apr. 8, 2022); *Lenox v. Equifax Info. Servs. LLC*, 2007 WL 1406914, at *6 (D. Or. May 7, 2007); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991); *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1007 (D. Ariz. 2006); *Holmes v. TeleCheck Int'l, Inc.*, 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).

willfulness turns on NCS's decision to continue to report the account without ever reaffirming with REEP that the balance remained and was due. Sep Statement ¶¶ 58-60. Such evidence is sufficient to support a jury's finding of willfulness, and NCS cites no case to the contrary. *Garcia*, 2025 WL 1100898, at *14.

NCS also overlooks that if NCS received the May 18, 2021 email, as should be assumed in order to consider the evidence in the most favorable light for the non-moving party, willfulness is strongly supported. If NCS ignored that email, or had faulty procedures for handling such emails (Sep. Stmnt ¶¶ 69-73), the jury could easily make a finding of willfulness.

Also problematic for NCS on the willfulness question is its lack of a showing that it contemporaneously understood its FDCPA and CCRAA obligations. The Court therefore has no ability to determine whether NCS's actions were objectively reasonable, so NCS cannot avail itself of the *Safeco* willfulness defense. The language of footnote 20 in *Safeco* requires that a defendant's actual *interpretation* at "the time of the challenged conduct"—not merely its own external conduct—was not objectively unreasonable. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016). The U.S. Supreme Court subsequently confirmed this understanding of *Safeco* in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), explaining:

> Thus, as we have stated previously, "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." By a similar token here, *we do not look to legal interpretations that respondents did not believe or have reason to believe at the time they submitted their claims*.

*Schutte*, 598 U.S. 739 at 755 (emphasis added, citation omitted). Thus, only NCS's understanding of the statute during the period of the challenged conduct is relevant to its *Safeco* argument. Though necessary for NCS's invocation of *Safeco*, it has not explained what its interpretation of the CCRAA was during the period it was reporting the account to the CRAs. This failure dooms any argument that what NCS

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

1 did could not be found to be willful.

2    *Schutte* confirms that context matters. And it matters more when considering

3 a party's state of mind at some point in the past. NCS offers no discussion of its

4 interpretation of the CCRAA at all, stating merely "we deleted the account when

5 Plaintiff disputed," so we could not have acted willfully. Mot. at 43. But that result

6 tells the Court nothing regarding NCS's interpretation of the CCRAA that led to the

7 process to which Plaintiff's account was subjected. And that is what matters for the

8 willfulness analysis. As the Supreme Court pointed out in *Schutte*, whatever NCS

9 might say now about its interpretation of the CCRAA, that does not preclude a

10 finding that NCS still knew what it was doing violated the CCRAA. *Id.* at 754–55.

11    NCS's brief (Mot. at 43) bears this analysis out. It devotes no space to

12 discussing the CCRAA or its interpretation of the statute, all but foreclosing any

13 reliance of *Safeco.* For the Court to conclude NCS did not act willfully the Court

14 must analyze NCS's interpretation of the statute, and NCS does not offer one. The

15 Court should therefore conclude NCS has not carried its summary-judgment burden

16 on willfulness.

17    **R.    Defendant's Reply: There is No Evidence that NCS Acted Willfully**

18    NCS did not act willfully under the CCRAA. The record shows NCS followed

19 structured onboarding procedures, relied on certifications from REEP, and received

20 no communication—via any channel, person, or entity—retracting or disputing the

21 balance until Plaintiff's 2023 dispute (RPSMF ¶¶ 54–58). Plaintiff offers no evidence

22 that NCS knew or should have known the account was inaccurate, especially where

23 NCS never received the alleged May 2021 email (RPSMF ¶¶ 25–28). Without clear

24 proof of reckless disregard or an objectively unreasonable interpretation of the

25 CCRAA, summary judgment is proper on willfulness. This is not a case of

26 "unjustifiably high risk" conduct—NCS operated under industry-standard

27 procedures and acted promptly when finally notified of a dispute in 2023. There is

28 no basis for a willfulness finding here.

**S.    Defendant's Argument: Violations of The FDCPA and CCRAA, if any, resulted from a bona fide error and are not actionable.**

Plaintiff's FDCPA and CCRAA claims still fail independently, as a violation of the laws, if any, is eradicated by NCS's **bona fide error defense,** which the 9th Circuit recognizes under 15 U.S.C. § 1692k(c).  *See Urbina v. Nat'l Bus. Factors Inc.*, 979 F.3d 758, 763 (9th Cir. 2020). NCS received a certified balance from the creditor, had no contrary notice, and acted promptly when Plaintiff eventually disputed.  *See also Clark*, 460 F.3d at 1177 (permitting reliance on creditor data).

The CCRAA likewise provides a bona fide error defense: "A person who furnishes information to a consumer credit reporting agency is liable for failure to comply with this section, unless the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, the furnisher maintained reasonable procedures to comply with those provisions."  Cal. Civ. Code § 1785.25(g).

A debt collector is not liable under these statutes if it can show by a preponderance of the evidence that: **(1) the violation was unintentional; (2) it resulted from a bona fide error; and (3) it occurred despite the maintenance of procedures reasonably adapted to avoid such an error.** *See Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1352 (Fed. Cir. 2009); *Pharms v. Nat'l Credit Sys.*, 2022 U.S. Dist. LEXIS 115129, at *26 (S.D. Ga. June 29, 2022); 15 U.S.C. § 1692k(c).

Courts have emphasized that a debt collector "need not demonstrate that [its] procedures are foolproof," but rather that they represent a **"reasonable precaution"** against FDCPA violations. *Dimovski v. Tolisano & Danforth, L.L.C.*, 2011 WL 1638051, at *4 (D. Conn. Apr. 28, 2011). Moreover, **when a debt collector reasonably relies on representations from a creditor that later turn out to be inaccurate,** the bona fide error defense still applies. *Clark*, 460 F.3d at 1177; *Sarver*

*v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004); *Swoager v. Credit Bureau of Greater St. Petersburg*, 608 F. Supp. 972, 975 (M.D. Fla. 1985); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

In an unreported case, the California Court of Appeal has applied 15 U.S.C. § 1692k(c) and Cal. Civ. Code § 1785.25(g) congruently. *See, e.g.*, *Antich v. Capital Accounts, L.L.C.*, No. B313167, 2023 WL 4758493, at *4 (Cal. Ct. App. July 26, 2023) (unreported). In deciding to set aside a default judgment against the defendant, the Court found that the defendant established a meritorious defense and set forth a "legally and factually tenable bona fide error defense under the FDCPA and CCRAA," where it: "(1) maintained a credit reporting system that screens out any account that has a zero balance, (2) maintained procedures to avoid credit reporting a debt that had already been paid, (3) had a procedure to delete an account if Capital was informed that the debt has been paid or settled, and (4) maintained a system wherein any zero-balance account that was previously credit reported triggered a "DA" (delete account) code to be sent to all consumer credit reporting agencies." *Antich*, 2023 WL 4758493, at *4-5.

NCS employs detailed and robust procedures to ensure the accuracy of account handling and to prevent the type of error Plaintiff alleges. SUF 15; Green Decl. ¶¶ 8–75. For REEP-managed properties such as Parc 410, Kristin Muse testified that she was personally contacted by Miguel Alvarado when accounts were ready, traveled onsite to collect the files, and verified that each included a lease, application, and final account statement showing a balance due. Files with negative balances were rejected, and only approved files were sent via FedEx to NCS's new accounts department. Muse Dep. 17:7–18:10; 35:16–36:22; Green Decl. ¶¶ 39–40.

NCS's intake policy requires manual review and entry of new accounts—especially paper submissions—into the WinDebt system, which immutably logs account activity. Green Decl. ¶¶ 23–24, 50; Sapp Dep. 38:20–39:18. The system automatically sends an acknowledgment email within 24 hours to the creditor,

requesting confirmation of the account's accuracy. Unless corrections are submitted, confirmation is presumed by both parties. Green Decl. ¶¶ 21–22; Sapp Dep. 44:18–46:7, 60:6–18. If an acknowledgment fails, the system generates an alert—but no such alert occurred here. Green Decl. ¶ 49; Sapp Dep. 49:1–51:25.

Clients are contractually required to certify accuracy upon placement and to report subsequent changes. Green Decl. ¶¶ 16–18, 45–46. Communications and disputes are logged contemporaneously, and all consumer disputes are promptly coded, investigated, and corrected if warranted. Green Decl. ¶¶ 27–32, 58–61. Had NCS received the alleged May 2021 email, it would have been documented in the account notes—but no such entry exists. Green Decl. ¶¶ 27, 50, 75; Exh. C.

Oversight of compliance is led by Ron Sapp, General Counsel Jonathan Green, and dedicated staff. Green Decl. ¶¶ 1–2; Sapp Dep. 44:4–14. At intake, NCS confirms balance amounts and responsible party information, and halts collection if a creditor later reports the balance was invalid or paid. Green Decl. ¶¶ 24, 40–43, 58–61; Sapp Dep. 60:1–5, 66:6–69:4. These safeguards are supported by regular training, audits, and enforcement mechanisms. Green Decl. ¶¶ 10–14, 33–36, 43–49, 57–61, 76–79.

Plaintiff's claim centers entirely on the non-receipt of an email allegedly sent by REEP to notify NCS that the debt had been paid. But the undisputed evidence confirms that NCS never received such an email, nor any notice triggering a duty to correct. REEP certified the balance at placement and failed to follow the required secure process to report any change. Green Decl. ¶¶ 17–20, 45, 65–67, 70.

When Plaintiff submitted a formal dispute through Equifax in May 2023, NCS promptly flagged the account, conducted an investigation, confirmed payment, and submitted the tradeline for deletion. ECF 33 ¶6, p.2; SUF 14. These facts show the reporting was based on certified information and, at worst, a bona fide error—satisfying the first two prongs of that defense.

Additionally, NCS's written client agreements require identity and balance verification, and its dispute resolution protocols are designed to catch and correct

errors quickly. Because NCS never received notice of payment before the tradeline was reported, Plaintiff's FDCPA and CCRAA claim fails even if the debt were in fact paid, as the record supports a complete bona fide error defense.

### T. **Plaintiff's Argument: NCS Has Not Proven Its Bona Fide Error Defense As A Matter Of Law.**

#### 1. *NCS Bases Its Arguments On Information Not Disclosed In Response To Interrogatories*

NCS provides over three pages of argument and evidence about the bona-fide-error defense, basing it largely on declaration testimony from Jonathan Green, NCS's General Counsel. (Mot. at 47-50.) Whatever NCS might use to support that defense is too little, too late, however, because it did not reveal any of the facts underpinning its defense when Plaintiff asked.

In Interrogatory No. 23, Plaintiff requested:

> State with particularity all facts supporting YOUR contention that YOU made a "bona fide error" with respect to the ACCOUNT, as alleged in the 12th Affirmative Defense of YOUR Answer to the First Amended Complaint in this action, filed on August 7, 2024.

Sep. Stmnt ¶ 78.

NCS responded with boilerplate objections along with a non-substantive answer that contained none of the facts on which it now relies. Sep. Statement ¶ 79. NCS never supplemented this response with any of the material it now presents in support of its Motion. The Court should therefore decline to consider this new material under Rule 26(e) and Rule 37(c)(1), and should consider only the interrogatory response as the factual basis for the bona-fide-error defense.

NCS will no doubt respond that Plaintiff did not seek to compel a substantive answer to this Interrogatory, but that is no excuse for NCS's sandbagging. Courts have long held that Rule 37(c)(1) exclusion need not be preceded by a motion to compel. *Silver State Broad., L.L.C. v. Bergner*, 705 F. App'x 640, 641 (9th Cir. 2017)

("[B]ecause Rule 37(c)(1) establishes an automatic exclusion sanction for violations of that rule, Mr. Bergner did not need to move to compel disclosure before seeking sanctions."); *Krause v. Hawaiian Airlines, Inc.*, No. 2:18-cv-00928 JAM AC, 2019 WL 13225251, at *4 n.2 (E.D. Cal. June 7, 2019) ("Litigants are not required to bring a motion to compel disclosure before seeking the sanction of exclusion."). The Court should therefore reject NCS's improper attempt to pad the record after discovery has closed, and not consider any of this undisclosed evidence in support of NCS's bona-fide-error defense.

### 2. There Are Genuine Issues Of Material Fact As To Bona Fide Error

A defendant can invoke the defense of bona fide error only by proving as a matter of law that, even if its "mistakes were unintentional, BYL can only escape liability if its policies were (1) 'reasonably adapted to avoid the error' and (2) actually maintained." *Gao*, 2022 WL 294749, at *5 (quoting *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005–06 (9th Cir. 2008)). Because this is an affirmative defense, NCS bears the burden of proof. *Carrera v. Allied Collection Servs., Inc.*, 743 F. Supp. 3d 1210, 1226 (D. Nev. 2024), *amended on reconsideration in part*, No. 2:22-cv-01604-GMN-DJA, 2025 WL 842948 (D. Nev. Mar. 17, 2025).

NCS has not met the elements of the bona-fide-error defense as a matter of law. First, it cannot maintain such a defense because it staunchly claims it made no errors in handling Plaintiff's account. Sep. Stmnt ¶¶ 76–77. If there is no error, how could it then be bona fide? It cannot, so the defense fails at the threshold.

Second, NCS claims to have "detailed and robust" procedures in place to prevent errors like those Plaintiff alleges, but all it really does is accept the account from the original creditor, begin collecting, and wait for someone to state it is doing something wrong. On the whole, NCS' claims to have reasonable procedures is countered by evidence that undisputedly Plaintiff did not owe the debt, and REEP told NCS that, but NCS's "set it and forget it" approach to collection is designed so

1    that it would never learn of a problem like Plaintiff's until she disputes with a credit

2    bureau. But NCS knew (or there are at least fact issues as to whether it knew) or

3    should have known of the inaccuracy, before it reported the debt even the first time,

4    NCS has no real process to verify accounts without an FCRA credit dispute being

5    filed.

6         While NCS claims to have confirmed with REEP that the balance was correct

7    and owing, it has no record of that communication. Sep. Stmnt ¶ 3. REEP denies

8    receiving any verification request. Sep. Stmnt ¶ 3. REEP did produce, however, an

9    email to NCS in which REEP advised NCS that there was no balance owed and to

10   cease collecting on the account. Sep. Stmnt ¶ 25-27. And as NCS's Corporate

11   Representative testified, anything NCS did regarding account onboarding and

12   collection was only "up front," i.e. despite years of credit reporting passing, there

13   was no ongoing communication with anyone about the status of the account. Sep.

14   Stmnt ¶¶ 58-68. Plaintiff produced evidence that directly contradicts NCS's claims

15   of account verification and the usefulness of its processes. The court cannot weight

16   the reasonableness of those processes on summary judgment, and issue is best left

17   for the jury to determine. *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147,

18   1157 (9th Cir. 2009) ("We have held that 'summary judgment is generally an

19   inappropriate way to decide questions of reasonableness because the jury's unique

20   competence in applying the reasonable man standard is thought ordinarily to preclude

21   summary judgment.'"); *see Engelen v. Erin Capital Mgmt., LLC*, 544 F. App'x 707,

22   709 (9th Cir. 2013) (reversing entry of summary judgment on bona-fide-error

23   defense because a reasonably jury could return a verdict for plaintiff); *Tourgeman v.

24   Collins Fin. Servs., Inc.*, No. 08-cv-1392-CAB (NLS), 2015 WL 11613279, at *4

25   (S.D. Cal. May 12, 2015) ("Again, whether these procedures were 'reasonably

26   adapted' to avoid the misidentification of the original creditor in the state-court

27   complaint is an issue for the jury."); *Riley v. Giguiere*, No. S-06-2126 LKK/KJM,

28

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

2008 WL 436943, at *7 (E.D. Cal. Feb. 14, 2008) (reserving question of reasonableness of processes in support of bona-fide-error defense for jury).

What is more, NCS has not shown as a matter of law that its processes were actually maintained. Everything about plaintiff's account suggests they were not: acceptance of an account that was already paid, no acknowledgment email to Reep, no proof that anyone in Georgia ever looked at the account, and no response to Reep's account closure email in May, 2021. All NCS can prove it really does is accept the account and begin collecting. taking no active steps to confirm the account with the original creditor over time.

Additionally, regarding the cancellation email sent to Ms. Muse (Sep. Stmnt ¶ 25), REEP denies that NCS ever instructed it that account closure emails had to be provided through a portal and only to certain individuals at NCS. Sep. Statement ¶ 10. In fact, there was no portal in existence. *Id.* NCS cannot produce any written procedures on this, and did not do so in discovery. NCS also had no procedures for its sales staff in San Antonio to record account cancellation emails. Kristin Muse had never been trained on it, and indeed had no way of even logging into the main collections system, to which she was not connected. Sep. Stmnt ¶ 69-73. Given their relationship, it is foreseeable that REEP's representative, Miguel Alvarado, would send a cancellation email to Kristin Muse, his main contact and admitted "go to" person at NCS in San Antonio. Sep. Stmnt ¶ 10.

Given this contrast in evidence as to some issues and lack of evidence as to others, the Court should conclude that genuine issues of material fact exist as to NCS's bona-fide-error defense, making summary judgment on that defense inappropriate.

### U.    Defendant's Reply: NCS's Bona Fide Error Defense Is Well-Supported By Its Procedures and Complete Lack of Notice

NCS's bona fide error defense is well-supported by its documented,

reasonable procedures and the complete lack of corrective notice from Plaintiff or REEP. As detailed in RPSMF ¶¶ 54–58, 69–73, NCS required upfront certification from clients, maintained protocols for updates and disputes – specifically to prevent these types of issues - and had no notice of any error before May 2023. REEP never recalled the account or responded to verification efforts, and Plaintiff did not dispute the debt until years later (RPSMF ¶¶ 25–28, 63–75).

Plaintiff's claim that NCS failed to disclose its defense facts is baseless—those facts were disclosed through deposition and declarations and directly tied to the discovery record. Unlike the cases Plaintiff cites, NCS had no reason to know of an error. Without a dispute by Plaintiff or proof of NCS's receipt of communications from REEP requesting recall (for which there is no such proof), summary judgment on bona fide error remains appropriate.

## V.    Defendant's Argument: Plaintiff's FDCPA and CCRAA claims are time-barred.

Under Cal. Civ. Code § 1785.33, a CCRAA claim must be filed within two years of the date the plaintiff knew or should have known of the violation. Plaintiff testified that she became aware of the NCS tradeline in May 2021, yet she did not file suit until August 2023—more than two years later. ECF 33, ¶ 3. Her own admission triggers the start of the limitations period. *See Gorman*, 584 F.3d at 1155 (limitations period under the CCRAA begins when the consumer becomes aware of the disputed reporting).

Even assuming a continuing reporting theory, there is no evidence that NCS took any further affirmative action after initial reporting in 2021, and Plaintiff concedes she had no communication with NCS until May 2023. *Maloy v. Phillips*, 64 F.3d 607 (11th Cir. 1995), the clock starts at the last act by the furnisher—here, initial placement and reporting.

The FDCPA claim is also barred. The FDCPA has a one-year statute of

limitations from the date of the alleged violation. 15 U.S.C. § 1692k(d). The Supreme Court in *Rotkiske v. Klemm*, 140 S. Ct. 355, 357 (2019), held the clock begins when the violation occurs—not when the plaintiff discovers it. Because NCS's last act of reporting occurred in 2021, and Plaintiff filed suit in 2023, her claim is untimely. Accordingly, both the CCRAA and FDCPA claims are barred by the applicable statutes of limitation. Summary judgment is appropriate.

### W.    Plaintiff's Argument: NCS Has Not Shown That Plaintiff's Claims Are Time Barred

#### 1.    NCS Has Waived Any Statute of Limitations Defense

Defendants must plead affirmative defenses with the same degree of specificity as the claims of a plaintiff, so that the plaintiff has fair notice of what she faces in litigating those defenses. NCS pleaded its limitations defense in the most-conclusory manner possible, stating:

> AD 22. As a separate alternative affirmative defense to the Complaint, NCS alleges that Plaintiff's claims may be barred by any or all of the affirmative defenses contemplated by Rule 8(c) of the Federal Rules of Civil Procedure including, but not limited to, estoppel, failure of consideration, laches, *statute of limitations* and waiver. The extent to which Plaintiff's claims may be barred by one or more of said affirmative defenses, not specifically set out herein, which cannot be determined until NCS has had an opportunity to complete discovery. Therefore, NCS incorporates all said affirmative defenses as if fully set forth herein.

ECF 39 at 7 (emphasis added). There is no substance at all to these statements, and nothing to clue Plaintiff in as to what NCS intended to present as a limitations defense. It does not state which statute's limitations period it is referring to, when the time began running, or what triggered the clock to start. Without such factual allegations, Plaintiff is deprived of the fair notice as to the underpinnings of the limitations defense. Courts in this Circuit have rejected this manner of pleading, and this Court should as well, and conclude NCS has waived the defense by failing to

1  adequately plead it.[6]

2  ## 2.  *Plaintiff's Claims Are Not Time-Barred*

3      Defendant gets the facts and the law wrong on the statute of limitations. Oddly,

4  Defendant posits that the statute of limitations runs from May, 2021, *before* NCS

5  even began violating the law with inaccurate credit reporting, which of course, is

6  impossible. NCS started its inaccurate credit reporting to four different credit

7  reporting agencies on July 13, 2021, and continued reporting for another two years

8  and a total of 80 times.

9      Plaintiff first learned of NCS' credit reporting (to Trans Union at least) on

10 August 7, 2021, when she pulled her credit report via her bank app., and realized

11 NCS was reporting a derogatory collection account. Sep. Stmnt ¶ 36. Plaintiff filed

12 suit on August 16, 2023. ECF 1. The CCRAA statute of limitations is "two years

13 from the date the plaintiff knew of, or should have known of, the violation of this

14 title."  Thus, plaintiff can recover for any violations occurring or discovered from

15 August 16, 2021 forward. There were 75 such violations. Sep. Stmnt ¶ 36. The only

16 violations outside the default two-year period were on 7/13/21, 7/18/21, 8/1/21,

17 8/8/21, and 8/15/21. Sep. Stmnt ¶ 36. Plaintiff seeks recovery for those violations

18 under the continuing violations tolling doctrine.

19     Likewise, on the FDCPA claim, Plaintiff can recover for all violations

20 occurring from August 16, 2022 forward, under the one-year statute of limitations.

21

22 _____

23 [6] *Eritrean Ass'n of Greater Seattle v. Gebrekidan*, No. 3:24-cv-05517-DGE, 2025 WL 447780, at
   *2 (W.D. Wash. Feb. 10, 2025) ("'[A] party's mere reference to a legal doctrine or statutory
   provision without specifying the legal grounds and setting forth the elements of the defense does

24 not provide sufficient notice.'") (quoting *Guirguis v. U.S. Bank Nat'l Ass'n as Tr. for GSR Mortg.
   Loan Tr. 2006-4F Mortg. Pass-Through Certificate Series 2006-4F*, No. C18-1456-JCC, 2021 WL

25 779111, *2 (W.D. Wash. Mar. 1, 2021); *see also N. Bay Credit Union v. MRB Direct, Inc.*, No.
   2:24-cv-00212-MMD-CSD, 2025 WL 1447635, at *5 (D. Nev. May 19, 2025) (striking multiple

26 affirmative defenses where "there are no factual allegations supporting these defenses in the
   Answer, nor can the Court determine what Defendants might mean by these defenses from

27 reviewing the rest of the Answer and counterclaims") (citation omitted); *Kohler v. Staples the Off.
   Superstore, LLC*, 291 F.R.D. 464, 470 (S.D. Cal. 2013) (finding "'barred by the applicable statute

28 of limitations'" insufficient, and striking the defense).

1  There are 41 such violations.  Plaintiff seeks recovery for the remaining 39 earlier
2  violations on a continuing violations theory.

3      Courts—including this one—interpreting the FCRA and CCRAA have held
4  that each transmission of inaccurate information creates a separate cause of action,
5  and so triggers a new limitations period. *Rogers v. Equifax Info. Servs. LLC*, No. CV
6  14-1708-JFW AGRX, 2015 WL 467408, at *7 (C.D. Cal. Jan. 13, 2015) (holding
7  "the Court concludes that Rogers has raised genuine issues of material fact as to
8  whether Chase committed new CCRAA violations in 2013 by re-furnishing
9  information to Equifax that it knew or should have known was incomplete or
10 inaccurate"); *Kirsten v. Ocwen Loan Servicing, LLC*, No. 2:13-cv-01215 JAM-KJ,
11 2013 WL 5315577, at *4 (E.D. Cal. Sept. 20, 2013) ("However, according to the
12 allegations, Defendant furnished information to CRAs several times with the earliest
13 alleged violation being in 2010 and the latest in 2013. Because Plaintiff filed his
14 claim on May 6, 2013, only transmissions of information before May 6, 2011, are
15 time barred."); *Whitesides v. Equifax Credit Info. Servs.*, 125 F. Supp. 2d 807, 812
16 (W.D. La. 2000) (holding that "each transmission of the same credit report is a
17 separate and distinct tort to which a separate statute of limitations applies").

18     NCS does not cite a single case supporting its argument that Plaintiff's claims
19 would be time-barred from May, 2021, before any violations even occurred. Plaintiff
20 cannot be held to have "discovered" violations that have not occurred yet. She has
21 two years to sue, at a minimum, from the date of each violation.

22     NCS barely touches the continuing violations doctrine (Mot. at 55), which
23 courts have applied to toll the limitations period in FDCPA and CCRAA cases. As
24 one court explained in discussing the doctrine in an FDCPA case:

25
26     The key is whether the conduct complained of constitutes a continuing
       pattern and course of conduct as opposed to unrelated discrete acts. If
27     there is a pattern, then the suit is timely if "the action is filed within one
       year of the most recent date on which the defendant is alleged to have
28     violated the FDCPA"[,] and the entire course of conduct is at issue.

*Joseph v. J.J. Mac Intyre Cos., L.L.C.*, 281 F. Supp. 2d 1156, 1161 (N.D. Cal. 2003) (citation omitted). Plaintiff's claim here undoubtedly reflects a continuing pattern of conduct—NCS's reporting of the inaccurate tradeline across two years, with 80 separate and identical reporting events. NCS hopes to brush all this away by claiming "there is no evidence that NCS took any further affirmative action after initial reporting in 2021" (Mot. at 55), but that is incorrect. NCS took the affirmative step of reporting the account to four CRAs every month for two years. If that is not a continuing pattern of conduct, it is difficult to imagine what would be. The Court should conclude that NCS has failed to carry its summary judgment burden on limitations as to Plaintiff's CCRAA claims.

NCS fares no better on Plaintiff's FDCPA claims. NCS argues that "[b]ecause NCS's last act of reporting occurred in 2021, and Plaintiff filed suit in 2023, her claim is untimely" because the 2023 filing date falls outside the FDCPA's one-year limitations period. Mot. at 55. NCS apparently believes that the only act to which liability may potentially attach is the first time it reported the tradeline to the CRAs. What it thinks about the other 79 months the tradeline showed up on Plaintiff's credit is a mystery. Fortunately, courts have solved that mystery—each time NCS reported the tradeline is a violation of the FDCPA, just as with the CCRAA.

The Ninth Circuit has agreed with the Fourth, Sixth, Seventh, Eighth, and Tenth Circuits that "every alleged FDCPA violation triggers its own one-year statute of limitations as provided in § 1692k(d)." *Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1040 (9th Cir. 2023). Thus, at best for NCS, it can trim from 79 the number of actionable FDCPA violations, but it cannot make Plaintiff's FDCPA claims go away entirely, because it reported the tradeline multiple times between August, 2022 and August, 2023. Sep. Stmnt ¶ 32-34. Since there are certainly viable claims for violations within the one-year period, all of Plaintiff's claims are not time-barred. Plaintiff is also entitled to tolling under the continuing violations doctrine, for the FDCPA claim, thus making all 80 instances of credit reporting actionable.

1

2

## X.    Defendant's Reply: Plaintiff's Claims Are Time Barred Because NCS Did Not Report a New Tradeline 80 Separate Times

3      Plaintiff's claims are time-barred. NCS did not report a new tradeline 80

4  separate times—it merely maintained the same tradeline originally reported in July

5  2021, with no material changes, and Plaintiff did not challenge it until 2023. Courts

6  have held that passive maintenance of previously furnished information does not reset

7  the limitations period. *See Clark v. Green Tree Servicing L.L.C.*, 69 F. Supp. 3d 1203,

8  1225 (D. Colo. 2014); *Larson v. Ford Credit*, No. 06-CV-1811 (JMR/FLN), 2007 WL

9  1875989, at *5 (D. Minn. June 27, 2007); *Mills v. Equifax Info. Servs., LLC*, 2019

10  WL 5064699, at *3 (W.D. Ky. Oct. 9, 2019).

11      The continuing violation doctrine does not apply where the same static

12  tradeline is simply re-reported without new actionable conduct. *See Broccuto v.*

13  *Experian Info. Sols., Inc.*, No. 3:07CV782-HEH, 2008 WL 1969222, at *3 (E.D. Va.

14  May 6, 2008); *Young v. LVNV Funding L.L.C.*, No. 4:12CV01180 AGF, 2013 WL

15  4551722, at *6 (E.D. Mo. Aug. 28, 2013). Plaintiff does not even have consumer

16  reports from this time-frame to show separate instances of – or any changes to – the

17  reporting – merely NCS's testimony that it maintained the same tradeline with the

18  same information. Accordingly, any claims based on alleged violations prior to

19  August 16, 2022 (FDCPA) or August 16, 2021 (CCRAA) are time-barred. Here,

20  where the furnishing began before these dates, Plaintiff's claims are fully time-barred.

21  ## IX.    Conclusion

22  ***A.    Defendant's conclusion***: Because Plaintiffs cannot show that NCS acted in a

23  manner violating the FDCPA or CCRAA, or that NCS acted in any way unreasonably

24  or in violation of the law, NCS is entitled to summary judgment in their favor.

25  ***B.    Plaintiff's conclusion***: The motion should be denied due to disputed issues of

26  material fact and a failure to shift the burden of proof on the evidence.

27

28  Dated: June 5, 2025                    Respectfully submitted,

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Katrina DeMarte*

Katrina DeMarte (CO Bar: 43135,
MI Bar: P81476; GA Bar: 821011)
DeMarte Law, PLLC
39555 Orchard Hill Place
Suite 600 / PMB 6338
Novi, MI 48375
Tel: 313-509-7047
katrina@demartelaw.com

Jeffrey Alan Paris
State Bar No. 113527
PARIS and PARIS, LLP
11901 Santa Monica Blvd.
Suite 517
Los Angeles, CA 90025
(310) 392-8722 – Telephone
(310) 392-1768 – Telecopy
PandP424@aol.com

*Counsel for Defendant National
Credit Systems, Inc.*

NOTICE OF MOTION FOR SUMMARY JUDGMENT, AND JOINT MEMORANDUM

<u>CERTIFICATION OF COMPLIANCE</u>

The undersigned, counsel of record for Defendant National Credit Systems, Inc., certifies that this brief contains 19861 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 5, 2025                      Respectfully submitted,

*/s/ Katrina DeMarte*
Katrina DeMarte (CO Bar: 43135,
MI Bar: P81476; GA Bar: 821011)
DeMarte Law, PLLC
39555 Orchard Hill Place
Suite 600 / PMB 6338
Novi, MI 48375
Tel: 313-509-7047
katrina@demartelaw.com

# CERTIFICATE OF SERVICE

I certify that on June 5, 2025, a copy of the foregoing was filed and served electronically in the ECF system.  Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Dated: June 5. 2025

By:   */s/ Katrina DeMarte*
Katrina DeMarte