# EXHIBIT 2-A

# **Expert Rebuttal Report**

**Lisa Krejci v. National Credit Systems, Inc.**

**Civil Action No.: 2:23-cv-6709-MEMF (RAOx)**

**April 22, 2025**

**James Droske**

I, James (Jim) Droske, have been retained by the Defendant National Credit Systems Inc.'s (NCS) counsel to provide an Expert Witness Rebuttal Report in the matter of **Lisa Krejci v. National Credit Systems, Inc., Civil Action No.: 2:23-cv-6709-MEMF(RAOx), United States District Court, Central District of California.**

While I have reviewed all the documents listed in <u>**Exhibit C**</u>, I reserve the right to amend my opinions and provide additional opinions if I am presented with additional information, or documents through discovery or testimony.

It is my understanding that individuals may be deposed and additional documents may be provided from potential credit grantors in this matter and therefore, I may write a supplement expert report and amend or add to my opinions if necessary.

## <u>QUALIFICATIONS</u>

My name is Jim Droske. I have 32+ years of experience in mortgage lending, auto lending and other credit related industries.

I originated mortgage loans for approximately 8 years and was Vice President and co-owner of a mortgage company.

I worked in the auto finance industry for 12 years and was both directly and indirectly responsible for helping customers obtain credit to finance their vehicle purchases.

For more than a decade I have run a credit repair company that assists consumers in reviewing credit reports and correcting inaccuracies.

The details of my experience, training, and qualifications are provided in my curriculum vitae, see attached <u>**Exhibit A**</u>.

The following is a summary of my background, and the approximate dates of my experience most relevant to this engagement.

### A) Employment

*1) Mortgage Origination*

I hold an NMLS license registration (Nationwide Multi-State Licensing Service) to originate mortgage loans in the State of Illinois.

My NMLS ID number is 1965769. My current employer for mortgage loan origination is Cross Country Mortgage.

I worked as a mortgage broker from 2002-2010 (approximately 8-9 years).

From 2002 until 2006 I was employed at Enterprise Mortgage in Oak Brook, Illinois and, during most of that period, I was the branch manager of their Naperville, Illinois location.

While a branch manager, I managed between 12 and 20 loan officers at any given time and continued to originate my own loans.

My general responsibilities include reviewing the mortgage applicant's credit reports from all three of the major consumer reporting agencies or "CRAs" (Experian, TransUnion, Equifax). While I did not make underwriting decisions myself, I would analyze the consumer's credit to anticipate if they would fit into a particular lender's requirements for financing.

For loan applications that required submission through an AUS or Automated Underwriting System (explained below), I would oversee the submission process for all loan applications by either personally entering the application into the AUS or reviewing the AUS Findings when required.

My experience includes assisting applicants in obtaining prime conventional loans, jumbo loans, FHA loans, second mortgages, and subprime mortgages.

From 2006 to 2010, I was the co-owner and Vice President of Impact Home Mortgage in Downers Grove, Illinois.

As a co-owner of this mortgage company, I oversaw the day-to-day activities of the business and managed a staff of 4-8 loan officers.

I reviewed the credit reports for applications that were processed by Impact Home Mortgage during this four-year period. I conservatively estimate that I have reviewed more than 2,000 consumer Tri-Bureau credit reports from TransUnion, Experian, and Equifax in connection with mortgage applications.

When applications were submitted using the AUS, I personally submitted most of those applications through one of two platforms: Desktop Underwriter or "DU," Fannie Mae's platform, or Freddie Mac's similar platform known as Loan Prospector, which is now called Loan Product Advisor ("LPA").

I trained new loan officers on how to read and understand credit reports, and how to submit information through the LPA or DU platforms.

Based on a review of the consumer's credit reports and other information, I would help determine which of the 10 to 15 lenders our company worked with would likely consider approving the loan transaction.

As a result of my experience in the mortgage industry, I am familiar with the lending guidelines of various mortgage originators.

*2) Automobile Industry*

Prior to my experience in the mortgage industry, I was a manager in the automobile industry for approximately 12 years, from 1990 to 2002.

A major focus of my duties involved the review of consumer credit reports for the purpose of obtaining financing for consumers to purchase vehicles.

From 1990 to 1996 I was the Finance Director of Jerry Gleason Chevrolet in Forest Park, Illinois. In that role I was responsible for obtaining financing and facilitating the sale of roughly 250 to 350 vehicles per month.

At any given time, the dealership had 6 to 8 different lending sources available as financing options for consumers.

The lending criteria ranged from prime rate financing for consumers with excellent credit to subprime financing for consumers with poor credit.

I would review the consumer's credit reports to assess their credit worthiness, based on the contents of the credit report and many other factors, and then try to present different options for the consumer to consider for financing their purchase.

Credit reports and credit scores had a significant impact on the lending terms available to each consumer.

I tried to help each consumer obtain financing by matching them with the best possible loan terms from the lender most likely to approve them based on their credit score and other factors affecting the likelihood of repayment.

Of the 12 years I was in the automobile industry, I worked as the Finance Director for 7 years and Subprime Finance Director for part of 1 year.

The other 4 years were spent in other management capacities including General Sales Manager and Sales Manager.

I reviewed thousands of consumer credit reports during my years in the automobile industry.

I can conservatively estimate that I reviewed over 10,000 consumer credit reports during these 12 years in connection with the financing of vehicle purchases.

### 3) Credit Restoration

Illinois Credit Services is a credit repair company operating in Plainfield, Illinois.  It is registered with the Illinois Secretary of State as a Credit Repair Organization and was incorporated in May 2009.

In approximately 2011, I became the President of Illinois Credit Services and took over management of the day-to-day activities of that business.

Illinois Credit Services is not a debt settlement company or a debt management company but instead works with consumers to challenge unverifiable information found on credit reports and work to ensure their credit report is accurate.

Reviewing consumer credit reports from various sources is part of my day-to-day activities at Illinois Credit Services.

This review includes but is not limited to, analyzing consumer credit reports from the three primary CRAs (TransUnion, Experian, and Equifax) and identifying adverse information that may be inaccurate.

Approximately 80% of our new clients come from referrals by mortgage loan officers, realtors, automobile dealers and past clients.

## B) Certifications and Training

I have over 150+ hours of training and multiple certifications on subjects that include, but are not limited to, credit and credit scoring, mortgage loan origination, automotive lending, and expert witness work.

I have received a certification from the American Bankers Association for their course on "Fair Credit Reporting Act for Compliance Professionals."

Most recently, I have completed 20 hours of mortgage education from Mortgage Educators and Compliance, and in 2020 I passed the mortgage loan originators test through NMLS (Nationwide Muti-State Licensing Service).

Over the years, I have continued to attend seminars, summits, conventions, and various educational and training events that have contributed to my knowledge in the areas of mortgage lending and credit reporting issues.

## C) Publications

A list of publications and articles which I have contributed to are listed in attached **Exhibit B**.

## D) Presentations and Academia

I have given more than 100 presentations on credit, credit scoring, and the role of credit in the mortgage lending industry and the home buying process.

These presentations have generally been given to mortgage loan originators, realtors, and consumers.

I created a course on credit and credit scoring for mortgage loan originators for Falcon Innovations – a NMLS Continuing Education Provider.

I was appointed a Lifelong Learning instructor at the College of Dupage in 2013, and I typically instruct one or two classes each quarter, on credit, credit scoring, and the process of obtaining a mortgage and purchasing a vehicle.

These classes are non-credit hour classes, are open to the public, do not require enrollment in the college and offered as determined by the college.

I graduated from the University of Illinois at Chicago in 1988 with a bachelor's degree with a dual major in Management and Marketing.

## E) Expert Witness Retentions in the Last Four Years

- *Zepherine Miller v. National Credit Systems Inc.,* (Case No.: 1:23-cv-2620-NYW-MEH) (U.S. District Court for the District of Colorado)
- *Casselman and Chafee (formerly known as McClure) v. Lithia of Missoula II, LLC and Toyota Motor Credit Corporation,* (Case No.: 9:23-cv-00141-DLC-KLD) (U.S. District Court for the District of Montana Missoula Division)
- *Reilley v. Lithia of Missoula, Inc., dba Lithia Chrysler Jeep Dodge of Missoula, and Horizon Credit Union* (Case No.: DV-23-678-Dept. No. 2) (Missoula County Fourth Judicial District Court)
- *Horowitz v. Chex Systems, Inc., and Bank of America, N.A.,* (Case No.: 8:22-cv-02002-DFM) (U.S. District Court, Central District of California, Southern Division)
- *Ballard and Ballard, individually and on behalf of all others similarly situated v. Citadel Servicing Corporation,* (Case No.: 8:22-cv-01679-FWS-ADS) (U.S. District Court Central District of California)
- *Estrada v. Conn Appliances, Inc.,* (Case No.: 01-21-0003-7369) (American Arbitration Association)
- *Castillo v. Castillo (*Case No.: 19-CIV-02631) (Superior Court of California, County of San Mateo, Unlimited Jurisdiction)
- *Paniagua v. Milestone Financial, LLC et al.,* (Case No.: CGC-18-571279) (Superior Court of the State of Cailfornia, County of San Francisco)
- *Bethancourt, et al. v. Bates, et al.,* (Case No.: 834-218) (24th Judicial District Court for the Parish of Jefferson, State of Louisiana)
- *LaCour v. Credit Collection Services, Inc.; Equifax Information Services, LLC and TransUnion, LLC (*Case No.: 5:22-cv-65-JGB-SHK) (U.S. District Court Central District of California)

- *Kotoch v. Toyota Motor Credit Corporation, et al.,* (Case No.: 1:20-cv-02538-JPC)
- *Jacobson v. Hyundai Capital America* (Case No.: 1:22-cv-00371) (U.S. District Court Northern District of Illinois)
- *Lentz v. Merrick Bank Corporation* (Civil Action No.: 2:22-cv-02670-CFK) (U.S. District Court for the Eastern District of Pennsylvania)
- *Brantley and Brantley v. Ally Financial* (Civil Action No.: 1:22-cv-527) (U.S. District Court Eastern District of Virginia)
- *Larocco v. Acima Credit* (Case No.: 4:21-cv-01779) (U.S. District Court Southern District of Texas Houston Division)
- *Aranda v. NMAC* (Case No.: 2:21-cv-03451-CBM) (U.S. District Court Central District of California)
- *Minor v. Citibank, N.A.* (AAA Case No.: 01-22-0002-7200)
- *Sanchez v. JPMorgan Chase Bank, N.A.* (Case No.: 2:21-cv-00896-JAT) (U.S. District Court for the District of Arizona Phoenix Division)
- *Stevan L. Denenberg v. CitiBank, N.A.* (Case No.: 3:19-cv-02063-MMA-NLS) (U.S. District Court for the Southern District of California San Diego Division)

## 1. <u>COMPENSATION</u>

I am being compensated $375.00 per hour for all work performed in this matter. I have no financial interest in the outcome of this case.

## 2. <u>SCOPE OF WORK</u>

I have been retained by Defendant National Credit Systems Inc. (NCS) to provide a rebuttal report of Plaintiff's expert, Thomas Tarter, in which he opines that NCS did not maintain nor follow reasonable industry procedures regarding the reporting of a $138.00 collection furnished to Lisa Krejci's credit reports.

In addition, I will provide a rebuttal to Mr. Tarter's allegations that NCS knew or should have known that the information NCS furnished to the national Credit Reporting Agencies (NCAs) regarding the collection assigned to NCS by PARC 410 was inaccurate.

Furthermore, I will provide a rebuttal to Mr. Tarter's allegations that Ms. Krejci suffered damages in the form of credit damages, "chilling", credit denials, credit stigma, and other alleged damages upon which Mr. Tarter opines in his report.

My opinions in this matter relate primarily to NCS' reasonable procedures and alleged damages for furnishing collection account information to the CRAs after which a collection was assigned to it by its client, PARC 410 for an account in the name of the Plaintiff, Lisa Krejci.

## 3. **DOCUMENTS REVIEWED**

The complete list of documents and information I have reviewed is listed in **Exhibit C**.

## 4. **OPINIONS AND BASIS FOR OPINIONS**

NOTE: Some of the information listed below is not intended to be a discussion of all lending guidelines and all aspects of the lending approval process but instead focuses on the aspects of the application process that are most relevant to this case.

None of the information in this report is intended to provide a legal opinion but instead it provides my opinions based on my experience, education, and training.

In this report, I will use the term "reasonable procedure" and the context of that term for the purposes of this report is not intended to be a legal opinion or provide a legal definition of the term but instead the use of the term reasonable procedure indicates my opinion of what is reasonable.

### Summary of Opinions

NCS followed standard, customary, and reasonable procedures in its attempt to furnish accurate information to the CRAs regarding the account #4589994 for $138.00 assigned to it by PARC 410.

Plaintiff was not denied credit or receive credit with adverse terms at any time when NCS furnished information to the CRAs regarding NCS account #4589994.

Plaintiff was not "chilled" from applying for credit.

## 1.  NCS Was Assigned the Account By PARC 410 on 05/04/2021

NCS requires all Clients, including PARC 410 (REEP Management, LLC), to sign a services agreement.

To reasonably ensure that the information received by NCS from its Clients is accurate and are legally owed debts, NCS includes the two following stipulations in this agreement:

1)  *"Client also warrants and represents that all accounts so placed with NCS are bona fide accounts due and owing from Debtor to Client, and that Client has all necessary and legal authority to place said accounts for collections with NCS."*[1]

(bold and italics added)

2)  *"Client agrees to only submit for collection verifiable owed amounts, which may be substantiated by applicable law and the underlying agreement/lease governing the transaction."*[2]

(bold and italics added)

PARC 410 sent Ms. Krejci's file to NCS on May 04, 2021, and as Mr. Tarter notes on page 11 of his report, PARC 410 included in that file a final account statement that shows a balance of $138.07 being owed.

## 2.  NCS Verified the Debt Was Owed with PARC 410 Before Furnishing Information to the CRAs

NCS did not simply accept the file information from PARC 410 and begin collection activities.

In fact, to ensure that the debt is correctly owed to the creditor, in this case, PARC 410, NCS verifies that the debt is owed by requiring a review of the final account statement provided by PARC 410.

---

[1] LK 260
[2] LK 261

The final account statement is the printed verification from PARC 410 stating that as of 05/04/2021, PARC 410 provided information to NCS that $138.07 was owed by Plaintiff and NCS independently verified this information to be true by reviewing the final account statement provided by PARC 410.

In the deposition of Kristin Muse, NCS Regional Sales Director, she testifies that before any file is sent to new accounts, including Plaintiff's file, the following documents are reviewed:

*"The lease contract, the application, and the final account statement."*[3]

As Ms. Muse further testifies in her deposition:

*"The final account statement will show what is owed to the community*

*at the bottom of it."*[4]

It is a reasonable procedure to review the final account statement provided by PARC 410 to ensure NCS has verified the amount of $138.07 was accurately owed by Ms. Krejci.

In fact, it is a policy that NCS independently review the final account statement before accepting any collection from its clients, including PARC 410.

In her deposition, when asked what the process is when reviewing a new file which does not have contain a final account statement for NCS to review for accuracy, Ms. Muse also testifies:

*"I wouldn't take them if they didn't."*[5]

*"You can't turn in a file that doesn't have a final account statement."*[6]

NCS did not just simply start collection activity because PARC 410 told them too.

NCS followed reasonable procedures to verify that the $138.07 debt was verifiably owed to PARC 410 by independently reviewing the final account statement provided by PARC 410 showing the balance was unpaid at the time NCS accepted the file.

---

[3] Deposition of Kristin Muse (Page 60, lines 13, 14)
[4] Deposition of Kristin Muse (Page 62, lines 7-9)
[5] Deposition of Kristin Muse (Page 64, lines 2, 3)
[6] Deposition of Kristin Muse (Page 64, lines 6-8)

### 3. NCS Sent Two Letters to Plaintiff

#### 1) NCS Letter to Ms. Krejci dated May 07, 2021

Within three (3) days of NCS accepting the file on 05/04/2021 from PARC 410, NCS mailed a letter to Ms. Krejci informing her the account has been placed for collections.

The NCS letter was mailed to:

**LISA MAE KREJCI**

**451 3RD AVE.**

**SAINT LIBORY, NE 68872-2805**

The letter also states that NCS may furnish information to the credit bureaus.

Prior to furnishing any collection information to the credit bureaus, NCS advises Ms. Krejci that she should contact NCS and the letter provides multiple ways to contact NCS including four (4) different phone numbers (a main number, two toll free numbers and a direct number to Antonio Hughes. The letter also included an address for NCS.

Although Plaintiff acknowledges receiving this letter, I have seen no evidence in this case in which Ms. Krejci contacted, or made any attempt to contact, NCS regarding the account.

Furthermore, Plaintiff contacted PARC 410 shortly after receiving this letter rather than contacting NCS as instructed.

#### 2) NCS Letter to Ms. Krejci dated June 16, 2021

On June 16, 2021, approximately 40 days after the first letter, NCS sent another letter to Ms. Krejci to the same address informing her that NCS will soon report the account information to the credit bureaus and once again advised her to contact NCS to avoid any adverse credit reporting.

NCS provided reasonable and customary notification to Plaintiff that they were going to report the account to the credit bureaus prior to furnishing the account information to any CRA.

I have not seen any evidence in this case in which Plaintiff contacted, or made any attempt to contact, NCS regarding this account after NCS mailed her those two letters.

It is my understanding that Plaintiff claims she did not receive this second letter.

If Plaintiff did not receive the second letter, which evidence shows NCS did in fact send, there is a reasonable degree of certainty that Ms. Krejci was never aware the NCS collection was reported on her credit reports at any time until she obtained a copy of her three credit reports in May 2023, approximately two years later.

Furthermore, although Plaintiff informed PARC 410 that in May 2021 she was purchasing a house, there is no evidence or inquiries that she applied for a mortgage loan on or around this time.

### 3) NCS Did Not Receive Notification the Debt Was Paid

Evidence in this case shows that NCS independently verified the $138.07 debt was unpaid with a final account statement provided to NCS by PARC 410 in May 2021. However, the debt was actually paid on 02/15/2021, unknowingly to NCS.

At no time did NCS receive information from either PARC 410 or from Ms. Krejci that the debt was paid until an indirect dispute was sent by Ms. Krejci in May 2023 to the three CRAs and then received by NCS.

Up until that point in May 2023, I have not seen any evidence in this case which shows Plaintiff ever disputed this debt in any way, either directly or indirectly, by phone, in writing, or electronically.

PARC 410 claims to have sent an email from Miguel Alvarado to Kristin Muse on May 18, 2021, to stop any collections and do not report as in collections because they are attempting to purchase a home.

As Kristin Muse testified in her deposition in this case regarding the email from Mr. Alvarado:

*"…I didn't receive an email…"*[7]

I see no evidence in this case that NCS received Mr. Alvarado's email including:

- No "read receipt" that the email was read
- No acknowledgment from NCS that the email request was received

---

[7] Deposition of Kristin Muse (Page 68, line 25, Page 69, line1)

- No response email from Kristin Muse acknowledging Mr. Alvarado's request
- The email does not display that the correct email was used for Kristin Muse

It is not reasonably possible for anyone, including NCS, to respond and act upon information which they did not receive.

To ensure that NCS collection debts are cancelled efficiently and properly, Mr. Alvarado testifies that debt cancellation requests are required to be sent to NCS through a ResMan system and that emailing Ms. Muse is not the required process to send a debt cancellation request to NCS.

When asked where it is required to send debt cancellation notices to NCS, Mr. Alvarado testifies:

***"In the Resman system, we have a dropdown box to select the collection, and that's the only one that's available. And we attach all documents, and it goes through the ResMan system."[8]***

Furthermore, Mr. Alvarado acknowledges that emailing Kristin Muse was not the proper and required way to notify NCS of the debt cancellation in this case.

When asked in his deposition if emailing Kristin Muse was NOT the proper way of notifying NCS of the debt cancellation request, Mr. Alvarado testifies:

***"Correct."[9]***

I have not seen any evidence in this case in which PARC 410 followed the reasonable procedures and policies in place to notify NCS that Plaintiff's debt was paid and cancelled.

## 4) NCS Maintains Reasonable Industry Standards and Practices

NCS maintains reasonable policies, procedures, and business practices.

---

[8] Deposition of Miguel Alvarado (Page 51, lines 1 – 4)
[9] Deposition of Miguel Alvarado (Page 51, line 20)

To ensure that NCS is following reasonable policies and procedures in their business practices, NCS implements written policies and procedures including, but not limited to the following examples:

- Policies and Procedures for **"Written Dispute Procedures"**[10]

- Policies and Procedures for **"Verbal Dispute Procedures"**[11]

- A **"F.D.C.P.A. Acknowledgment"** letter signed by employees stating
  By signing the below statement, I acknowledge that National Credit Systems, Inc. has provided training and testing regarding the Fair Debt Collection Practices Act. I completely comprehend and understand the F.D.C.P.A. and agree to abide by all federal and state regulations pertaining to third party collections. I realize that I can be held personally liable for any violations I commit. I further understand that violations of any federal or state laws pertaining to third party collections may constitute termination of my employment at National Credit Systems.[12]

- **"NCS Procedures for Account Accuracy – Summary"**[13]

- **MEMO (Client Services Department) from Management dated August 3, 2009** stating "It is the policy and strong desire of our company to only pursue collection of correct, accurate, verifiable, and legally owed debts from only those responsible for these obligations. To help in this effort, it is important that you pay close attention to charges assessed by our clients, as well as other account accuracy aspects."[14]

- **MEMO (Collection Department) from Management dated March 14, 2010** stating, among other things, "Charges assessed should be supportable by the agreement or other documentation provided by our clients."[15]

- **MEMO (Data Entry) from Management dated August 29, 2009** stating, among other things, "It is important that you are careful in this process and pay

---

[10] Bates No. 152
[11] Bates No. 149
[12] Bates No. 193
[13] Bates No. 607

[14] Bates No. 609
[15] Bates No. 610

close attention to promote accuracy. While we depend on our clients to provide
necessary and correct information to us, we need to go a step further in reviewing
what is being provided to us and speak up when you find problem areas or
unsupported charges."[16]

- **MEMO (All Staff Members) from Management dated 01/05/2007** stating,
  among other things, "Employees found to be in violation of company policies will
  be fined..." And "These penalties are an alternative to more severe consequences
  such as suspension and/or termination; however, they do not exclude these
  options."[17]

- **MEMO (All Employees) from Ron Sapp dated 08/05/2019** stating, among
  other things, "National Credit Systems Inc. is firm in its resolve to operate in a
  professional and ethical manner." And "With that said, we will not continue our
  working relationship with employees who are found to be intentionally entering
  false or inaccurate collection notes, falsifying work actions, entering inaccurate
  payments, or doing anything else that brings an individual's honesty and integrity
  into question."[18]

NCS has implemented, and continues to implement, reasonable policies and procedures
to ensure that they comply with the laws, ethics, and standards of their industry, including
furnishing account information to the CRAs.

NCS followed reasonable procedures when accepting Plaintiff's account from PARC 410
and furnishing the account to the CRAs after independently reviewing the final account
statement provided to NCS by PARC 410.

## 5) NCS Deleted Account Upon First Knowledge the Debt Was Paid

Evidence in this case shows that Plaintiff first became aware that the NCS account was
reporting to her credit reports in May 2023 as Mr. Tarter noted in the chronology of events on
page 11 of his expert report.

---

[16] Bates No. 611
[17] Bates No. 617
[18] Bates No. 623

The only way for Plaintiff to know that the NCS account was reporting on her credit reports would be to review her reports.

Evidence in this case shows that Plaintiff did not review any credit report to know that the NCS account was reported to any CRA until she first obtained her credit reports on the following dates:

- May 11, 2023, TransUnion credit report
- May 12, 2023, Experian credit report
- May 12, 2023, Equifax credit report

Approximately 10 days after first knowing about the error on her credit reports, Plaintiff wrote letters to each of the three CRAs indirectly disputing the information.

Since May 2021, there is no evidence I have seen in this case that Plaintiff ever disputed the debt either verbally or written, directly to NCS, or indirectly to the CRAs or PARC 410 until May 22, 2023, when Plaintiff filed the indirect dispute.

Upon receiving the indirect dispute information and upon first knowledge that the information furnished may be incorrect, NCS immediately followed reasonable and customary procedures in handling the dispute.

Within eight (8) days of the date of Ms. Krejci's dispute letters to the three CRAs, NCS drafted a letter dated May 30, 2023, and emailed on May 31, 2023, to Chris Singleterry, Senior Regional Manager, REEP Management.[19]

As reasonable and customary industry practices require, NCS reviewed and forwarded all supporting documents provided by Ms. Krejci with her dispute.

- In its correspondence to the original creditor, PARC 410/REEP Management, NCS stressed the importance of immediate action to ensure that the information reporting is accurate or if it should be deleted.

    *"Please understand that it is very important that the information below be reviewed and replied to as soon as possible and __no later than 06/19/2023__."*[20]

---

[19] REEP Document Production
[20] REEP Document Production (Letter dated May 30, 2023 from NCS to PARC 410)

(Italics, underline, and bold added)

- NCS requests that PARC 410/REEP Management review all of the documentation and its records and confirm if the Plaintiff owes the balance.

    ***"PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE DEBTOR OWES THE BALANCE".[21]***

    (Italics and bold added)

- On May 31, 2023, NCS receives information from PARC 410/REEP Management that the balance is not owed.

    ***"The previous resident does not owe a balance."[22]***

    (Italics and bold added)

Upon verifying the debt was paid, NCS followed reasonable industry procedures and the account was deleted from all CRAs.

### 6) The Dispute Process

While there are many aspects to the consumer dispute process to correct information a consumer believes is inaccurately reporting on their credit reports, there are general guidelines which apply in this case.

The Consumer Financial Protection Bureau (CFPB) states that Experian, Equifax, and TransUnion process more than 1.6 billion credit accounts for over 200 million adults every month[23] with approximately 10,000 – 12,000 data furnishers providing this information.

Although a data furnisher can maintain reasonable industry standards and practices and comply with all required regulations for its industry, the volume of 1.6 billion accounts maintained each month stands to reason that errors can and do exist.

---

[21] REEP Document Production ((Letter dated May 30, 2023 from NCS to PARC 410)
[22] NCS-072
[23] https://www.consumerfinance.gov/about-us/blog/report-illustrates-how-big-three-credit-reporting-companies-are-giving-consumers-the-runaround/

Federal law allows a consumer to obtain a free copy of their consumer credit reports through www.annualcreditreport.com every 12 months however, since approximately 2020, TransUnion, Experian, and Equifax have allowed consumers free access to their reports once per week.

When a consumer believes that there is inaccurate information on any one of their consumer credit reports, the consumer has the right to dispute this information through several different processes including:

- A consumer can send a written dispute to the credit bureaus (indirect dispute)
- A consumer can send a written dispute to the furnisher (direct dispute)
- A consumer often has the option to fax a dispute request
- A consumer can verbally dispute information with the credit bureaus
- A consumer can verbally dispute information with the furnisher
- A consumer can submit an electronic dispute
- A consumer can hire a third party such as a Credit Repair Organization (CRO)

There are numerous options to submit a dispute electronically through each of the CRAs websites, most credit monitoring websites, and often furnishers websites.

It is my experience that when a consumer reviews information in their credit reports and is aware that inaccurate information is reported, the consumer will typically choose one or more of the many options available to them to dispute the information.

Furthermore, in my experience when a consumer believes or feels that if any inaccurate information reported to their credit reports could adversely impact their ability to obtain new credit in any way, that consumer is more likely than not going to take appropriate steps to dispute the information, including any of the easily accessible ways listed above.

The general purpose of the consumer dispute process is to efficiently, effectively, and accurately correct inaccurate information on a consumer's credit reports, which in this case, NCS did exactly that.

## A. NCS Did Not Adversely Impact Plaintiff's Ability to Obtain Credit

## 1. Minimum Credit Score Requirements

**A) Mortgage Lending – General Guidelines**

When a Residential Mortgage Credit Report (RMCR) is obtained for a borrower, all three credit reports and scores are pulled from TransUnion, Equifax, and Experian.

The qualifying credit is the middle of the three credit scores. Meaning, the highest and lowest credit scores will not be considered, and the borrower's qualifying score is the remaining middle score.

When only two scores are delivered on a RMCR, the qualifying score is the lower of the two scores.

**Conventional Loans** – The minimum required qualifying credit score for a conventional loan through Fannie Mae or Freddie Mac is a 620.

Although I have not seen any evidence that Plaintiff applied for a mortgage loan at any time until 01/08/2024, Plaintiff's credit score of 663 on her Experian credit report dated 05/11/2023, was substantially higher than the minimum required score of 620 and therefore, **her credit score was not a deterrent in applying for a conventional mortgage.**

**Federal Housing Administration (FHA)** – The minimum required qualifying credit score for a FHA loan is typically 580 with a 3.50% down payment requirement however, FHA can be approved down to a 500-credit score with a minimum down payment of 10%.

Plaintiff's credit score of 663 was substantially higher than the minimum required score of 580 and therefore, **her credit score was not a deterrent in applying for an FHA mortgage**.

**Veterans Administration Loans (VA)** – While the VA does not have a minimum credit score requirement to apply for a VA mortgage, it is conservative to say that although there is no minimum score requirement, some lenders may require a minimum of 580 or 620 credit score.

Plaintiff's credit score of 663 was substantially higher than any minimum required score for a VA loan and therefore, **her credit score was not a deterrent in applying for a VA mortgage**.

**B) Automobile Lending – General Guidelines**

In general, automobile dealerships have a multiple number of options for lending in which they can offer to a consumer.

While Plaintiff's credit score of 663 is not in itself a deterrent to be approved for an auto loan, I agree with Mr. Tarter as he states on page 16 of his report…

> *"…any credit risk measurement involves varying degrees of professional judgment,…"*

It can be considered a concern in the auto lending process when an applicant has very limited credit experience and/or no previous auto loan experience, such as in the case of Ms. Krejci.

Meaning, the presence of a $138 collection on a credit report would generally be less of a deterrent for a new auto loan than if an applicant has limited overall credit experience and no previous auto loan history.

## 2. Providing an Adverse Action Letter

First and foremost, a consumer cannot be denied any extension of credit unless they apply for credit.

Simply put…if there is no application there cannot be a denial.

Under federal law, a lender is required to send the consumer an Adverse Action letter if a consumer is denied a loan or extension of credit and a consumer credit report was considered in the decision.

The notice must include information stating the credit score, the name of the credit bureau which provided the credit report, and the credit bureau's address.  In addition, the notice must also explain the consumer's right to obtain a copy of the credit report for free.

The Equal Credit Opportunity Act (ECOA) requires a creditor to provide the applicant with the specific principal reason for the adverse action.

When a mortgage loan application is denied, the Adverse Action notice provided to the consumer will typically also include the following:

- The description of the loan application
- The action taken
- Principal reason(s) for the denial

If Plaintiff was denied a mortgage loan application because of the furnishing of information by NCS to the credit bureaus, an Adverse Action notice would have been required to be provided to the Plaintiff.

In this case, there is no evidence that an application was ever submitted for approval by Plaintiff.

Furthermore, I have not seen or been provided any evidence or documentation that Plaintiff received an Adverse Action Notice of any kind, including a notice stating that she was denied credit at any time.

### 3.  Risk Based Pricing Notices

In general, if a consumer is approved for credit but receives adverse terms in connection with the loan approval, the creditor must provide the consumer a "Risk-Based Pricing Notice".

A Risk-Based Pricing Notice is a notice to inform the consumer that they are being offered loan terms less favorable than the loan terms being offered to other consumers.

I have not seen any evidence or documentation in this case that Plaintiff received a Risk-Based Pricing Notice of any kind, at any time while the NCS account was reported to her credit reports.

## B. The Use of Credit Reports

### 1.  Overview

A credit report is a list of a consumer's financial data compiled into a statement (i.e. report) which generally lists current and past financial obligations including loan payment history and other financial obligations.

As previously mentioned, there are approximately 12,000 – 15,000 data furnishers which furnish financial information to credit reporting agencies.

The three major consumer credit reporting agencies (CRAs) are TransUnion, Equifax, and Experian.

When a lender submits a request for a credit report, the CRAs will compile the information provided to them by the data furnishers into a credit report that can be used for a number of different purposes including new extensions of credit.

As Mr. Tarter correctly explains on page 18 of his expert report:

> ***"Once compiled, the information is given to potential authorized users for them to make a decision…"***

However, Mr. Tarter fails to point out that in the loan approval process, if a potential lender or creditor does not request a report to be compiled…the CRAs do not compile the information, and the credit report information is not seen or considered.

## 2.  Overview of FICO the Scoring Model

While the algorithms for scoring models are very complex, there are five basic categories which comprise the FICO algorithms.

1) **PAYMENT HISTORY (35% of the score)**

2) **DEBT UTILIZATION (Debt Ratios) (30% of the score)**
3) **LENGTH OF HISTORY (15% of the score)**
4) **MIX OF CREDIT (10% of the score)**
5) **INQUIRIES (New Credit) (10% of the score)**

An inquiry is when a credit report is requested from one of the CRAs and the report information is then compiled and provided to the authorized user of the report.

There are two types of inquiries:

- Hard Inquiries
- Soft Inquiries

All credit inquiries, both hard and soft, will remain on a consumer's credit report for up to 24 months.

**HARD INQUIRIES** - "Hard" inquiries are placed on a consumer's credit report when a lender accesses the consumer's credit report in consideration of an extension of credit.

All hard inquiries will remain on a consumer's credit report for a total of 24 months but only inquiries dated within 12 months will be calculated into the FICO scores.

Inquiries represent that the consumer is attempting to obtain new credit obligations.

In this case, I have reviewed multiple credit reports of the Plaintiff and I have not seen any evidence of a hard inquiry on any credit report which indicates that Plaintiff did not apply for any extension of credit from at least May 2019 through and including December 2023.

For example, Plaintiff's Equifax credit report dated Dec. 19, 2023, reports no hard inquiries:

**Hard Inquiries**

Inquiries that may impact your credit rating/score
These are inquiries made by companies with whom you have applied for a loan or credit. They may remain on your file up to 2 years.
You currently do not have any Hard Inquiries in your file.

[24](highlight added)

The fact that Plaintiff did not have any hard inquiries at any time in which the NCS account reported to her credit reports indicates that no potential lender was able to consider the collection in their lending decision, hence, the NCS could not have adversely impacted any lending decision at any time.

**SOFT INQUIRIES** – "Soft" inquires are typically when a report is reviewed for one of the following purposes:

- Account Review – reports provided to entities in which the entity has a current relationship with the consumer (e.g. in Plaintiff's case, Bank of America)
- Reports Requested by the Consumer – reports provided directly to the consumer
- Promotional Inquiries – Information received by companies so that they can provide the consumer with a firm offer of credit

---

[24] LK 078

**PROMOTIONAL INQUIRIES** –

In his expert report, Mr. Tarter opines that Ms. Krejci was not able to receive promotional inquiries due to the reporting of the NCS account.

As a result, Mr. Tarter opines that Plaintiff suffered damages because she was not able to receive promotional offers for extensions of credit.

Mr. Tarter's analysis and opinion regarding promotional inquiries is incorrect and misleading to the trier of fact.

Mr. Tarter fails to explain to the trier of fact that a consumer has the option to "opt out" of receiving promotional offers of credit.

If a consumer "opts out" of promotional offers, the consumer has made the decision that they do not want to receive any pre-approved offers, promotional offers, or pre-qualified solicitations from any company.

In his analysis, Mr. Tarter fails to note that Plaintiff had "opted out" of receiving promotional offers of credit which means Plaintiff willingly chose to be excluded from such offers for an indefinite period of time and was not denied from receiving these offers due to the NCS account, as Mr. Tarter states in his report.

After reviewing multiple credit reports in this case, Plaintiff had a history of choosing to opt out of promotional offers over an extended period of time.

According to documents provided to me in this case, there are multiple examples providing evidence that Plaintiff "opted out" of receiving promotional offers including:

**Example 1 - TransUnion credit report dated 05/11/2023:**

Consumer Credit Report for LISA M. KREJCI

## Credit Report Messages

**PROMOTIONAL OPT-OUT:** This file has been opted out of promotional lists supplied by TransUnion. (Note: This opt-out has no expiration date.) [25]

---

[25] TU 15

**Example 2 - Equifax credit report dated 01/01/2024:**

ALERT(s):        File Blocked For Promotional Purposes

                                                                                    26

**Example 3 - TransUnion credit report dated 11/09/2023:**

## Credit Report Messages

**PROMOTIONAL OPT-OUT:** This file has been opted out of promotional lists supplied by TransUnion. (Note: This opt-out has no expiration date.)

                                                                                    **27**

**Example 4 - Equifax credit report dated 04/04/2025:**

**Consumer File Notices:**
 Opted-Out of Prescreened Offers

                                    **28**

In his report, Mr. Tarter misleads the trier of fact by opining that the NCS account was the reason Plaintiff did not receive promotional offers when, in fact, evidence shows Plaintiff made a choice to opt out of receiving those offers.

In page 26 of his report, Mr. Tarter incorrectly opines the following:

> ***"Consequently, it is my opinion that because of NCS' collection account trade line credit reporting, it was foreseeable and highly likely that Ms. Krejci did not receive promotional offers or solicitations due to potential creditors criteria of not wanting to lend to a person with a past due obligation that was in a long-term collection."[29]***

(bold and italics added)

In his expert report on page 26, footnote 57, Mr. Tarter continues to exaggerate an incorrect claim of damages regarding promotional inquiries:

---

[26] LK 365
[27] TU 62
[28] LK 379
[29] Expert Report of Thomas Tarter (Page 26)

***"It is impossible to know how many pre-approved or pre-qualified solicitation offers Ms. Krejci may have received because of purchaser guidelines that excluded accounts that were in collections. Ms. Krejci never even got the opportunity to consider such potential offers and/or their value."[30]***

(bold and italics added)

The evidence in this case shows that Plaintiff would never have received a promotional offer of credit because she willingly chose to opt out from receiving these offers.

The NCS account did not, and could not, have had any effect on Plaintiff receiving or not receiving promotional offers of credit and therefore, Plaintiff did not suffer damages of credit availability and credit expectancy in this manner.

### 3.  The Dollar Amount of a Collection in the Lending Process

Any collection with a very small unpaid balance is not considered to be significant factor of a consumer's credit history and are not considered in many scoring models.

The CFPB reports that FICO Score versions 8 and later exclude collections under $100, and VantageScore versions 3.0 and later exclude collections under $250.[31]

In addition, for the most typical mortgage loan applications for conventional, FHA, and VA loans, collection accounts with a balance under $1000.00 are typically allowed to be shown as "in dispute" on the consumer's credit report.

When an account is shown as "in dispute" on a consumer's credit report, the scoring models do not consider the performance of that account in the score calculation.

Meaning, smaller balance collections such as the $138.00 NCS collection would not be considered in many scoring models because of the low balance and would not be as much of a concern to a potential mortgage lender unless the balance exceeded $1000.00

---

[30] Expert Report of Thomas Tarter (Page 26, footnote 57)
[31] https://files.consumerfinance.gov/f/documents/cfpb_market-snapshot-third-party-debt-collections-tradelines-reporting_2023-02.pdf

It is my opinion that the NCS collection for $138.07 would not be a serious concern for a mortgage underwriter.

Such a small dollar amount collection would not generally be required to be paid off as a condition of the loan approval…would generally not be required to be removed from "in dispute" status because of the low dollar amount…and would more likely than not require only a Letter of Explanation (LOE) from the borrower to document the loan file with an explanation why the collection appears on the credit report.

For a typical mortgage loan application, if the dollar amount of a reported non-medical collection is <u>larger than $1,000.00, it is not allowed</u> to be "in dispute" and must be calculated into the scoring models.

On Plaintiff's Equifax credit report dated April 04, 2025, a collection reports from CTL Management, Inc for a "rental agreement" collection opened 09/20/2023 with an unpaid past due balance of $4,142.00.

On that Equifax credit report, CTL Management is the only collection reported on Plaintiff's credit report and one of the key factors affecting the score was the high balance of $4,142.00 on this collection:



[32](highlight added)

To further explain the significant differences between how a collection of $138.00 is treated compared to $4,142.00 in the mortgage lending process, The Department of Housing and

---

[32] LK 378

Urban Development (HUD) requires that <u>only collections with a total balance of $2,000.00 or greater</u>, are required to be calculated into the borrower's debt-to-income ratios.

> **If evidence of a payment arrangement is not available, the lender must calculate the monthly payment using 5% of the outstanding balance of each collection, and include the monthly payment in the borrower's debt-to-income ratio.**[33]

(bold added)

The dollar amount of a collection can have an impact on both the credit scores and also the professional judgment used by lending professionals when assessing a credit application and credit report for loan approval.

From my many years of experience in the loan approval process, it is my experience and opinion that a collection for $138.00 would have far less concern in the consideration of a mortgage loan approval than an unpaid collection balance of $4,142.00

## 4. Collections are Not Required to be Paid Off for a Mortgage

Many typical mortgage loan guidelines do not require that collections be paid off as a condition for loan approval.

For example, the Fannie Mae Selling Guidelines do NOT require collection accounts to be paid to qualify for a Fannie Mae loan.

The Fannie Mae Guidelines state the following:

- For one-unit, principal residence properties, borrowers are not required to pay off outstanding collections or non-mortgage charge-offs—regardless of the amount.

[34]

## 5. A Collection is Not a "Significant Derogatory Events" in Mortgage Lending

---

[33] https://www.hud.gov/sites/documents/13-24ml.pdf
[34] https://selling-guide.fanniemae.com/sel/b3-5.3-09/du-credit-report-analysis#P3176

Typically, there are mandatory waiting periods in which a consumer must wait before applying for a mortgage loan after a "significant derogatory event".

For mortgage lending purposes, Fannie Mae Guidelines describe a significant derogatory event as one of the following:

Bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, short sales, and charge-offs of mortgage accounts.[35]

For Fannie Mae lending purposes, the NCS collection is not considered a significant derogatory event and would not in itself be a reason for a mortgage denial or mandatory waiting period before applying.

## C. Plaintiff was Approved for a Mortgage with an Open Collection

On 09/20/2023, CTL Management, Inc opened a new "joint" collection account against Plaintiff in the amount of $4,142.00 for collection on a "Rental Agreement".

**New Collection opened 09/20/2023:**



**CTL MANAGEMENT, INC - Closed**
9498 SW Barbur Blvd Ste 200, Portland, OR  972195423 | (503) 245-1255
Account Number: *60N1 | Owner: Joint Account
Loan/Account Type: Rental Agreement | Status: =

Date Reported: 03/31/2025 | Balance: $4,142
Credit Limit: = | High Credit: $4,480

Date Opened: 09/20/2023          Date of 1st Delinquency: 10/08/2023        Terms Frequency: =
Date of Last Activity: =         Date Major Delinquency 1st Reported: 03/04/2024   Months Reviewed: 16
Scheduled Payment Amount: =      Amount Past Due: $4,142                    Deferred Payment Start Date: =
Actual Payment Amount: =         Charge Off Amount: =                       Balloon Payment Amount: =
Date of Last Payment: 10/13/2023  Date Closed: =                            Balloon Payment Date: =
Term Duration: 1 Months          Activity Designator: =                     Narrative Code(s): 057, 267

**Payment History**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2025 | C | C | = | = | = | = | = | = | = | = | = | = |
| 2024 | C | C | = | = | = | = | = | = | = | = | = | = |
| 2023 | | | | | | | | = | = | C | C | C |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ✓ | Paid on Time | 30 | 30 Days Past Due | 60 | 60 Days Past Due | 90 | 90 Days Past Due | 120 | 120 Days Past Due |
| 150 | 150 Days Past Due | 180 | 180 Days Past Due | V | Voluntary Surrender | F | Foreclose | C | Collection Account |
| CO | Charge Off | B | Included in Bankruptcy | R | Repossession | TN | Too New to Rate | | No Data Available |

[36](highlight added)

When a new collection is opened against Plaintiff on 09/20/2023 for $4,142.00, it is more likely than not that in January 2024 Plaintiff was aware that that there was an unpaid derogatory balance which was, or will be, turned over to collections and reported to the three credit bureaus.

---

[35] https://selling-guide.fanniemae.com/sel/b3-5.3-0/significant-derogatory-credit-events-waiting-periods-and-re-establishing-credit
[36] LK 380

Plaintiff obtained copies of all three credit reports just prior to applying for a mortgage on 01/08/2024.

- Plaintiff obtained Experian credit report dated January 01, 2024[37]

- Plaintiff obtained Equifax credit report dated January 01, 2024[38]

- Plaintiff obtained TransUnion credit report dated January 02, 2024[39]

On 01/08/2024, a mortgage company obtained a credit report through Factual Data, a company which typically provides mortgage lenders Residential Mortgage Credit Reports (RMCR).

| Company Information | Inquiry Type | Inquiry Date(s) |
|---|---|---|
| **FACTUAL DATA**<br>*875 GREENTREE RD PITTSBURGH PA 15220* | **Hard** | 01/08/2024 |

Although I have not been provided the mortgage credit report dated 01/08/2024, it is reasonably likely that the new $4,142.00 collection was not reporting to the credit bureaus at this time since it was not reporting on the three reports obtained by Plaintiff just seven (7) days earlier and the information on the Equifax report dated 09/20/2023 shows this collection was first reported on 03/04/2024.

But a collection that is not reported on any credit report does not mean that the collection does not exist and does not mean it will not be considered in the mortgage underwriting process.

When a borrower applies for a mortgage, an application is completed called a Uniform Residential Loan Application (URLA), formerly known as Fannie Mae Form 1003.

It is of paramount importance that a mortgage lender knows of all debts and liabilities owed by the applicant so the underwriter can properly assess the risk of the loan applicant.

The debts and liabilities owed by the borrower are not limited to those debts and liabilities only reported to the credit bureaus.

---

[37] LK 027
[38] LK 088
[39] LK 128

Since the debt owed to CTL Management was opened on 09/20/2023 prior to the time of the mortgage application in January 2024, it would have been required to be disclosed under section 2d. of the URLA that this debt was owed.



To ensure the accuracy of the information provided by the borrower on the loan application, the Acknowledgement and Agreements section of the URLA states:

**I agree to, acknowledge, and represent the following:**

**(1) The Complete Information for this Application**
• The information I have provided in this application is true, accurate, and complete as of the date I signed this application. [41]

• Any intentional or negligent misrepresentation of information may result in the imposition of:
    (a) civil liability on me, including monetary damages, if a person suffers any loss because the person relied on any misrepresentation that I have made on this application, and/or
    (b) criminal penalties on me including, but not limited to, fine or imprisonment or both under the provisions of Federal law (18 U.S.C. §§ 1001 *et seq.*). [42]

While I have not been provided the URLA for the Plaintiff's mortgage application in this case, there is a reasonable amount of certainty that Plaintiff was not "chilled" from applying for any extension of credit, including a mortgage loan, since she knew, or is likely to have known, that there was a $4,142.00 collection account against her at the time she applied for her mortgage.

---

[40] https://singlefamily.fanniemae.com/media/7896/display
[41] https://singlefamily.fanniemae.com/media/7896/display
[42] https://singlefamily.fanniemae.com/media/7896/display

### D. In His Expert Report, Thomas Tarter, Misleads the Trier of Fact on Multiple Points

For the benefit of the trier of fact, it is important that an expert report provide the most factually accurate information possible and provide expert opinions significant to the facts of the case.

There are multiple instances in which Mr. Tarter provides either contradictory or misleading information in his report and for the benefit of the trier of fact in this case, the following information is intended to explain and clarify these instances.

### 1. Plaintiff Was Not "Chilled" From Applying for Credit

While Mr. Tarter opines in his expert report that Plaintiff was "chilled" from applying for credit for approximately two years, evidence in this case shows that it is more likely than not that Plaintiff was not even aware that the NCS account appeared on her credit report at any time during the two years prior to May 2023.

If the Plaintiff was not aware the NCS collection was reporting on her credit reports, which evidence shows to be true in this case, it is not possible for Plaintiff to be chilled from applying for credit because of the NCS account.

Mr. Tarter provides to the trier of fact the opinion that Plaintiff did not apply for credit because she was afraid of applying credit for fear of being turned down due to the NCS reporting.

Plaintiff applied for a mortgage loan on 01/08/2024 when it is more likely than not that she knew there was a recent collection against her for $4,142.00.

I disagree with Mr. Tarter and it is my opinion that Plaintiff was not chilled from applying for credit due to the $138.00 NCS account being furnished to the CRAs.

### 2. Plaintiff's Use of Credit Over the Years

Ms. Krejci has displayed a very limited use of credit including only having one (1) open credit card account with Bank of America over the last nearly 20 years.

There is no evidence to show that Ms. Krejci has borrowed money for a mortgage, or an auto loan, or even another credit card other than the one Bank of America card.

There is no evidence that Ms. Krejci ever applied for any extension of credit other than a Bank of America credit card and a mortgage…both of which were approved.

In most lending environments, the presence of only one credit card account on a borrower's credit report would indicate a "thin" credit profile and may not meet minimum credit requirements for many types of extensions of credit.

For example, some auto loan approvals may require previous auto loan history on the credit report.

For many mortgage loan programs, there is a minimum number of trade lines required on a credit report.

Furthermore, Plaintiff did not experience a reduction in her credit limit or any other adverse impact for her Bank of America credit card at any time while the NCS account was reported to the CRAs.

**BANK OF AMERICA** #440066902169**** ( 201 N TRYON STREET, NC1-022-08-15, CHARLOTTE, NC
Date Opened:    05/19/2005                          Date Updated:        12/28/2023
Responsibility: Individual Account               Last Payment Made: 12/01/2023
Account Type:   Revolving Account
Loan Type:      CREDIT CARD
High Balance: High balance of $6,550 from 07/2021 to 01/2022; $6,550 from 03/2022 to 12/2023
Credit Limit: Credit limit of $7,500 from 07/2021 to 01/2022; $7,500 from 03/2022 to 12/2023          [43]

(highlight added)

### 3. Opted Out of Promotional Inquiries

As previously mentioned, Plaintiff willfully "opted out" of received any promotional offers of credit and any opinion Mr. Tarter alleges that the NCS account caused damages of credit availability and promotional offers is misleading to the trier of fact.

## 5. <u>SUMMARY OF OPINIONS</u>

In review and consideration of all documents I was provided in this case, NCS performed a reasonable and independent investigation of the accuracy of the information it received from PARC 410 before furnishing information to the CRAs.

---

[43] LK 130

During no time in which NCS furnished the account information to the CRAs, Plaintiff was never denied credit and did not receive any extension of credit with adverse terms.

In addition, it is more likely than not that Plaintiff was not aware of the NCS collection on her credit reports and therefore, did not suffer harm from being chilled from applying for credit or incur herculean efforts and massive frustrations from the dispute process.

In addition, Plaintiff's credit scores were, at all times, high enough to be approved for a mortgage, auto loan, or credit card.

The policies and procedures which NCS had in place during the time periods relevant to this case, and which were followed by NCS to verify the debt was accurate prior to furnishing the information to the CRAs, were reasonable.

Furthermore, Plaintiff did not suffer from any credit related damages but for the furnishing of account information by NCS.

This expert report is based on my 34 years of experience and knowledge working in consumer credit related industries including credit restoration, mortgage loan origination, and automobile sales/lending. All my comments and opinions are accurate to the best of my knowledge at the time I wrote this report. I reserve the right to amend or supplement my opinions. I declare the information contained in this report is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

Executed this 22[th] day of April, 2025

In Willowbrook, Illinois

James Droske

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my ability.

Executed this 5th day of June, 2025

James Droske

# James Droske Curriculum Vitae

jim@creditexpertconsulting.com

630-476-0489

Since 1990, James Droske has experience in various credit related industries including credit repair/restoration, mortgage loan origination, and automotive sales and financing. His expertise and specialized knowledge include **credit reporting, credit scoring, credit dispute processes, credit damages, and the use of credit reports and credit scores for mortgage and automobile lending**.  In addition, his expertise includes knowledge and practical application of the **FCRA, CROA, and FDCPA**.

- 34+ years in credit related industries
- reviewed tens of thousands of credit reports

He has been the **guest speaker** at dozens of events for consumers and real estate industry professionals regarding credit and scoring including the Mainstreet Organization of Realtors, and Greater O'Hara Association. He has also been quoted in multiple publications including **CNBC, BuzzFeed, Columbia College, Lending Tree, BadCredit.org, NerdWallet, and Moneywise**.

## Relevant Experience - Credit Restoration (15+ Years from 2010-Present)

- Reviewed thousands of tri-bureau credit reports (to date)
- Owner and President / Illinois Credit Services (Plainfield, IL) 2010- Present
  - Owner Credit Expert Consulting, LLC since 2019

## Relevant Experience - Mortgage Origination (12+ Years from 2002-2010, currently active NMLS ID # 1965769 since 07/2020)

- Reviewed thousands of Residential Mortgage Credit Reports (RMCRs)
- **Active NMLS ID # 1965769** – employed at Cross Country Mortgage
- Mortgage Originator / Enterprise Mortgage (Oak Brook, IL) 2002-2006
- **Branch Manager** (Naperville, IL location) 2003-2006
  - Specialized knowledge includes FHA, Conventional, Jumbo, Subprime, and Second Mortgages, Automated Underwriting Systems (AUS) for Fannie Mae (DU)
  - Experienced with "What if" and "Rapid Rescoring" credit score simulation processes

- **Vice President and Co-Owner** / Impact Home Mortgage (Downers Grove, IL) 2006-2010
  - Managed the day-to-day activities of the mortgage company including managing a staff of approximately 4-8 loan officers

**President and Co-Owner** / Lakeland Title Company (Lisle, IL) 2006-2010

## Relevant Experience - Automobile Industry (12 Years from 1990-2002)

- Reviewed tens of thousands of credit reports
- **Finance Director** / Jerry Gleason Chevrolet (Forest Park, IL) 1990-1995
  - Arranged delivery and financing of 250-350 vehicles per month including prime and subprime loans

- **Subprime Finance Director** / Jerry Gleason Chevrolet (Forest Park, IL) 1995-1996
  - Arranged auto loan financing for higher risk borrowers with lower credit scores

- **General Sales Manager** / Jerry Gleason Dodge (Forest Park, IL) 1996-1998

- **Sales Manager** / Joyce Ford (Chicago, IL) 1998-2000

- **Finance Manager** / Bill Jacobs Chevrolet (Joliet, IL) 2000-2002

## Certificates / Training / Instruction

- **Active NMLS ID # 1965769 (since 07/2020)**

- **American Bankers Association**

  - Fair Credit Reporting Act (FCRA) for Compliance Professionals – 2019. Perfect score on certification exam

- **Completed 76 hours Credit Expert Training**
  1. Credit Expert Summit (14 Hours) – completed February 2015
  2. Credit Expert Summit (14 Hours) – completed September 2015
  3. Credit Expert Summit (16 Hours) – completed August 2016
  4. Credit Expert Summit (18 Hours) – completed August 2017
  5. Credit Expert Summit (18 Hours) – completed August 2018

- **Completed 66 hours Expert Witness Training**
  1. SEAK – Expert Witness Training – May 2016 (14 Hours)
  2. NACVA Expert Witness Bootcamp – November 2018 (16 Hours)
  3. Credit Expert Witness and Mock Deposition Training – May 2019 (20 Hours)
  4. Credit Expert Witness Training – October 2024 (16 hours)

- **College of DuPage** (Glen Ellyn, Illinois) – Lifelong Learning Instructor since 2013 (quarterly non-credit hour class – as needed)

- **CCFL – Conference on Consumer Finance Law** (10 Hours) May 2019
- Approved Instructor – Falcon Innovations (a NMLS Continuing Education Provider for Mortgage Brokers) Created class on Credit and Credit Scoring for Mortgage Originators
- FICO Pro Certified – All Regs Academy - June 2012
- GMAC Finance & Insurance Training - Detroit, MI (5 days) 1990

## <u>Education</u>

- Graduate – University of Illinois at Chicago (Chicago) 1988
  - o Dual Major (Management and Marketing)

# "EXHIBIT B"

I have been quoted and contributed to the content of many articles including the following:

https://moneywise.com/managing-money/debt/cost-of-credit-is-up-heres-what-that-means-for-you

https://www.nerdwallet.com/article/finance/credit-tradelines

https://www.gobankingrates.com/credit/credit-monitoring/credit-freeze/

https://www.cnbc.com/select/does-divorce-affect-credit-score/

https://www.cnbc.com/select/what-credit-score-is-needed-for-personal-loan/

https://www.cnbc.com/select/how-to-get-a-760-credit-score/

https://www.google.com/amp/s/www.buzzfeed.com/amphtml/jasminsuknanan/credit-score-facts-myths-debunked

https://www.cnbc.com/select/what-to-do-with-no-money-and-bad-credit

https://www.cnbc.com/select/credit-advice-from-experts

https://www.cnbc.com/select/perfect-credit-score

https://www.cnbc.com/select/when-to-freeze-your-credit

https://www.cnbc.com/select/which-should-you-have-revolving-credit-or-installment-credit

https://www.cnbc.com/select/what-credit-score-should-you-have/

https://www.cnbc.com/select/tips-to-improve-credit-score

https://www.cnbc.com/select/what-is-credit-mix

https://www.cnbc.com/select/what-is-a-good-credit-utilization-ratio

https://www.cnbc.com/select/how-to-keep-credit-utilization-low

https://www.cnbc.com/select/how-to-get-the-best-credit-score

https://www.cnbc.com/select/revolving-credit-vs-installment-credit

https://www.cnbc.com/select/whats-the-best-age-for-first-credit-card

https://www.columbiachronicle.com/college-should-have-shared-data-breach-information-sooner-experts-say

https://www.badcredit.org/news/illinois-credit-services-educates-consumers-on-credit-repair/

https://www.cod.edu/academics/continuing_education/adult/articles.aspx

I have also written various blog posts which can be found at the website:

https://www.illinoiscreditservices.com/blog

In 2016, I wrote a manual for mortgage brokers continuing education for Falcon Innovations (An NMLS Continuing Education Provider) titled: Understanding Credit and Credit Scoring

# "EXHIBIT C"

## Documents Reviewed

I performed a general overview of all the documents I was provided with related to this case.

My primary focus was on reviewing the documents relevant to this case in order to provide my opinions pertaining to my Scope of Work as explained on Page 8 of this report.

List of Documents:

- First Amended Complaint
- Plaintiff's document production
- Expert Report of Thomas Tarter
- Plaintiff's multiple credit reports
- NCS' document production
- Plaintiff's and Defendant's Interrogatories
- Plaintiff's and Defendant's Request for Production
- REEP document production
- Plaintiff's and Defendant's Responses
- Deposition of Kristin Muse
- Deposition of Miguel Alvarado
- Protective Order


If there are other related documents which I was provided and reviewed but are not listed above, I reserve the right to amend this list.

I have also reviewed and considered the following:

- Selling Guide: Fannie Mae Single Family
  https://singlefamily.fanniemae.com/media/25726/display
- The Equal Credit Opportunity Act (ECOA)
- The Fair Credit Reporting Act (FCRA)
- hud.gov website
- The CFPB website
- All websites and references footnoted in my report