ALEXANDER B. TRUEBLOOD (Cal. Bar No. 150897)
TRUEBLOOD LAW FIRM
10940 Wilshire Boulevard, Suite 1600
Los Angeles, California 90024
Telephone: (800) 616-9325
Facsimile: (800) 616-9325
Email: alec@hush.com

Attorneys for Plaintiff
LISA KREJCI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KREJCI,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>NATIONAL CREDIT SYSTEMS, INC., and TRANS UNION LLC,<br><br>　　　　Defendants. | Case No: 2:23-cv-6709-MEMF(RAOx)<br><br>**DECLARATION OF LISA KREJCI IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: July 17, 2025<br>Time: 1:30 p.m.<br>Courtroom: 8B<br><br>Pretrial Conference: October 1, 2025<br>Trial date: October 20, 2025 |

I, Lisa Krejci, declare as follows:

1. I am over the age of 18 years and have personal knowledge of the facts stated in this declaration. I would competently testify thereto if called as a witness. I am the plaintiff in this action.

2. I am currently a budget analyst for the Department of Veteran's Affairs. I served in the United States Air Force for twenty years, including as a medical officer and Flight Chief, and was honorably discharged.

3. On April 8, 2020, my husband Jason Collins and I entered into a residential lease for an apartment at 5827 N.W. Loop 410, Apt. 1410, in San Antonio, Texas. The lessor was 5827 Loop 410, LLC, which I knew as Parc 410 or Parc Four Ten apartments, and the apartment complex was managed by Reep Management, LLC.

4. I intended to and did use apartment 1410 at 5827 N.W. Loop 410 in San Antonio, Texas, exclusively for my personal and family use. At no time did either I or my husband ever operate any business from the apartment, nor did we ever rent out the apartment to anyone else. We intended to and did use the apartment strictly as our family living space.

5. In late 2020, I accepted a job offer in California, and gave notice to Parc 410 that we would be moving out of the apartment. On January 1, 2021, we moved out and went to California. Our rent was paid in full.

6. On January 11, 2021, I received notice from Parc 410 that I owed a balance of $138.07 for water and sewer charges that had not been previously billed. On January 20, 2021, I mailed a cashiers check to Parc 410 in San Antonio, Texas, in the amount of the outstanding bill, $138.07. Parc 410 received the check on January 22, 2021, according to the mail tracking. Attached to the Index of Evidence at Exhibit 5-1, is a true and

1  correct copy of the mail tracking for the letter containing the check.
2  Attached to the Index of Evidence at Exhibit 5-2, is my bank statement
3  showing that Parc 410 cashed the cashiers check.
4     7.   In mid-May, 2021, my sister notified me that she had received
5  a letter dated May 7, 2021 from National Credit Systems, Inc., at her
6  address at 451 3rd Avenue, St. Libory, Nebraska. She sent me an image of
7  the letter, which stated that I owed $138.07 to Parc 410 apartments, and
8  that NCS would furnish information to the credit reporting agencies in 30
9  days about the debt. Other than this letter, I have never received any
10 communication, written or oral, from NCS, including any phone calls or
11 phone messages.
12    8.   In response to the May 7, 2021 debt collection letter from
13 NCS, my husband and I decided to get into contact with Parc 410 and
14 advise them that we had already paid the $138.07, have them withdraw the
15 account from NCS, and have them make sure no credit reporting occurred.
16 My husband contacted Parc 410 to accomplish this, and on May 18, 2021,
17 at about 7:49 a.m. Pacific time, I received an email from the assistant
18 manager of Parc 410 apartments, Miguel Alvarado, stating that he had just
19 emailed collections at NCS advising it to stop collections and credit
20 reporting, because my Parc 410 account was paid and because we were
21 purchasing a home.  The email to me also attached a copy of Parc 410's
22 "final account statement" showing the account paid, as posted on February
23 15, 2021. A true and correct copy of the May 18, 2021 email I received
24 from Miguel Alvarado is attached to the Index of Evidence as Exhibit 5-3.
25    9.   At this time in mid-May, 2021, and thereafter during 2021,
26 my husband and I were looking to purchase an older home, using
27 financing.  Later, in 2022, we narrowed our choice to buying a new-build
28 home which we also wanted to finance. Our interest in a new-build home

1  continued through 2023.  I was concerned that NCS might make
2  inaccurate credit reporting on my paid Parc 410 account, and that this
3  would hurt my credit score and prevent us from taking out a mortgage.
4  But after I received the May 18, 2021 email from Miguel Alvarado
5  confirming he had notified NCS that the account was paid and had
6  instructed NCS not to credit report, I thought the matter was taken care of.

7       10.    In August, 2021, I viewed my Trans Union credit report via a
8  cell phone application provided by my credit union, Navy Federal Credit
9  Union. I noticed that NCS was reporting an unpaid collection account for
10 $138.07 in connection with my apartment at Parc 410 in San Antonio. I
11 believed I had exhausted my options for removing the NCS credit
12 reporting. I had already contacted Parc 410, NCS' own client, and they had
13 instructed NCS not to make any credit reporting, yet NCS ignored that
14 instruction.  I believed that if NCS' own client couldn't stop it from credit
15 reporting, my contacting NCS and asking the same, would be futile.  I did
16 not know about my right to make an indirect dispute to the credit reporting
17 agencies themselves, under the Fair Credit Reporting Act, until after I
18 found counsel in May, 2023.

19      11.    I continued checking my Trans Union credit report via the
20 Navy Federal Credit Union cell phone application from August, 2021
21 through May, 2023.  I viewed my Trans Union credit report by this method
22 on September 7, 2021, January 6, 2022, June 26, 2022, February 7, 2023,
23 March 23, 2023, and May 5, 2023.  These pulls of my Trans Union credit
24 report are reflected on my May 12, 2023 Trans Union credit report which I
25 requested and obtained on that date, a true and correct copy of which is
26 attached to the Index of Evidence as Exhibit 5-4.  The pulls are recorded
27 on page LK 114, in the Account Inquiries section, under "Lisa Krejci via
28 Trans Union Interactive."

3

12. From August, 2021 through the end of May, 2023, I refrained from seeking any new credit, including the mortgage I wanted, because I knew that NCS' derogatory credit reporting was still on my credit reports. As Miguel Alvarado had correctly stated in his May 18, 2021 email, my husband and I were looking for a home to buy in 2021, and then also in 2022-2023. But I felt I could not successfully make any credit application, for a home or otherwise, with the NCS derogatory on my credit reports. I understood I would have been denied or would have received unfavorable higher-cost financing because of NCS' credit reporting. Thus, I had no choice but to refrain from seeking any new credit until I could get NCS off my credit reports.

13. From August, 2021 through the end of May, 2023, I experienced emotional distress and physical symptoms because of NCS' derogatory credit reporting, including the feeling of being trapped, anger, frustration, helplessness, stress, sleeplessness, worry, and increased migraine headaches. I had multiple arguments with my husband over NCS' derogatory credit reporting, because I blamed him for not being able to do anything about it. I was constantly asking him to fix the situation, which led to unwanted conflict between us. The additional migraines, and the sleeplessness, made it difficult to focus on my job. My mother died during this period, and I had the responsibility of administering her estate, which was hard to concentrate on effectively because of the stress, worry, and migraines.

14. My migraine headaches increased because of the NCS credit reporting. On May 4, 2022, I visited a neurologist, Dr. Kandarweep Grewal at Sutter Health in Roseville, California, for migraine treatment. He prescribed a new and stronger medication, Nurtec, than the one I had been taking, to alleviate my migraines. I incurred prescription costs for

the Nurtec in the approximate amount of $114 between May 4, 2022 and May, 2023, and during this period, incurred $22 in insurance co-pay costs for my visits to Dr. Grewal.

15. In May, 2023, I hired my counsel Alexander Trueblood of the Trueblood Law Firm, to help me get the NCS derogatory credit reporting off of my credit reports. On May 12, 2023, I pulled my credit reports directly from Trans Union, Experian, and Equifax. A true and correct copy of the Trans Union credit report I pulled that day is attached to the Index of Evidence as Exhibit 5-4. A true and correct copy of the Experian credit report I pulled that day is is attached to the Index of Evidence as Exhibit 5-5.

16. After pulling my May 12, 2023 credit reports, I saw that NCS' derogatory credit reporting was still on all three credit reports, reflecting an unpaid NCS collection account in the amount of $138.07. My counsel Mr. Trueblood prepared three letters for me to sign and send to the credit reporting agencies. True and correct copies of my signed credit reporting dispute letters, without exhibits, are attached to the Index of Evidence as Exhibit 5-6. On May 22, 2023, I paid $28.95 to mail the three dispute letters by certified mail to the credit reporting agencies. A true and correct copy of the payment receipt for these letters is attached to the Index of Evidence as Exhibit 5-7.

17. By June 16, 2023, Experian and Equifax had notified me that the result of my disputes was that the NCS credit reporting derogatory was being deleted. However, Trans Union notified me in a May 26, 2023 letter that the NCS account would remain on my Trans Union credit report, but now would show as a paid collection. This was still a derogatory mark on my credit report, and inaccurate because the account should never have

been in collections. A true and correct copy of Trans Union's May 26, 2023 letter to me is attached to the Index of Evidence as Exhibit 5-8.

18. NCS was silent in response to my disputes of May 22, 2023. It never notified me that it had taken any action on the disputes. As far as I knew, the NCS account was still on my Trans Union credit report as a paid collection and affecting my credit negatively. One goal I had in filing this lawsuit was to try to force NCS to finally remove its credit reporting from my Trans Union report completely. My attorney filed this lawsuit on August 16, 2023 and incurred a filing fee of $402, which he advanced on my behalf.

19. When NCS' credit reporting was finally off my credit reports, my credit score jumped up significantly, and I was able to seek credit. While NCS' derogatory was on my credit reports, my Experian credit score on May 12, 2023 was 663, as shown by Index of Evidence, Exhibit 5-5, at LK 015. After NCS came off my credit reports, my Experian credit score on December 18, 2023 was 826, as shown Index of Evidence Exhibit 5-9, at LK 018.

20. Attached to the Index of Evidence as Exhibit 5-10 is a true and correct copy of my January 1, 2024 Experian credit report, which I requested and obtained from Experian, showing a credit score of 801.

21. With my credit restored, my husband and I decided to buy a larger and more modern new-build home. We found the home we wanted in Roseville, California at the end of 2023, and I applied for a mortgage in

February, 2024.  My credit application was granted and the mortgage was issued in the amount of $457,990, at an interest rate of 4.99%.

      Executed this 29th day of May, 2025 in Roseville, California.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*Lisa Krejci*
_____
Lisa Krejci