1             **O**

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  Lisa Krejci,                           Case No.:  2:23-cv-06709-MEMF-RAO

12              Plaintiff(s),      **ORDER DENYING MOTION FOR**

13         v.              **SUMMARY JUDGMENT AND DENYING MOTION IN LIMINE [ECF NOS. 62, 65]**

14

15  National Credit Systems, Inc. et al,

16             Defendant(s).

17

18

19

20       Before the Court are a Motion for Summary Judgment (ECF No. 62) filed by Defendant

21  National Credit Systems, Inc. and a Motion *in limine* (ECF No. 65) filed by Plaintiff Lisa Krejci. For

22  the reasons stated herein, the Court DENIES the Motion for Summary Judgment and DENIES the

23  Motion *in limine*.

24

25

26

27  / / /

28  / / /

1    **I.    Factual Background**

2        Plaintiff Lisa Krejci ("Krejci") is a resident of California. From August 2020 to January

3    2021, Krejci and her husband leased an apartment at 5827 N.W. Loop 410 in San Antonio, Texas.

4    The apartment complex was previously managed by REEP Management, LLC ("REEP"). Defendant

5    National Credit Systems, Inc. ("NCS") is a debt collection agency that had a contractual relationship

6    to perform debt collection services for REEP.

7        This case concerns Krejci's allegations that NCS falsely reported to the three major credit

8    reporting agencies that she owed unpaid utility charges to her former landlord.

9    **II.    Procedural History**

10        On August 16, 2023, Krejci filed a complaint against NCS and TransUnion LLC. ECF No. 1

11    ("Complaint"). On April 15, 2024, Krejci filed a notice to dismiss TransUnion LLC as a party from

12    the proceedings, which the Court granted. ECF No. 27. On July 24, 2024, Krejci filed a First

13    Amended Complaint alleging two causes of action: (1) violation of the Fair Debt Collection

14    Practices Act, 15 U.S.C. § 1692 *et seq.* and (2) violation of the California Consumer Credit

15    Reporting Agencies Act, Cal. Civil Code § 1785.1 *et seq. See generally* ECF No. 33 ("First

16    Amended Complaint" or "FAC").

17        On August 7, 2024, NCS filed an answer and asserted twenty-three affirmative defenses,

18    including an affirmative defense based upon "the statute of limitations." ECF No. 39 ("Answer").

19    On June 6, 2025, NCS filed a Motion for Summary Judgment. ECF No. 62 ("MSJ" or "Motion").

20    The parties filed a Joint Memorandum of Points and Authorities, Joint Statement of Uncontroverted

21    Facts, and a Joint Appendix of Exhibits. *See* MSJ, ECF Nos. 62-1, 62-5.

22        On July 3, 2025, Krejci filed a Motion *in limine*. ECF No. 65 ("MIL"). NCS filed an

23    opposition, and Krejci filed a reply. ECF Nos. 73 ("MIL Opp'n"), 77 ("MIL Reply"). The Court held

24    oral argument on this matter on August 21, 2025.

25    **III.    Applicable Law**

26    **A.    Article III Standing**

27        Federal courts are "courts of limited jurisdiction" and "possess only that power authorized by

28    Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

1  "The Constitution limits Article III federal courts' jurisdiction to deciding 'cases' and

2  'controversies.'" *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835

3  (9th Cir. 2012) (quoting U.S. Const. art. III, § 2). "[T]o have Article III standing, a plaintiff must

4  adequately establish: (1) an injury in fact . . . (2) causation . . . and (3) redressability."

5  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008).

6      **B. Motion for Summary Judgment**

7      Summary judgment should be granted if "the movant shows that there is no genuine dispute

8  as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

9  56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

10  *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

11  477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

12  return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

13      A court must view the facts and draw inferences in the manner most favorable to the non-

14  moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil*

15  *Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of

16  persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

17  and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine*

18  *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the

19  moving party must either: (1) produce evidence negating an essential element of the nonmoving

20  party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving

21  party's case. *Id.*

22      Where a moving party fails to carry its initial burden of production, the nonmoving party has

23  no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

24  persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

25  summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its

26  burden of production, the burden shifts to the nonmoving party to produce evidence showing a

27  genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,

28  the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

1  depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

2  there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal

3  quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a

4  genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322.

5          A party cannot create a genuine issue of material fact simply by making assertions in its

6  legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

7  1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

8  the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

9  address another party's assertion of fact . . . the court may . . . consider the fact undisputed."

10 Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

11 required to consider evidence set forth in the moving and opposing papers and the portions of the

12 record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

13 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

14 insufficient; there must be evidence on which the jury could reasonably find for [the opposing

15 party]." *Anderson*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the

16 moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*,

17 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

18     **C.  Fair Debt Collection Practices Act**

19         The Fair Debt Collection Practices Act ("FDCPA") prohibits a debt collector from using

20 "any false, deceptive, or misleading representation or means in connection with the collection of any

21 debt." 15 U.S.C. § 1692e. Conduct that violates this section of the FDCPA includes:

22 "(8) Communicating or threatening to communicate to any person credit information which is

23 known or which should be known to be false, including the failure to communicate that a disputed

24 debt is disputed." *Id.* § 1692e(8).

25         The FDCPA also prohibits a debt collector from using "unfair or unconscionable means to

26 collect or attempt to collect any debt." *Id.* § 1692f. Conduct that violates this section of the FDCPA

27 includes: "(1) The collection of any amount (including any interest, fee, charge, or expense

28

1  incidental to the principal obligation) unless such amount is expressly authorized by the agreement

2  creating the debt or permitted by law." *Id.* § 1692f(1).

3       "[W]ithout the prior consent of the consumer given directly to the debt collector, . . . a debt

4  collector may not communicate, in connection with the collection of any debt, with any person *other*

5  *than* the consumer, his attorney, *a consumer reporting agency if otherwise permitted by law*, the

6  creditor, the attorney of the creditor, or the attorney of the debt collector." *Id.* § 1692c(b) (emphasis

7  added).

8       The FDCPA holds liable "any debt collector who fails to comply with any provision of this

9  subchapter with respect to any person . . . in an amount equal to the sum of" "any *actual damage*

10  sustained by such person as a result of such failure." *Id.* § 1692k(1) (emphasis added). However, "[a]

11  debt collector may not be held liable in any action brought under this subchapter if the debt collector

12  shows by a preponderance of evidence that the violation was not intentional and resulted from bona

13  fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error."

14  *Id.* § 1692k(c).

15       "An action to enforce any liability created by this subchapter may be brought in any

16  appropriate United States district court without regard to the amount in controversy, or in any other

17  court of competent jurisdiction, within *one year from the date on which the violation occurs*."

18  *Id.* § 1692k(d) (emphasis added).

19       **D. Consumer Credit Reporting Agencies Act**

20       The California Consumer Credit Reporting Agencies Act ("CCRAA") prohibits a person

21  from "furnish[ing] information on a specific transaction or experience to any consumer credit

22  reporting agency if the person knows or should know the information is incomplete or accurate."

23  Cal. Civ. Code § 1785.25(a).

24       "Any consumer who suffers damages as a result of a violation of this title by any person may

25  bring an action in a court of appropriate jurisdiction against that person to recover the following:

26       (1) In the case of a negligent violation, actual damages, including court costs, loss of
        wages, attorney's fees and, when applicable, pain and suffering.

27

28       (2) In the case of a willful violation:

5

1

(A) Actual damages as set forth in paragraph (1) above:

2

*Id.* § 1785.31(a)(1)–(2)(A).

3

"An action to enforce any liability created under this chapter may be brought in any

4

appropriate court of competent jurisdiction within two years from the date the plaintiff knew of, or

5

should have known of, the violation of this title, but not more than seven years from the earliest date

6

on which liability could have arisen, except that where a defendant has materially and willfully

7

misrepresented any information required under this chapter to be disclosed to a consumer and the

8

information so misrepresented is material to the establishment of the defendant's liability to the

9

consumer under this chapter, the action may be brought at any time within *two years after the*

10

*discovery by the consumer of the misrepresentation*." *Id.* § 1785.33 (emphasis added).

11

### IV.    Evidentiary Objections[1]

12

Both parties raise several evidentiary objections to the opposing parties' evidence. ECF Nos.

13

62-2, 62-3. Most of the objections are not convincing as they are boilerplate objections based on lack

14

of foundation, hearsay, and relevance that are duplicative of the summary judgment standard itself.

15

*See Sandoval v. County of San Diego*, 985, F.3d 657, 665 (9th Cir. 2021). Furthermore, the Ninth

16

Circuit has recognized that "a party does not necessarily have to produce evidence in a form that

17

would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil

18

Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) (quoting *Block v. City of*

19

*Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)). In other words, when evidence is not presented

20

in admissible form at summary judgment but could be later presented in an admissible form at trial, a

21

court may still consider the evidence for the purposes of summary judgment. *Id.* at 1037; *see Celotex*

22

*Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form

23

that would be admissible at trial in order to avoid summary judgment."). For these reasons, to the

24

extent the Court relies upon evidence to which the parties object, the objections are OVERRULED.

25

To the extent the Court does not, the objections are DENIED.

26

27

[1] The Court considered Krejci's Motion *in limine* and NCS's Opposition to the Motion *in limine* in making
this determination on the Motion for Summary Judgment. ECF Nos. 65, 73.

28

1    Krejci objects to NCS's reliance on the declaration of Jonathan Green ("Green") and the

2    exhibits thereto under Rule 37(c)(1). ECF No. 62-6 ("Green Decl."), Ex.1. In particular, Krejci

3    argues that NCS failed to properly disclose Green as a witness, and accordingly, his declaration and

4    exhibits must be excluded under that rule. NCS responds that it did identify Green and that any

5    failure to do so was substantially justified and harmless.

6    Under Rule 37(c)(1), "if a party fails to provide information or identify a witness as required

7    by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on

8    a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.

9    R. Civ. P. 37(c)(1). Rule 26(a)(1)(A)(i) requires parties to disclose "the name and, if known, the

10    address and telephone number of each individual likely to have discoverable information--along with

11    the subjects of that information--that the disclosing party may use to support its claims or defenses,

12    unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i); *see Benjamin v. B*

13    *& H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017) (affirming district court's striking of

14    declarations where plaintiff offered three declarations to support their motion for summary judgment

15    but failed to list witnesses pursuant to Rule 26 and only mentioned the witnesses' names in an

16    interrogatory response). The Ninth Circuit recognized that a party fails to show the non-disclosure

17    was substantially justified or harmless if they wait until the motion for summary judgment to

18    identify the likely witness. *Id.*

19    The Court finds that NCS's disclosures did not meet the requirement of the Rules. NCS

20    contends that it disclosed Green's identity in its Initial Disclosures by stating that its witnesses

21    included "Past and Present representatives, employees, agents, and the custodians of records." ECF

22    No. 62-2 at 3–4. NCS also states that Green signed two discovery verifications and a declaration that

23    were emailed to Krejci's counsel. *Id.*

24    In its opposition to Krejci's Motion *in limine*, NCS argues that its failure to disclose Green

25    was substantially justified because they revealed his name to Krejci in the documents produced in

26    discovery. MIL Opp'n at 7. NCS also argues that their witness Ron Sapp ("Sapp"), the Vice

27    President of Operations at NCS, disclosed Green's name during his deposition as the individual in

28    charge of compliance. *Id.* at 1. These arguments are unavailing, as NCS represented elsewhere in its

Motion for Summary Judgment that compliance oversight is led not only by Green, but also by Sapp and other dedicated staff. MSJ at 24, 66. By failing to identify Green as a witness, NCS conveyed to Krejci that, despite his presence in the documents, it intended to rely on Sapp for testimony regarding compliance and did not believe Green had discoverable information that Sapp could not otherwise provide.[2] Similarly, the Court does not find that the failure to disclose was harmless. For these reasons, the Court concludes that NCS's failure to disclose Green as a likely witness before it filed its Motion for Summary Judgment deprived Krejci of the opportunity to propound additional discovery specific to him.

Accordingly, Krejci's objection to Green's declaration is SUSTAINED. The Court will not consider Green's declaration, the exhibits attached thereto, or any of NCS's undisputed facts which rely solely on the declaration or exhibits. The Court also DENIES AS MOOT Krejci's Motion *in limine*. ECF No. 65.

---

[2] At the hearing, counsel for NCS explained to the Court that Sapp is extremely ill and that Green would serve as an alternate witness at trial. She also asserted that Krejci's counsel has long been aware of this and therefore its request to exclude Green's declaration is disingenuous. And in her declaration in support of NCS's opposition to Krejci's Motion *in limine* (*see* ECF No. 73-1 ("DeMarte Decl.") ¶ 6), she points to a prior declaration at ECF No. 54-2 (cited in error as "52-2") as evidence of Krejci's knowledge of Sapp's illness and unavailability. *See* ECF No. 54-2 ("DeMarte Aff. Decl.") ¶¶ 3–6.

But in that prior declaration, NCS expressly stated that "Sapp . . . is *the* person most knowledgeable on the topics in Plaintiff's Fed. R. Civ. Proc. 30(b)(6) topics, and NCS *cannot* prepare a suitable alternative unless or until he returns from medical leave." *Id.* ¶ 5 (emphasis added). NCS also sought an extension of time *specifically* "to accommodate the illness of its witness." *Id.* ¶ 6.

None of this would put Krejci on notice that in fact Green and Sapp are *equally* knowledgeable and that Green would be *substituted in* for Sapp. *See* MIL Opp'n at 9 (explaining that NCS was filing a declaration from Sapp that was "substantively identical" to the challenged declaration of Green). Nor does the email correspondence attached to the Opposition to Krejci's Motion *in limine* demonstrate that NCS advised Krejci that Green would be substituted in for Sapp (*see* ECF Nos. 73-2, Ex. A, 73-3, Ex. B, 73-5, Ex. D); if that had occurred, it would appear to the Court that NCS would have then made Green available for a deposition rather than seeking an extension due to Sapp's illness.

And although counsel implied at the hearing that Sapp is too ill to participate in this litigation at all—thereby making Krejci's request to exclude Green particularly inappropriate—Sapp's submission of a declaration in Opposition to Krejci's Motion *in limine* undercuts this implication. *See* ECF No. 73-6 ("Sapp. Decl.").

To be clear, the Court will not be considering the Sapp declaration either, given that it came long after briefing on the MSJ closed. As Krejci pointed out, failing to prepare or rely on the Sapp declaration during the MSJ briefing deprived Krejci of the opportunity to challenge it based upon his deposition testimony. MIL Reply at 1.

1    Krejci also objects to NCS's reliance on the deposition of Kristin Muse ("Muse") and the

2    exhibits attached thereto under Rule 37(c)(1). ECF No. 62-34 ("Muse Depo."), Ex. 6-4. Although

3    Krejci is correct that NCS did not identify Muse's name in its Initial Disclosures, the Court notes

4    that Krejci had the opportunity to depose Muse. *Id.* Thus, NCS's failure to disclose Muse as a likely

5    witness was harmless. Krejci's objection to Muse's deposition is OVERRULED.

6    **V.    Findings of Fact**[3]

7    The Court finds that the following material facts are established for trial under Federal Rules

8    of Civil Procedure 56(a) and 56(g).

9    On April 8, 2020, Krejci and her husband entered into a residential lease for an apartment at

10   5827 N.W. Loop 410 in San Antonio, Texas. PSAF ¶ 20. The lessor and former landlord was 5827

11   Loop 410, LLC ("Parc 410"), and the apartment complex was managed by REEP. *Id.* Krejci and her

12   husband used the apartment for personal and family use. PSAF ¶ 21. NCS had a contractual

13   relationship to perform debt collection services for REEP. PSAF ¶ 81. In late 2020, Krejci accepted

14   a job offer in California and gave notice to Parc 410 that she would be moving out of the apartment.

15   PSAF ¶ 22. On January 1, 2021, she moved out. *Id.*

16   On January 11, 2021, Krejci received notice from Parc 410 that she owed a balance of

17   $138.07 for water and sewer charges that had not been previously billed. PSAF ¶ 23. On January 20,

18   2021, Krejci mailed a cashier's check to Parc 410 in the amount of $138.07. *Id.* Parc 410 received

19   the check on January 22, 2021, and cashed it. *Id.*

20   On or about May 2021, Krejci received a debt collection letter from NCS, dated May 7,

21   2021, which had originally been sent to her sister in Nebraska. PSAF ¶ 24. Krejci asked her husband

22   to contact Parc 410 to advise that she had already paid the $138.07 balance and to request the

23   withdrawal of the account from collection. *Id.*

24

25   ─────────────────

26   [3] The facts set forth below are taken from the parties' respective Joint Statements of Uncontroverted Facts ("SUF"), Plaintiff's Statement of Additional Facts ("PSAF"), and the stipulated evidence. *See* ECF Nos. 62-1.

27   To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the

28   opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

From July 13, 2021, through May 28, 2023, NCS reported to Equifax, TransUnion, and Experian that Krejci owed a debt in the amount of $138.07. PSAF ¶ 32. During this period, three businesses—Bank of America, FiServe Checkfree Corp., and Western Dental Services—accessed Krejci's TransUnion credit reports, which listed the $138.07 debt in collections. PSAF ¶ 35. Krejci first discovered on August 7, 2021 that NCS was reporting a collection account on her TransUnion credit report. PSAF ¶ 36. Krejci did not contact an NCS representative from August 2021 through April 2023 because she believed she had exhausted her options for removing the collection account from her credit reports. PSAF ¶ 39. Krejci did not know about her right to file a dispute with the credit reporting agencies regarding the debt. *Id.*

On May 22, 2023, Krejci, with the assistance of counsel, mailed letters to the three major credit reporting agencies to dispute the debt. PSAF ¶ 47. TransUnion notified Krejci in a letter dated May 26, 2023, that the collection account would remain on her TransUnion credit report as a paid collection. PSAF ¶ 49. Krejci filed suit against TransUnion on August 16, 2023, in part, to remove the paid collection account from her TransUnion credit report. PSAF ¶ 50.

On May 30, 2023, NCS marked Krejci's account as disputed. PSAF ¶ 34.

**VI.    Discussion**

NCS seeks summary judgment on Krejci's claims under the FDCPA and CCRAA. Krejci has the ultimate burden of persuasion at trial on each of her claims. As a result, in the instant Motion, NCS has the initial burden of production and ultimate burden of persuasion. As a threshold matter, the Court will address whether Krejci has Article III standing to pursue her claims under the FDCPA and CCRRA.

**A.  Krejci Has Standing to Bring Claims Under the FDCPA and CCRAA.**

The parties dispute whether Krejci has alleged a concrete and particularized injury sufficient to confer standing under the FDCPA and CCRAA. To establish Article III standing, a plaintiff must allege an injury that is concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339 (citation omitted). "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Id.*

"A plaintiff must show that a concrete injury 'actually exist[s]'; in other words, it is 'real, and not abstract.'" *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018) (citing *Spokeo*, 578 U.S. at 340). "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (citing *Spokeo*, 578 U.S. at 340–41). Examples of intangible harms include "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. "[A] bare procedural violation, divorced from any concrete harm," cannot "satisfy the injury-in-fact requirement of Article III." *Id.*; *see Syed v. M-I*, 853 F.3d 492, 499 (9th Cir. 2017) (affirming *Spokeo* principle that bare technical violations of a statute does not result in a concrete injury).

"'The party invoking federal jurisdiction bears the burden of establishing' standing—and, at the summary judgment stage, such a party 'can no longer rest on . . . "mere allegations," but must "set forth" by affidavit or other evidence "specific facts."'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (citation omitted); *see Syed*, 853 F.3d at 499, n.4. "However, these specific facts 'for purposes of the summary judgment motion will be taken to be true.'" *Sierra Club v. Trump*, 963 F.3d 874, 884 (9th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), vacated and remanded *sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).

i.  <u>Krejci's Injury is Concrete and Particularized.</u>

The Court concludes that Krejci's injury is both concrete and particularized. To start, Krejci's injury is particularized because her credit information affects her in a personal and individual way. *See Spokeo*, 578 U.S. at 339.

Krejci's injury is also concrete. Krejci has provided a TransUnion credit report dated May 12, 2023 showing the $138.07 in collections and identifying three companies—Bank of America, Fiserv Checkfree Corp., and Western Dental Services, Inc.—that "obtained information from [Krejci's] credit file in connection with an account review or other business transaction." ECF No. 62-23, Ex. 5-4 at 7, 14. Krejci suggests that she was "actually harmed," in part, because these three

companies viewed her "inaccurate credit reports" containing NCS's "false and derogatory" information. MSJ at 19. The Court finds this basis sufficient to show that Krejci's injury was concrete. *See TransUnion*, 594 U.S. at 417 (concluding that class members whose misleading credit reports were disseminated to third-party businesses suffered a concrete injury because they "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation," but that class members whose misleading credit reports were not disseminated to third parties lacked standing).

Krejci has also submitted a declaration and deposition transcript in which she testified under oath that she "experienced emotional distress and physical symptoms because of NCS'[s] derogatory credit reporting, including the feeling of being trapped, anger, frustration, helplessness, stress, sleeplessness, worry, and increased migraine headaches." ECF No. 62-19 ("Krejci. Decl."), Ex. 5 ¶ 13; *see* ECF No. 62-31 ("Krejci Depo."), Ex. 6-1 at 97:22–98:14 (describing harm to credit reputation, medically-related harm, and emotional harm). Krejci testified that she "incurred $22 insurance co-pay costs" from visits to her neurologist and "incurred prescription costs for . . . Nurtec [medication] in the approximate amount of $114" to treat migraines that were exacerbated by the misleading credit reports. Krejci Decl. ¶ 14; MSJ at 19–20. Krejci also paid $28.95 in out-of-pocket expenses to mail dispute letters to the three major credit reporting agencies and has attached a copy of the receipt. Krejci Decl. ¶ 16; ECF No. 62-26, Ex. 5-7. These bases are also sufficient to show that Krejci suffered an actual injury. *See* Cal. Civ. Code § 1785.21(A)(1) (permitting recovery of "actual damages, including court costs, loss of wages, attorney's fees and, when applicable, pain and suffering"); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333, 1335–36 (9th Cir. 1995) (interpreting the term actual damages in the Federal Credit Reporting Act ("FCRA"), which the CCRAA mirrors, to include recovery for emotional distress and humiliation). Because the Court finds these bases sufficient to establish standing, it need not reach Krejci's other arguments. Accordingly, Krejci has met her initial burden of production.

NCS raises several arguments in turn, all of which lack merit. NCS contends Krejci's claims "do not rise to the level of an actionable controversy" because she "asserts nothing more than a bare statutory violation untethered from any concrete or particularized harm." MSJ at 16, 23. While NCS is correct that a bare procedural violation does not establish Article III standing, *see TransUnion*,

594 U.S. at 440, Krejci has suffered a concrete and particularized injury from the dissemination of her inaccurate credit reports to third-party businesses, *see id.* at 432. NCS's argument is therefore unpersuasive.

NCS next argues that Krejci "confirmed . . . she 'didn't intend to use credit' during the relevant period and had 'no plans' to do so." MSJ at 17 (citing Krejci Depo. at 94:1–8, 96:18–22). NCS also claims that Krejci "had not checked her credit report at any time prior to 2023," *id.* (citing Krejci Depo. at 95:11–18), and that she "declined promotional credit solicitations altogether," *id.* (citing Krejci Depo. at 94:5–6). As an initial matter, the Court notes that NCS fails to properly cite the relevant portions of Krejci's deposition in support of its arguments. Its remaining arguments likewise rely on inaccurate citations to the same transcript. ECF No. 17. As a result, the Court declines to address these arguments. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (Arguments "not supported by citations to the record or to case authority are generally deemed waived."); *Carmen*, 237 F.3d at 1029 (holding district courts are only required to consider evidence cited in the moving and opposing papers and need not "'comb the record'" looking for other evidence).

Accordingly, the Court concludes that Krejci has met her burden of establishing that she has standing to sue under the FDCPA and CCRAA.

**B.  NCS is Not Entitled to Summary Judgment on Krejci's FDCPA Claim.**

The FDCPA is a strict liability statute that "makes debt collectors liable for violations that are not knowing or intentional." *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010) (citing *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008)); *see Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1171 & n.11 (9th Cir. 2006). Sections 1692e and 1692f prohibit debt collectors from, respectively, making false or misleading representations and employing unfair practices.

Here, the parties dispute whether there is a genuine dispute that NCS violated section 1692e(8) by communicating to the three credit reporting agencies about Krejci's debt, which it knew or should have known to be false, and section 1629f(1) by attempting to collect from Krejci amounts that were not owed under contract or law. *See generally* MSJ. As a preliminary matter, the Court

1    considers NCS's contention that Krejci's FDCPA claim fails at the outset "because she has not

2    shown that NCS attempted to collect a 'debt' as defined by the FDCPA." MSJ at 23. NCS maintains

3    that the FDCPA "applies only to obligations 'primarily for personal, family, or household

4    purposes.'" *Id.* (citing 15 U.S.C. § 1692a(5)). NCS also disputes that Krejci's debt is "consumer in

5    nature." *Id.* (citing *Turner v. Cook*, 362 F.3d 1219, 1227 (9th Cir. 2004) and *Narog v. Certegy Check

6    Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011)).

7        The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to

8    pay any debt" and defines "debt" as "any obligation or alleged obligation of a consumer to pay

9    money arising out of a transaction in which the money, property, insurance, or services which are the

10   subject of the transaction are primarily for personal, family, or household purposes, whether or not

11   such obligation has been reduced to judgment." 15 U.S.C. § 1692a(3), (5); *see Bloom v. I.C. Sys.

12   Inc.*, 972 F.2d 1067, 1068–69 (9th Cir.1992) (explaining that the FDCPA applies to debts incurred

13   for personal rather than commercial reasons).

14       Although the Ninth Circuit has not directly addressed whether  water and sewer charges

15   qualify as a debt under the FDCPA, the Court has little difficulty concluding that it does. In *Turner*,

16   the Ninth Circuit considered "whether a tort judgment resulting from business-related conduct

17   qualifie[d] as a debt under the FDCPA." 362 F.3d at 1227. There, the court's holding turned on its

18   interpretation of the word, "transaction," which the FDCPA does not define. *Id.* The court found

19   persuasive the Seventh Circuit's interpretation of the word to mean "'those obligations to pay arising

20   from consensual transactions, where the parties negotiate or contract for consumer-related goods or

21   services.'" *Id.* (citation omitted). Nonetheless, the Ninth Circuit ultimately adopted the Eleventh

22   Circuit's interpretation, which defined "transaction" as involving "some kind of business dealing or

23   other consensual obligation" arising from a contractual arrangement. *Id.* at 1227–28 (citation

24   omitted).

25       Viewed through the lens of *Turner*, the Court finds that Krejci's utility charges constitute a

26   "debt" within the meaning of the FDCPA because it arises from a contractual obligation under a

27   residential lease between Krejci and Parc 410. In other words, the $138.07 debt is based on a

28   transaction involving property intended for "personal, family, or household purposes." 15 U.S.C. §

1    1692a(5). Krejci states that she and her husband used the apartment "as their family living space."

2    MSJ at 27; *see Bloom*, 972 F.2d at 1068–69 (FDCPA does not apply to debts incurred for

3    commercial reasons). Moreover, the statute's definition of "consumer" is broad enough to

4    encompass Krejci, as she is a "natural person obligated . . . to pay any debt." 15 U.S.C. § 1692a(3).

5    The closest analogues the Court has found are two California district court decisions holding that

6    rent constitutes a "debt" under the FDCPA. *See Dickman v. Kimball, Tirey & St. John, LLP*, 982 F.

7    Supp. 2d 1157, 1164 (S.D. Cal. 2013) (finding that back rent is a debt under the FDCPA); *Gonzalez

8    v. L. Off. of Allen Robert King*, 195 F. Supp. 3d 1118, 1126 (C.D. Cal. 2016) (affirming *Dickman*

9    and holding that an individual obligated to pay rent qualifies as a "consumer" under the FDCPA).

10   Like rent, utility charges also arise from a consumer's contractual obligation to pay for services

11   under a residential lease. Thus, the reasoning in *Dickman* and *Gonzalez* applies with equal force

12   here. NCS cites no binding authority supporting a conclusion different from the one the Court

13   reaches here.

14         In reply, NCS asserts that Krejci failed to distinguish *Narog*. The Court, however, finds

15   *Narog* inapposite. In that case, the district court agreed that plaintiff's FDCPA claims should be

16   dismissed "because all of plaintiff's claims related to defendant's action *after* defendant had already

17   acknowledged that plaintiff did not owe a debt." 759 F. Supp. 2d at 1193 (emphasis added). Here,

18   Krejci's FDCPA claim relates to NCS's actions *before* it allegedly became aware on May 30, 2023,

19   that Krejci had disputed the debt. Therefore, the Court rejects NCS's argument and concludes that

20   Krejci's water and sewer charges constitute a "debt" for purposes of the FDCPA.

             i.   <u>A genuine dispute of material fact remains as to whether NCS violated
                  15 U.S.C. sections 1692e(8) and 1692f(1).</u>

21
22         NCS contends Krejci's FDCPA claim fails because she has not shown that NCS knew the

23   $138.07 debt was false or disputed before it communicated the unpaid debt to credit reporting

24   agencies. MSJ at 23–24. NCS is wrong on the law. In *Clark*, the Ninth Circuit unequivocally

25   rejected the subjective standard NCS propounds and held that strict liability applies under the

26   FDCPA, such that proof of a defendant's mental state is not required. *Clark*, 460 F.3d at 1175–76.

27

28

NCS argues that there is no evidence that Alvarado sent the May 18, 2021 email to Muse informing her that the debt had been paid and to cease any collections and reporting. MSJ at 36; ECF No. 62-41, Ex. 7. NCS cites a response in Alvarado's deposition, in which he could not recall the exact date he sent the email, to argue that "no witness has authenticated" it and, therefore, it was never sent. ECF No. 62-32 ("Alvarado Depo."), Ex. 6-2 at 13:1–6. However, NCS overlooks the portion of the cited transcript where, later on the same page, Alvarado admitted to sending the email in question. *Id.* at 13:15–18 (Q: "Do you have any reason to believe that you did not send this email on May 18th, 2021, at 9:41 a.m.?" A: "No."); 39:8–18 (confirming the trustworthiness and authenticity of the May 18, 2021 email). NCS's argument is therefore unpersuasive. For similar reasons, the Court rejects NCS's analogous claim that Yvette Davis, the President of REEP, offered no testimony to authenticate the May 18, 2021 email. MSJ at 25; ECF No. 62-33 ("Davis Depo."), Ex. 6-3 at 23:25–24:6 (confirming the authenticity of the May 18, 2021 email).

NCS also cites excerpts of Muse's deposition where she testified that she "didn't receive an email" from Alvarado on May 18, 2021. Muse Depo. at 68:25–69:1. Muse stated that she conducted a search for Alvarado's name in her Outlook email account but could not locate the email in question. *Id.* at 30:15–21. NCS also cites the deposition of Sapp, who independently searched for the May 18, 2021 email in Muse's email account and found nothing. ECF No. 62-35 ("Sapp Depo."), Ex. 6-5 at 99:4–103:3. Muse confirmed that had she received such an email from Alvarado, she would have forwarded it to client services. Muse Depo. at 74:25–75:11. However, because Muse did not receive such email, NCS argues that it had "no duty to investigate or act" under the FDCPA. MSJ at 31. The Court finds that Muse's and Sapp's depositions negate an essential element required under subsection 1692e(8). They show that, because NCS never received the May 18, 2021 email, NCS did not communicate false credit information to credit reporting agencies. Accordingly, NCS has met its initial burden of production as to subsection 1692e(8).

As to subsection 1692f(1), NCS cites no cases to support its contention that reporting Krejci's unpaid debt to credit reporting agencies did not amount to a prohibitive collection effort under section 1692f. Moreover, NCS submits no evidence of the lease that lawfully created the debt or even directs the Court's attention to its Service Agreement with REEP authorizing it to collect any

outstanding debt on REEP's behalf. ECF No. 62-45, Ex. 11-I. As such, NCS has not met its initial burden of production with respect to subsection 1692f(1).

The Court finds—as Krejci contends—that Alvarado's and Davis's testimony, stating both that the May 18, 2021 email was sent and that it is authentic, creates a genuine dispute of fact as to whether the email was sent, thus precluding summary judgment as to subsection 1692e(8). The Court therefore denies NCS's Motion for Summary Judgment with respect to the FDCPA claim.

> ii.   NCS has not met its burden to prove it qualifies for the bona fide error defense under 15 U.S.C. section 1692k(c).

"Although the FDCPA is a strict liability statute, it excepts from liability those debt collectors who satisfy the 'narrow' bona fide error defense." *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948 (9th Cir. 2011) (quotation omitted) (citing *Reichert*, 531 F.3d at 1005). "The bona fide error defense is an affirmative defense, for which the debt collector has the burden of proof." *Reichert*, 531 F.3d at 1006 (citing *Fox*, 15 F.3d at 1514). "Thus, to qualify for the bona fide error defense, the defendant must prove that (1) it violated the FDCPA unintentionally; (2) the violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid the violation." *McCollough*, 637 F.3d at 948. "The defense requires the defendant to show that it maintains procedures to avoid errors." *Reichert*, 531 F.3d at 1006 (citing *Clark*, 460 F.3d at 1176–77). "[A] debt collector fail[s] to meet its burden under the defense when it [does] not produce evidence of 'reasonable preventive procedures' aimed at avoiding the errors." *Id.* (citing *Fox*, 15 F.3d at 1514).

Because the Court sustained Krejci's evidentiary objection to Green's declaration, *see supra* Section III, it must rely on the only other evidence NCS cites to prove it procedures are reasonable: the deposition of Sapp, the Vice President of Operations at NCS. NCS asserts that compliance oversight is led, in part, by Sapp, who testified about its intake policy and explained that acknowledgement emails are automatically sent to creditors like REEP within twenty-four hours of opening an account, requesting confirmation of the account's accuracy. Sapp Depo. at 38:20–39:18, 44:18–46:7. However, NCS does not cite to any relevant portions of the transcript, if they exist, where Sapp testifies about the reasonable policies and procedures NCS maintains to prevent the error

alleged by Krejci: namely, the May 18, 2021 email Alvarado sent to Muse that Muse, NCS, and Sapp claim was never sent. Without such evidence, NCS is not entitled to protection under the bona fide error defense.[4] *See Reichert*, 531 F.3d at 1006.

### iii.    Krejci's FDCPA claim is not time-barred under 15 U.S.C. section 1692k(d).[5]

"Under the FDCPA, consumers can bring private actions 'in any appropriate United States district court without regard to the amount in controversy . . . within one year from the date on which the violation occurs.'" *Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1040 (9th Cir. 2023) (quoting 15 U.S.C. § 1692k(d)). "[E]very alleged FDCPA violation triggers its own one-year statute of limitations." *Id.* "'[A]bsent the application of an equitable doctrine, the statute of limitations in [section] 1692k(d) begins to run on the date on which the alleged FDCPA violation occurs, not the date on which the violation is discovered.'" *Id.* at 1040–41 (citing *Rotkiske v. Klemm*, 589 U.S. 8, 10 (2019)). "Thus, to determine when the FDCPA's statute of limitations begins to run, the key question is what act constitutes the occurrence of an FDCPA violation." *Id.* at 1401. In *Brown*, the Ninth Circuit formulated a test to determine at which point an independent violation of the FDCPA triggers the statute of limitations: when the alleged FDCPA violation involves the filing of a debt collection lawsuit, courts "determine which actions constitute independent FDCPA violations by

---

[4] At the hearing, NCS argued that Muse testified to following certain reasonable procedures, such as reviewing the files she picked up from Alvarado to confirm there was an outstanding balance before sending them to the corporate office to open new accounts. *See* Muse Depo. at 32:20–35:15, 58:10–64:13. However, this testimony still does not address the error alleged by Krejci, and therefore a genuine dispute remains.

[5] Krejci contends NCS failed to adequately plead the statute of limitations as an affirmative defense and, as a result, suffered unfair prejudice because she had no fair notice of what arguments NCS "intended to present." MSJ at 55. A statute of limitations defense is an affirmative defense that the defendant should raise in the pleadings or else the defense is presumptively waived. See Fed. R. Civ. P. 8(c). "In the absence of a showing of prejudice, however, an affirmative defense may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993); *see Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010) ("[A]bsent prejudice to the plaintiff, the district court has discretion to allow a defendant to plead an affirmative defense in a subsequent motion."). Even accepting Krejci's argument that NCS inadequately pled its affirmative defense in its Answer but properly raised it for the first time on summary judgment, the Court concludes that Krejci has suffered no unfair prejudice. Krejci had notice that NCS intended to raise a statute of limitations defense. Throughout the discovery period, NCS made no attempt to hide that it wanted to determine whether Krejci's claims were barred. NCS asked questions in several depositions directly related to the precise date at which Krejci knew about the May 7, 2021 notice letter. Krejci now claims that she was unable to conduct fact discovery on that issue, but this claim is baseless. She was on notice of the statute of limitations defense since NCS filed its Answer and has been reminded during the discovery process. Krejci thus cannot show that any delay was unreasonable or prejudicial.

1  considering (1) the debt collector's last opportunity to comply with the statute and (2) whether the

2  date of the violation is easily ascertainable." *Id.* at 1042.

3      The Ninth Circuit has not applied the *Brown* test to determine if a debt collector's rereporting

4  of inaccurate accounts to credit reporting agencies constitutes independent violations of the FDCPA,

5  each of which would trigger its own one-year statute of limitations. The Ninth Circuit has confirmed

6  that "there is no 'continuing violation doctrine' in the FDCPA context, which would allow plaintiffs

7  to 'sweep in a series of component acts that comprise a claim, if one of those acts was within the

8  limitations period.'" *Brown*, 73 F.4th at 1044 (citation omitted). "Rather, 'the only kinds of claims a

9  plaintiff can bring are discrete violations of the FDCPA.'" *Id.* (citation omitted).

10     Krejci initiated this suit on August 16, 2023. *See* Complaint. Krejci admitted that she

11  received the May 7, 2021 letter from NCS through her sister, informing her that the amount to be

12  collected was $138.07 and that if the debt was not paid after the expiration of a 30-day period, NCS

13  "may furnish information concerning [her] account to consumer reporting agencies (credit bureaus)."

14  ECF No. 62-10, Ex. 1-D. Thus, the earliest violation forming the basis of Krejci's FDCPA claim was

15  the letter from NCS dated May 7, 2021. Because this alleged violation occurred more than one year

16  before the suit was filed, Krejci's FDCPA claim is time-barred—unless the Court determines that

17  NCS's rereporting of the inaccurate account to credit reporting agencies constitutes "discrete

18  violations of the FDCPA." *See Brown*, 73 F.4th at 1044. Since the Court must evaluate the debt

19  collector's conduct from the standpoint from the "least sophisticated debtor," *see Brown*, 73 F.4th at

20  1042, the Court concludes that each reporting was a discrete act that violated the FDCPA as a matter

21  of law. Therefore, any alleged wrongdoing that occurred prior to August 16, 2022, is time-barred

22  because it occurred more than one year before Krejci filed her initial Complaint. This includes the

23  May 7, 2021 letter. However, given that Krejci also rests her FDCPA claim on NCS's rereporting of

24  the disputed debt, these claims survive to the extent that any rereporting occurred on or after August

25  16, 2022.

26      **C.  NCS is Not Entitled to Summary Judgment on Krejci's CCRAA Claim.**

27     The CCRAA states, in relevant part, "that '[a] person shall not furnish information on a

28  specific transaction or experience to any consumer credit reporting agency if the person knows or

should know the information is incomplete or inaccurate.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010) (quoting Cal. Civ. Code § 1785.25(a)). The Ninth Circuit has interpreted the phrase "incomplete or inaccurate" to require furnishers of credit information to refrain from making any reports that are "'patently incorrect'" or "'misleading.'" *Carvalho*, 629 F.3d at 890 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)). In addition, the statutory term "'should have known' imparts a test of reasonableness." *Shultz v. Dep't of Army,* 886 F.2d 1157, 1160 (9th Cir. 1989; *see Rost v. United States*, 803 F.2d 448, 451 (9th Cir. 1986) (explaining that under California tort law, constructive knowledge is measured by what a "reasonable man under the same or similar circumstances" would have known). "'Summary judgment is generally an inappropriate way to decide questions of reasonableness.'" *Gorman*, 584 F.3d at 1157 (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir.1994)). "It is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'" *Id.* (quoting *Software Toolworks*, 50 F.3d at 621). Therefore, the key question under section 1785.25(a) is whether a reasonable debt collector in NCS's position would have known that Krejci's account was disputed.

             i.   <u>A genuine dispute of material fact remains as to whether NCS would have reasonably known that Krejci's account was disputed.</u>

NCS cites the same excerpts from Muse's and Sapp's depositions and employs the same arguments it made earlier regarding Krejci's FDCPA argument to assert that, because the depositions show the May 18, 2021 email was never sent, NCS had no way of knowing that there was an inaccuracy with respect to Krejci's debt. *See* MSJ at 24, 36; Section VI.B.i. The critical flaw in NCS's argument is that it relies heavily on Green's declaration to demonstrate that Muse and NCS followed reasonable protocols and procedures to prevent the type of errors alleged by Krejci. MSJ at 24–26. Nonetheless, because the Court sustained Krejci's evidentiary objection to Green's declaration, it cannot rely on it to determine the reasonableness of Muse's and NCS's conduct. NCS has not cited excerpts of Sapp's deposition where he testifies about the reasonable policies and procedures in place to prevent emails like the one Alvarado sent from ever reaching Muse. Absent evidence that Muse's actions were reasonable, the Court cannot conclude at this stage that the

evidence permits only one inference: that a reasonable debt collector in NCS's position would not have known that Krejci's account was disputed. Having failed to meet its initial burden of production, the Court denies NCS's Motion for Summary Judgment with respect to Krejci's CCRAA claim. As a result, the Court need not reach the parties' arguments as to whether Krejci has proven willfulness and actual damages under the CCRAA.[6]

      ii.  <u>NCS is not entitled to summary judgment on its bona fide error defense under California Civil Code section 1785.25(g).</u>

The CCCRAA provides an affirmative defense if "the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with [the CCCRAA], the furnisher maintained reasonable procedures to comply with those provisions." Cal. Civ. Code § 1785.25(g). Because the Court sustained Krejci's evidentiary objection to Green's declaration, *see supra* Section III, and found Sapp's deposition inadequate to show that NCS was entitled to the bona fide error defense under section 1692k(d), *see supra* Section VI.B.ii, NCS has offered no other evidence that it maintains reasonable policies and procedures to prevent violations like those alleged by Krejci. Accordingly, NCS is likewise not entitled to the bona fide error defense under the CCRAA.

      iii.  <u>Krejci's CCRAA claim is not time-barred under California Civil Code section 1785.33.</u>

Section 1785.33 provides, in part, that a claim brought under the CCRAA must be filed "within two years from the date the plaintiff knew of, or should have known of, the violation . . . but not more than seven years from the earliest" violation. Cal. Civ. Code § 1785.31. In addition, when "a defendant has materially and willfully misrepresented any information required under this chapter to be disclosed to a consumer, . . . the action may be brought at any time within two years after the discovery by the consumer of the misrepresentation." *Id.* "[T]he ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation . . . . [Defendant must] demonstrate how a reasonably diligent plaintiff . . . would have

---

[6] As discussed previously, the Court notes that it has already determined Krejci suffered actual damages under the CCRAA for purposes of establishing standing. *See supra* Section VI.A.i.

1  discovered the violations." *Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1110 (9th Cir. 2012)

2  (quoting *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012)).[7] Thus,

3  "[s]ummary judgment [must be denied] if [defendant] fails to meet this burden and material issues of

4  fact remain as to 'whether plaintiff[] knew or had reason to know of the specific' violation." *Id.*

5  (quoting *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1266 (9th Cir. 1998)).

6      It is undisputed that Krejci first became aware of the disputed debt on May 7, 2021, when she

7  received the letter from NCS through her sister, stating that the amount to be collected was $138.07

8  and that if Krejci did not pay the date after 30 days NCS would "furnish information" to the credit

9  reporting agencies. ECF No. 62-10, Ex. 1-D. NCS asserts that May 7, 2021 is when Krejci should

10  have become aware of the violation and when the statute of limitations began to run. MSJ at 54.

11  Therefore, NCS argues that her CCRAA claim is time-barred because her initial Complaint was filed

12  more than two years after she first became aware of the first violation. *Id.* NCS has thus met its

13  initial burden of production.

14      Krejci contends her CCRAA claim is not time-barred because NCS indisputably rereported

15  her debt to the three major credit reporting agencies on or after August 16, 2021, which is within two

16  years of the filing of her initial Complaint. MSJ at 56. Krejci seeks to recover for violations

17  occurring on or after that date under the continuing violations doctrine. *Id.* Although the Ninth

18  Circuit has not applied the continuing violations doctrine in the context of the CCRAA, the Court

19  notes that other California district courts have done so in similar circumstances. "Generally, the

20  continuing wrong—or continuing violation—doctrine applies to 'repeated instances or continuing

21  acts of the same nature.'" *Finley v. Dynamic Recovery Sols. LLC*, No. 14-CV-04028-TEH, 2015 WL

22  5728307, at *3 (N.D. Cal. Sept. 30, 2015) (quoting *Sisseton-Wahpeton Sioux Tribe v. U.S.*, 895 F.2d

23  588, 597 (9th Cir. 1990)). "As applied to debt collection claims, the continuing wrong doctrine

24  permits recovery for actions outside the limitations period if they are sufficiently linked to unlawful

25  _____

26  [7] The Court notes that while the Ninth Circuit in *Drew* was addressing the statute of limitations for the FCRA,
courts in California have treated the FCRA and CCRAA the same. *See Olson v. Six Rivers Nat'l Bank*, 111

27  Cal. App. 4th 1, 12 (2003) (holding that because the CCRAA "is substantially based on the Federal Fair
Credit Reporting Act, judicial interpretation of the federal provisions is persuasive authority and entitled to

28  substantial weight when interpreting the California provisions").

conduct within the limitations period." *Id.*; *see Rogers v. Equifax Info. Servs. LLC*, No. CV 14-1708-JFW AGRX, 2015 WL 467408, at *7 (C.D. Cal. Jan. 13, 2015). Applying the doctrine to the facts here, the Court concludes that NCS committed new CCRAA violations on or after August 16, 2021 by rereporting the inaccurate debt to the three major credit reporting agencies. Therefore, because Krejci filed her initial Complaint on August 16, 2023, the Court finds that only transmissions of information occurring before August 16, 2021, are time barred.

## CONCLUSION

For the reasons stated herein, the Court ORDERS as follows:

1. Summary Judgment is DENIED to NCS on Krejci's FDCPA claim. (Claim 1).

2. Summary Judgment is DENIED to NCS on Krejci's CCRAA claim. (Claim 2).

3. Krejci's Motion *in limine* (ECF No. 65) is DENIED.


IT IS SO ORDERED.


Dated: August 26, 2025                    _____

                                          MAAME EWUSI-MENSAH FRIMPONG

                                          United States District Judge